Carmen THOMPSON, et al., Plaintiffs

v.

UNITED STATES DEPT. OF HOUS-ING AND URBAN DEVELOP-MENT, et al., Defendants

No. CIV.A. MJG–95–309.

United States District Court, D. Maryland.

Jan. 6, 2005.

Andrew David Freeman, Brown, Goldstein and Levy LLP, Susan Goering, Barbara A. Samuels, Eleanor Montgomery, American Civil Liberties Union of Maryland, Malissa Ruffner, Law Office, Terry J. Harris, Law Offices of Terry J. Harris, Baltimore, MD, Susan R. Podolsky, Jenner and Block, Washington, DC, for Plaintiffs.

Alison N. Barkoff, US Department of Justice Civil Rights Division Disability Rights Section, John A. Drennan, Anne L. Weismann, Carol A. Evans, Diane Kelleher, Jessika A. Lenner, Peter J. Phipps, Judry Laeb Subar, US Department of Justice Civil Division Federal Programs Branch, Frank Hunger, Ronald James Wiltsie, II, U.S. Department of Justice G/A, Joseph V. Jest, US Securities and Exchange Commission, Lisa Walker Scott, Housing and Development Law Institute, Washington, DC, Allen F. Loucks, Jennifer Lilore Huesman, Office of the United States Attorney, Elva Elizabeth Tillman, Harry S. Johnson, Wilbur D. Preston, Jr., William F. Ryan, Jr., Dana Petersen Moore, Whiteford Taylor and Preston, Thomas Bevely Corey, Law Office, Neal M. Janey, Sr., The Janey Law Firm, Charles Ross Diffenderffer, Brown, Diffenderffer and Kearney LLP, Michael Evan Blumenfeld, Brown and Sheehan LLP, Baltimore, MD, Lynne A. Battaglia, Court of Appeals of Maryland, Annapolis, MD, Deborah Sweet Byrnes, Whiteford, Taylor and Preston LLP, Michael Dale Oliver, Bowie and Jensen LLC, Towson, MD, for Defendants.

Kathleen A. Ellis, DLA, Piper, Rudnick, Gray, Cary and US LLP, George A. Nilson, Paul D. Shelton, Piper Rudnick LLP, Baltimore, MD, for Movants.

Mark J. Adams, Baltimore, MD, pro se.

## MEMORANDUM OF DECISION

GARBIS, District Judge.

This case was tried before the Court without a jury. The Court has heard the evidence, reviewed the exhibits, considered the materials submitted by the parties and had the benefit of the arguments of counsel.

As discussed herein, the instant case was brought on behalf of a class consisting of African–American residents of public housing units in Baltimore City claiming discrimination based on their race. Plaintiffs asserted, against Defendants[1], a plethora of claims based upon a broad range of legal theories. Defendants, in response, presented just as wide a variety of procedural and substantive defenses.

At trial, the parties presented weeks of evidence pertaining to racial relations and public housing in Baltimore from the post-Civil War era through the beginning of the Twenty–First Century, with the principal focus upon events since the 1954 Supreme Court decision in *Brown v. Board of Ed. of*

---

1. Plaintiffs sued two sets of Defendants referred to as Local Defendants and Federal Defendants. Local Defendants are the current, and predecessors to, the Housing Authority of Baltimore City ("HABC"), the Executive Director of HABC, and the Mayor and City Council of the City of Baltimore. Federal Defendants are the current, and predecessors to, the United States Department of Housing and Urban Development ("HUD") and the Secretary of HUD (the "Secretary").

*Topeka, Shawnee County, Kan.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*"Brown I"*).

Accordingly, the instant decision must address a vast quantity of evidence spanning more than a half century of governmental action and/or inaction in light of a comprehensive set of claims and defenses presented by the respective parties.

The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I. *INTRODUCTION*

### A. *Background* [2]

As the largest municipality in Maryland, a former slave state with a post emancipation policy of racial discrimination, Baltimore City historically had *de jure* racial segregation and a tradition of voluntary ethnic segregation as well.[3] Certainly, other cities below the Mason–Dixon line, including Washington, D.C., practiced racial segregation and the racial discrimination in Maryland did not rise to the point that it did in certain states.[4] Nevertheless, in 1954 there was, to a large extent, a recognizable "ghetto" within which lived essentially no Whites and virtually all of the Black residents of Baltimore City. Moreover, to the limited extent that there were Black residents of the counties in the Baltimore Region, the racial segregation there was, if different at all, even more pronounced.

In Baltimore City, until 1954, there were two separate school systems and there were, for all practical purposes, two separate downtowns. Whites frequented the large department stores, shops, theaters and restaurants of White Downtown in the Howard Street area. Blacks, while not legally excluded from the Howard Street stores were typically made less than welcome[5] and were unable to utilize eating facilities or theaters. The result was that a separate Black Downtown developed in the Pennsylvania Avenue area.

In the private sector there was open racial discrimination. Barry Levinson's motion picture "Liberty Heights," set in 1950's Baltimore, shocked some modern Americans with its display of the sign that, for many years, was posted prominently outside a public swimming pool on Falls Road[6] stating: "NO JEWS, DOGS OR COLOREDS ALLOWED."

In 1954, the leaders of then *de jure* segregated Baltimore City—a municipali-

**2.** This is provided only as a "broad brush" introductory summary and is not intended to be comprehensive or precise. A more extensive rendition of the historical background is provided throughout the body of the decision and in supplemental findings in Section V thereof.

**3.** For example, by the 1950's there were concentrated communities of Italian–Americans in and around "Little Italy," Polish–Americans in the Patterson Park area, Greek–Americans in "Greektown" around the east side of Eastern Avenue, German–Americans in Northeast Baltimore, Jewish–Americans in Northwest Baltimore, Chinese–Americans in a small "Chinatown" etc.

**4.** For example, in some states public drinking fountains were labeled by race and streetcars and buses had White and "Colored" seating areas.

**5.** For example, Blacks were not given the privilege regularly afforded Whites to try on clothes in the store or return any that were bought.

**6.** A Baltimore street that, for many years, was the well recognized *de facto* border between the religiously (but not racially) integrated Mount Washington neighborhood and "restricted" Roland Park with its residential covenants barring residents of either the "Negro" or "Hebrew" races.

ty with a population (majority White) approaching one million—had to consider what to do in light of the 1954 Supreme Court *Brown I* decision holding the maintenance of racially segregated schools to violate the Constitution. As particularly pertinent to the instant case, the City officials responsible for public housing decisions had to choose a course of action. They could have (as did the leadership in other segregated cities) decided to delay desegregation of public housing until such time as the Courts made it pellucid, beyond debate, that the principle that "separate but equal" public facilities were unconstitutional extended beyond the classroom. However, to their credit, they took the opposite approach.

Within a few months of the *Brown I* decision, HABC (the Housing Authority of Baltimore City) decided to desegregate its low-income housing units and took prompt action to carry out its decision. The prompt desegrative action, although contemporaneously considered precipitous by some who would have preferred a leisurely pace of change in racial relations, was acclaimed by those who sought progress in the civil rights area. Indeed, HABC was chosen to receive the 1955 Sidney Hollander Foundation Award for "its success in bringing White and Colored families together in the same projects."

During the four decades following *Brown I,* major demographic changes affected the housing patterns in Baltimore City and the surrounding counties. The City lost many industrial jobs and experienced a major population decline as residents, primarily White and above average in affluence, moved to the counties while the City population diminished and became more than majority (and later about two-thirds) African–American.

Although historically segregated housing patterns continued to predominate in Bal-

timore, fair housing laws and court decisions, which made racially based residential covenants unenforceable, resulted in more racially diverse neighborhoods. By the 1990's there was essentially no area of Baltimore City effectively off limits to residents by virtue of their race or religion. Of course, the City did not become racially homogenized. Many of those whose economic condition permitted a choice of places to live, chose to live in areas in which their race or ethnic group was in the majority.

While many African–Americans who succeeded economically chose to live in majority Black neighborhoods, others, particularly those in public housing, did not have any realistic opportunity to live in a mixed race environment absent desgregative action by governmental entities. Baltimore City's well-intentioned efforts at slum clearance and urban renewal improved the physical environment of many communities and the living conditions of some public housing residents but did little to promote racial integration of City neighborhoods.

Over time, the public housing projects became virtually all-Black. Essentially no Whites moved into the formerly segregated all-Black projects while the formerly all-White projects, over time, became first predominantly, and later virtually entirely, African–American also. Moreover, because established neighborhoods tended to fight the development of additional family public housing in their communities, after the construction of Hollander Ridge in the 1970's little additional family public housing was added to the City's supply other than scattered site units.

By 1990, it was generally recognized that the high-rise family public housing projects were dangerous and inappropriate places for families. One of the beneficial results of the instant case was a Consent

Decree, whereby, pursuant to an agreed Court Order, the high-rise projects were demolished. Nevertheless, there have not been significant opportunities for African–American residents of Baltimore City public housing to reside in racially mixed, rather than predominantly African–American, areas.

In the instant case, Plaintiffs contend that since 1954 the leadership of Baltimore City, during the mayoral administrations of DeAlesandro, Jr. ("Old Tommy"), Grady, Goodman, McKeldin (second administration),[7] D'Alesandro, III ("Young Tommy"), Schaeffer, Burns and Schmoke, engaged in a pattern and practice of discrimination against Blacks in regard to public housing. Plaintiffs further claim that, during the Schmoke administration, Defendants intentionally engaged in racial discrimination in violation of the United States Constitution and failed to take required action to ameliorate the effects of past race based discrimination in regard to public housing.

### B. *Summary of Decision* [8]

Plaintiffs filed the instant case on January 31, 1995 asserting Constitutional and statutory claims. The case is, of course, governed by statutes of limitations that restrict the time period for which a claim may be asserted. The period for which claims may be asserted against Local Defendants is three years and against Federal Defendants is six years. This means that, as to Local Defendants, a claim is time barred unless it is based upon an actionable wrong committed during the three year period from January 31, 1992 to the date of filing. For Federal Defendants, a claim is time barred unless it is based upon an actionable wrong committed during the six year period from January 31, 1989 to the date of filing. For convenience the term "Open Period" is used to refer to the period for which limitations are open, recognizing that it is a three year period for Local Defendants and a six year period for Federal Defendants.

While the Open Period stretches back to no earlier than January 31, 1989, it is necessary to consider evidence relating to events of earlier years. This results because Plaintiffs have asserted two types of claims:

1. Claims for alleged "active" wrongs committed during the Open Period, and

2. Claims for failure, during the Open Period, to take required action to ameliorate the effects of past wrongful racial discrimination.

Accordingly, the substantive focus of the case is on alleged wrongdoing by virtue of (1) positive discriminatory actions during the Open Period and (2) pre-Open Period discrimination for which the effects continued into the Open Period and were not then adequately addressed.

The Mayor of Baltimore City during the entire Open Period was Kurt Schmoke. One set of Plaintiffs' claims is based upon the allegation that the Schmoke administration and Federal Defendants intentionally discriminated against Plaintiffs because of their race.

---

**7.** McKeldin served as mayor in 1943–47 and 1963–67.

**8.** This summary is no more, and no less, than an intentionally superficial overview of the decision rendered herein. It is not comprehensive and, by no means does it precisely set forth the bases for the conclusions reached. While included to provide the reader with a general idea of the contents prior to reading the entire several hundred page document, it is not a part of the decision itself. The decision is contained in Sections II, III, IV and V and, to the extent of evidentiary rulings, in Section I.C.

The other set of Plaintiffs' claims is that during past mayoral administrations Defendants had intentionally discriminated in housing based upon race, that during the Schmoke administration there remained vestiges of that prior discrimination, and that during the Schmoke administration Defendants did not take required affirmative action to ameliorate the effects of that past discrimination.

It is undisputed that prior to the 1954 *Brown I* decision Federal and City administrations had intentionally discriminated against African–American residents of public housing due to their race. Accordingly, it would be possible for Plaintiffs to establish a viable claim even if they could not prove deliberate racial discrimination during the Schmoke administration.

The Court finds that, with one possible exception, Plaintiffs have not proven intentional racial discrimination in public housing on the part of Local or Federal Defendants during the Schmoke administration. Moreover, subject to the same exception, Plaintiffs have not proven that Defendants, during the Schmoke administration, violated a duty to take affirmative action to ameliorate the effects of prior intentional race based discrimination.

The Court further finds that Plaintiffs have not prevailed on their statutory claims against Local Defendants. The Court finds, however, that Plaintiffs have proven a statutory claim, and possibly a Constitutional claim as well, against Federal Defendants. It is with respect to HUD, and its failure adequately to consider a regional approach to desgregation of public housing, that the Court finds liability.

Section 3608(e)(5) of the Fair Housing Act requires Federal Defendants to "administer [housing] programs . . . in a manner affirmatively to further the policies of [the Act]." These policies include the provision of housing free from discrimination.

Geographic considerations, economic limitations, population shifts, etc. have rendered it impossible to effect a meaningful degree of desegregation of public housing by redistributing the public housing population of Baltimore City within the City limits. Baltimore City should not be viewed as an island reservation for use as a container for all of the poor of a contiguous region including Anne Arundel, Baltimore, Carroll, Harford and Howard Counties. Baltimore City contains only approximately 30% of the Baltimore Region's households. In 1940, 19 percent of the population of Baltimore City was African–American. By 2000, the population of Baltimore City was 64 percent African–American, while the population of the rest of the Baltimore Region was 15 percent Black.

In light of HUD's statutory duties and the fact that its jurisdiction and ability to exert practical leverage extend throughout the Baltimore Region, it was, and continues to be unreasonable for the agency not to consider housing programs that include the placement of a more than insubstantial portion of the Plaintiff class in non-impacted areas outside the Baltimore City limits.

The Court finds an approach of regionalization to be integral to desegregation in the Baltimore Region and that regionalization was an important alternative course of action available to Federal Defendants. By the term "regionalization" the Court refers to policies whereby the effects of past segregation in Baltimore City public housing may be ameliorated by providing housing opportunities to the Plaintiff class beyond the boundaries of Baltimore City. It remains to be seen, in further proceedings, whether HUD's failure adequately to consider regionalization policies was motivated by an intent to discriminate based

upon race, a willingness to bow to political pressure, oversight, neglect and/or other causes.

In sum, the Court finds that HUD failed to consider regionally-oriented desegregation and integration policies, despite the fact that Baltimore City is contiguous to, and linked by public transportation and roads to, Baltimore and Anne Arundel Counties and in close proximity to the other counties in the Baltimore Region. In effectively wearing blinders that limited their vision beyond Baltimore City, Federal Defendants, at best, abused their discretion and failed to meet their obligations under the Fair Housing Act to promote fair housing affirmatively.

It is high time that HUD live up to its statutory mandate to consider the effect of its policies on the racial and socioeconomic composition of the surrounding area and thus consider regional approaches to promoting fair housing opportunities for African–American public housing residents in the Baltimore Region. This Court finds it no longer appropriate for HUD, as an institution with national jurisdiction, essentially to limit its consideration of desgregative programs for the Baltimore Region to methods of rearranging Baltimore's public housing residents within the Baltimore City limits.

The case shall proceed to the remedial phase. The Court shall hear evidence regarding the appropriate action to take to insure that HUD shall, in the future, adequately consider a regional approach to the desegregation of public housing in the Baltimore Region.

### C. *Evidentiary Principles*

In view of the nature of the case, the parties presented a variety of expert opinion witnesses whose testimony was the subject of objections from opposing counsel. In lieu of lengthy hearings—prior to or during trial—regarding the admissibility of expert witness evidence, the Court essentially permitted the parties to present all proffered expert witness testimony and provided guidelines regarding the manner in which such testimony would be considered.

Accordingly, the direct examination of each expert witness was presented in the form of a written report with an hour or so of direct testimony to summarize and highlight the report. There was, of course, full cross-examination permitted.

The Court has, in the decisional process, followed the guidelines stated prior to trial. Accordingly, in the evaluation of expert witness testimony, the Court has been guided by the following principles:

1. Statements of legal principles, concepts, statutory and precedent interpretations, *etc.* are considered to be expressions of the witness' premises on which any admissible opinions may be based.

2. Statements of "facts" by expert witnesses do not constitute evidence of the "facts" but, rather, are articulations of the bases for the expert's opinions under Rule 703 of the Federal Rules of Evidence.

 a. *E.g.,* Plaintiffs' witness stated, "After *Brown*, not a single family public housing project was sited in a white residential neighborhood." [Written Direct] Test. of john a. powell [*sic* ] ¶ 14. This is not evidence of the absence of such siting.

3. Statements purporting to summarize or characterize other witness' testimony do not constitute evidence of what was, in fact, stated by the other witnesses.

4. Opinions as to how the Court should rule on issues presented herein are

arguments that may, or may not, be persuasive, depending upon the underlying rationale but not by virtue of an expert witness' *ipse dixit*. *E.g.*:

 a. "This [1950] ordinance is a powerful vestige of the era of *de jure* segregation that continues to steer public housing to black 'slum areas' and away from white neighborhoods ..." *Id.* ¶ 112.

 b. "They [HUD and HABC] have not taken adequate steps to eliminate the ongoing segregative effects of their earlier policies in Baltimore and have developed additional racially segregated public housing." *Id.* ¶ 114.

5. An expert's opinion that certain "facts" tend to establish a particular proposition is not evidence of the proposition but, rather, constitutes argument that has been considered as such. *E.g.*:

 a. "Examples such as Hollander Ridge and School 47 demonstrate that HUD and HABC consistently 'caved in' to white political opposition to the siting ..." *Id.* ¶ 16.

 b. "Data on the siting of [certain Public Housing] ... shows continuing progress in providing opportunities for Public Housing residents to live outside areas of minority concentration." Written Direct Test. of William M. Rohe, at 23.

6. Opinions in the form of generalities, or regarding tangential matters, even if arguably pertinent, are of *de minimis* significance. *E.g.*:

 a. "Over time federal policies have come to recognize that integration is a critical element..." [Written Direct] Test. of john a. powell [*sic*] ¶ 1.

 b. "In Baltimore alone, 13,595 public housing units were developed after *Brown* ["fact"], a critical mass that would have changed the trajectory of metropolitan development [opinion]." *Id.* ¶ 52.

7. Pejorative expressions have been disregarded.

8. Opinions relating to the remedy phase shall be considered only to the extent, if any, pertinent to the instant liability phase.

9. Opinions that manifestly do not meet the admissibility standard of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny constitute argument.

 a. *E.g.*, "These siting decisions by HABC and HUD were intentional and willful as was the segregative result." [Written Direct] Test. of john a. powell [*sic*] ¶ 15.

10. Unless otherwise indicated, for purposes of clarity, citations to the written direct (*i.e.*, "canned direct") testimony of expert witnesses throughout this opinion reference the names of said submissions as they appear on the submissions themselves. Thus, the Court notes an expert's title ("Dr.", "Ph.D.", *etc.*) only if it is included in the submission's heading. The Court intends no disrespect by any omission of an expert witness' title.

## II. *THE LEGAL FRAMEWORK*

### A. *The Parties*

#### 1. *Plaintiffs*

The named Plaintiffs are representatives of a class consisting of:

[a]ll African–Americans who resided in Baltimore City family public housing units ... between January 31, 1995 and [June 25, 1996], who presently reside in Baltimore City family public housing units or who will in the future reside in Baltimore City family public housing units prior to [such time that certain of the Defendants' desegregation obligations are fulfilled or expire].

*See* Order of June 25, 1996 granting the Joint Mot. of the Parties to Certify Class [Paper 54].

### 2. *Defendants*

Plaintiffs have sued two sets of Defendants, those responsible for the pertinent actions of the City of Baltimore ("Local Defendants") and those responsible for the pertinent actions of the United States government ("Federal Defendants)"

Local Defendants are the Housing Authority of Baltimore City ("HABC"),[9] the Executive Director of HABC, and the Mayor and City Council of the City of Baltimore.

Federal Defendants are the United States Department of Housing and Urban Development ("HUD")[10] and the Secretary of HUD (the "Secretary").

### B. *Plaintiffs' Claims*

Plaintiffs assert claims against Local Defendants and Federal Defendants grounded upon:

9. Since the 1950s, the entity now identified as the Housing Authority of Baltimore City ("HABC") has had several different names. For simplicity, HABC and its predecessor housing authorities, are all referred to herein as "HABC."

10. HUD was established in 1965. For convenience's sake, hereinafter, "HUD" also refers to the current federal agency's administrative predecessors.

1. The United States Constitution— Equal Protection under the Fourteenth and Fifth Amendments.

2. Title VIII of the Civil Rights Act of 1968 ("Title VIII," the "Fair Housing Act" or "FHA").

3. Title VI of the Civil Rights Act of 1964 ("Title VI").

4. The United States Housing Act of 1937 ("USHA").

5. The Housing and Community Development Act of 1974 ("HCDA").

These asserted bases for the Plaintiffs' claims are discussed herein in turn.

### 1. *The Constitutional (Equal Protection) Claims*

Plaintiffs base their Constitutional claims on the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution (as applied to Maryland state actors) and the Equal Protection guarantee of the Fifth Amendment (binding the Federal government).[11]

Generally, an individual is denied Equal Protection of the laws when a government actor, to that individual's detriment, draws distinctions on the basis of race. *E.g., McLaughlin v. Fla.,* 379 U.S. 184, 192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (a reviewing court must apply "strict scrutiny" to racial classifications). As most pertinent to the instant case, individuals are denied Equal Protection when, by the operation of public policies and

11. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954), held the concept of Equal Protection to be a critical component of the Due Process provision of the Fifth Amendment and thereby "reverse-incorporated" the law of Equal Protection to apply to the federal government.

programs, they are segregated on the basis of race. *Brown I*, 347 U.S. at 493–95, 74 S.Ct. 686 (such separation in public schools is inherently unequal regardless of its purported "equality"); *Johnson v. Va.*, 373 U.S. 61, 62, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963) (applying *Brown I* more generally to public facilities).

■ Even where a law is neutral on its face, discriminatory or segregatory application and administration of that law may deny Equal Protection rights. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

### a. *Intentional Discriminatory Actions*

■ A state actor's conduct violates the Equal Protection Clause only insofar as it results from a discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (*"Arlington Heights I "*).

■ In the context of Equal Protection, the term " 'discriminatory purpose[ ]' . . . implies more than . . . awareness of [discriminatory] consequences." [12] *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). "Discriminatory purpose" implies that a policymaker "selected or reaffirmed a particular course of action *at least in part* 'because of[ ]' . . . its adverse effects on an identifiable group." [13] *Id.* (emphasis added). The Supreme Court has made it clear that a racially discriminatory motivation may render state action unconstitutional even if such action is supported by other, legitimate, motivations. [14]

While neither a disparate impact on members of a particular class nor the foreseeability of this impact to policymakers suffices to ground Constitutional liability, "actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). Sometimes a "clear pattern, unexplainable on grounds other than race emerges from the effect of the state action . . ." *Arlington Heights I*, 429 U.S. at 266, 97 S.Ct. 555. The Court must also consider other available evidence bearing on discriminatory intent, including the historical background and context of a government action or policy and the legislative and administrative records kept in conjunction with such conduct. *Id.*, at 267–68, 97 S.Ct. 555.

■ If a plaintiff presents proof that a government defendant's decision was motivated in part by a racially discriminatory purpose, the burden shifts to the defendant to establish, by a preponderance of the evidence, that the same decision would have resulted even had the impermissible purpose not been considered. If, and only

---

**12.** In other words, the law of Equal Protection eschews common law notions that an actor inherently intends the natural consequences of his actions.

**13.** The Supreme Court has specified that, in impermissibly acting "because of" race, state actors need not directly demonstrate racial animus or hatred. *E.g., Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (finding even "benign discrimination" may render Constitutional liability).

**14.** "[L]egislators and administrators are properly concerned with balancing numerous competing considerations . . . But racial discrimination is not just another competing consideration. When there is proof that a discriminatory purpose has been a motivating factor in the decision, [] judicial deference is no longer justified." *Arlington Heights I*, 429 U.S. at 265–66, 97 S.Ct. 555.

if, a defendant fails to meet this burden, a court may find liability. *Id.*, at 271 n. 21; 97 S.Ct. 555.

Accordingly, to establish Equal Protection liability, Plaintiffs may present proof that Defendants acted[15] in a way that served to isolate Plaintiffs on the basis of race, motivated at least in part by a purpose to affect this discriminatory and adverse consequence.[16] Unless Defendants show that their pertinent conduct would have been the same even in the absence of improper motivations, such proof can provide a basis for liability.

### 2. *Duties Related to Past Discrimination*

In the instant case, the Plaintiffs contend that the Defendants not only intentionally discriminated against them during the period for which limitations are open ("the Open Period")[17] but also failed to meet obligations that existed by virtue of past discrimination for which a direct cause of action would be time barred.

■ Purposeful discrimination of a pervasive and chronic nature may confer upon government actors an affirmative duty to remedy past wrongs. *See Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294, 299–300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("*Brown II*"). A failure by Defendants to fulfill these duties during the Open Period would provide a basis for Equal Protection liability.[18]

The Supreme Court decision in *Brown II* imposed the duty on local school boards to 'effectuate a transition to a racially non-discriminatory school system.' *Penick*, 443 U.S. at 458, 99 S.Ct. 2941, quoting *Brown II*, 349 U.S. at 301, 75 S.Ct. 753. In *Penick*, the Defendant was deemed to be "since the decision in [*Brown II*] [,] under a *continuous* Constitutional obligation to disestablish" its segregatory system. *Id.* (emphasis added). The Supreme Court has also held that "[p]art of the affirmative duty imposed by our cases... is the obligation not to take any action that would impede the process of disestablishing the dual system and its effects." *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979).

While an affirmative discriminatory act must be purposeful, there is no similar "intent" element concerning the abdication of duties stemming from past discriminatory acts. *Id.* ("the measure of the post-*Brown I* conduct of a school board under an unsatisfied duty ... is the effectiveness, not the purpose, of [its] actions").

As this Court has stated,[19] there appears to be no basis to limit the "disestablishment" and "non-obstruction" duties, articulated in *Penick* and *Brinkman*, to the context of public schools. Indeed, as is the case with public schools, the vestiges of public housing segregation can adversely impact numerous members of a disadvan-

---

15. Of course, subject to limitations issues, discussed below.

16. Plaintiffs must present proof of discriminatory effect as well as discriminatory intent; nefarious intent alone cannot render Defendants liable. *See Palmer v. Thompson,* 403 U.S. 217, 224, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) (hereinafter, "*Palmer* ").

17. As discussed below, the Open Period encompasses January 31, 1989 to January 31,

1995 during the administration of Mayor Kurt Schmoke.

18. Of course, such duties cannot arise in the absence of some proven, affirmative discriminatory state action in the past. *Milliken v. Bradley*, 418 U.S. 717, 757, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

19. *See e.g.,* the Court's Mem. & Order of November 26, 2003 [Paper 576] (denying in part Local Defendants summary judgement).

taged class for prolonged periods of time, thus warranting the imposition on offending state actors of obligations to alleviate such burdens. On this question, the Court finds convincing the rationale expressed in *United States v. Yonkers Board of Education,* 624 F.Supp. 1276 (S.D.N.Y.):

> It is indisputable that a hypothetical single state agency which controls the operation of, and engages in the racial segregation of, both housing and schools—by confining for racial reasons the city's subsidized housing to one section of the city, while simultaneously adhering to a neighborhood school policy of student assignment—can be held liable for such conduct. It is inconceivable that state action may be fractionalized such that two state agencies could be permitted collectively to engage in precisely the same conduct, yet avoid legal accountability for the identical result.

*Id.* at 1535.

It may be difficult to specify the precise obligations that arise out of past discrimination under the *Brown* cases. Nevertheless, *Brown II* certainly imposes upon formerly discriminating government entities obligations to disestablish segregation in good faith, fairly and equitably, with due consideration of "local conditions" and with "practical flexibility," "reconciling public and private needs" yet acting promptly and reasonably, to eliminate the vestiges of discrimination and segregation.[20] *Brown II,* 349 U.S. at 299–301, 75 S.Ct. 753.

Defendants under a duty to remedy past discrimination must, in the broadest sense, treat the victims of discrimination fairly. As detailed above, their obligations under the *Brown* cases are defined upon the *bona fide* consideration of various factors.

As subsequent Supreme Court decisions elucidate, the weight assigned to each of these factors is determined from the totality of attendant circumstances.

For instance, where there has been "too much deliberation and not enough speed" in enforcing Constitutional rights, a further premium is placed on promptly and effectively disestablishing discriminatory vestiges. *See Griffin v. County School Bd. of Prince Edward County,* 377 U.S. 218, 229, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Green v. County School Bd. of New Kent County, Va.,* 391 U.S. 430, 438–39, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Where abuses have been less flagrant, defendants' duties appear to have been construed with greater deference to "practicality" and the pursuit of other legitimate policy. *See United States v. Fordice,* 505 U.S. 717, 731, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992). Where the passage of time, demographic change, or remedial efforts have dulled the effects of antecedent discrimination, defendants' obligations—and indeed, the propriety of judicial intervention—may likewise be altered. *See Freeman v. Pitts,* 503 U.S. 467, 494–96, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). Finally and most obviously, as *Brinkman* teaches, a defendant with a *Brown II* duty may not undermine its own disestablishment policies or otherwise impede desegregation. *Brinkman,* 443 U.S. at 538, 99 S.Ct. 2971.

In summary, if Plaintiffs demonstrate an affirmative and purposeful segregatory action by Defendants in the administration of housing policy that took place prior to the relevant Open Period, such conduct may obligate Defendants to disestablish the vestiges of the discrimination they imposed. The Court must determine the

---

**20.** The Court recognizes that much of *Brown II's* counsel is directed to District Courts. However, *Brown II* also notes, at 299, that defendants, in conjunction with the courts, have the "primary responsibility for elucidating, assessing, and solving the[ ] problems" of segregation.

extent and nature of Defendants' obligations on the basis of the circumstances demonstrated by each of the parties to this suit.[21] Equal Protection liability lies if Plaintiffs further demonstrate that Defendants, regardless of their intent, failed to fulfill such obligations within the Open Period. In essence, Plaintiffs could prevail if they prove that Defendants failed to treat the victims of past racial discrimination as required.

### C. Statutory and Regulatory Claims

#### 1. The Fair Housing Act ("FHA") (Title VIII)[22]

Title VIII prohibits public and private actors from engaging in a number of discriminatory practices and requires the statute be administered so as to fulfill its articulated goals. In general, to establish Title VIII liability, a plaintiff may show that such practices have caused her harm by affecting a discriminatory or segregatory impact upon her. Unlike the U.S. Constitution, Title VIII imposes liability on a government defendant even though a plaintiff may fail to prove that the defendant acted with discriminatory intent. However, a defendant may avoid statutory liability by demonstrating that its conduct served a public interest unattainable by alternate means.

#### a. Alleged Fair Housing Act Violations

Plaintiffs must make a threshold showing that Defendants, during the Open Period, engaged in some type of practice proscribed by Title VIII. Plaintiffs have alleged three types of such practices:

1. The denial of housing;

2. Discrimination in housing conditions and services; and

3. The failure to promote fair housing.

These allegations are discussed in turn.

(1). "Denial" of Housing (§ 3604(a))

Section 3604(a) of the FHA provides that it shall be unlawful "[t]o refuse to sell or rent . . . or otherwise make unavailable or deny . . . a dwelling to any person because of race . . ." (emphasis added).

At least with respect to government defendants, the case law indicates that there can be a constructive illegal "denial" of housing—i.e., a government entity may violate § 3604(a) by denying a plaintiff a housing opportunity (as opposed to an actual brick-and-mortar dwelling). See e.g., Smith v. Town of Clarkton, N.C., 682 F.2d 1055, 1065–66 (4th Cir.1982) (a town's withdrawal from a multi-municipality housing authority may ground § 3604(a) liability); Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 131 (3d Cir.1977) (illegal denial of housing may result from "inchoate" state action—defendant housing authority began, but did not complete, a public housing development); United States v. City of Black Jack, Mo., 508 F.2d 1179, 1188 (8th Cir.1974) (finding liability based on a zoning ordinance). Indeed, in an era where housing authorities are transitioning from the provision of "hard units" to the administration of more intangible housing pro-

---

**21.** The Court does not understand *Fordice* and related cases to set inherent categorical boundaries between elementary and secondary public education, higher public education, and other public programs tainted by past segregation. Nor does the Court understand *Fordice* to require overly mechanical inquiries, for instance as to whether Defendants' policies were "traceable" to pre-*Brown* prac-

tices. Rather, *Fordice* applied to Mississippi's state university system the longstanding principles of *Brown II* and its progeny, that remedial obligations are defined upon consideration of the aforementioned factors and the circumstances surrounding the case.

**22.** 42 U.S.C. § 3601 *et seq.*

grams involving vouchers *etc.*, a broad reading of § 3604(a) is appropriate to continue to hold government entities accountable under the subsection.

*Edwards v. Johnston County Health Dep't*, 885 F.2d 1215 (4th Cir.1989) does not preclude this reading of § 3604(a). In *Edwards* the United States Court of Appeals for the Fourth Circuit held that migrants could not assert § 3604(a) based upon their being afforded substandard housing. *Id.*, at 1222–24. There is logic to this since Title VIII should not be morphed into a housing code. Yet, *Edwards* is not controlling here. There is a discernable difference between the provision of substandard housing and the full denial of housing opportunities.

Such a denial would be actionable under the FHA.

(2). *Housing Conditions/Services (§ 3604(b))*

Section 3604(b) of the FHA states that it shall be unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . ."

As its text suggests, § 3604(b) is broad in scope. Several courts have interpreted this subsection quite expansively, for instance including within the scope of "services in connection with housing" the provision of police protection to homeowners. *Campbell v. City of Berwyn*, 815 F.Supp. 1138, 1144 (N.D.Ill.1993) (discriminatory termination of police protection is prohibited by § 3604(b)). Of course, this Court's construction of § 3604(b) must be guided and bound by established principles of statutory interpretation.[23]

In sum, discrimination in the conditions of housing, or in the provision of housing services, as specified above, is actionable.

(3). *Failure to Promote Fair Housing (§ 3608)*

■ Section 3608(e)(5)[24] requires Defendants to "administer [housing] programs . . . in a manner affirmatively to further the policies of this subchapter," among these the policy "to provide, within constitutional limits, for fair housing throughout the United States." 42 U.S.C. § 3601 (2003). "Fair housing," within the meaning of § 3601, means the elimination of discrimination in the sale or rental of housing.[25]

Section 3608 imposes upon Defendants an "affirmative" obligation; it requires Defendants to do something "more than simply refrain from discriminating themselves or from purposely aiding discrimination by others." *N.A.A.C.P. v. Secretary of Housing and Urban Development*, 817 F.2d 149, 155 (1st Cir.1987)("*N.A.A.C.P*") To the contrary, "[a]ction must be taken to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation[.]" *Id.,quoting Otero v. N.Y. City Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973).

**23.** *See Mackey v. Nationwide Ins. Companies,* 724 F.2d 419, 423 (4th Cir.1984) (declining to apply § 3604(b) to defendant's insurance practices, noting the traditional predominance of state regulation of insurance and the principle that non-specific Congressional enactments should not displace such arrangements).

**24.** Statutory references in this section are to Title 42 of the United States Code unless otherwise indicated.

**25.** "That is all it could possibly mean." 114 Cong. Rec. 4975 (Mar. 4, 1968) (statement of Sen. Mondale).

Certainly, § 3608 "does not mandate specific actions or remedial plans." *McGrath v. Dep't of Housing and Urban Dev.*, 722 F.Supp. 902, 908 (D.Mass.1989). It does, however, within Constitutional limits,[26] hold Defendants' actions to a high standard, in this case to have a commitment to desegregation. Defendants' failure to attain this standard can constitute an actionable statutorily violative practice.

### b. *Enforcement of Alleged FHA Violations*

Plaintiffs alleged that Defendants' practices violate three provisions of Title VIII. These provisions are enforced through different mechanisms, which are discussed in turn.

### (1). *Sections 3604(a) and 3604(b)*

After demonstrating that a defendants' practice falls within the purview of § 3604(a) and (b) of the FHA, a plaintiff can make a *prima facie* case of liability by proving that this practice produced a discriminatory impact *or* arose from a discriminatory purpose. Most Courts of Appeal, including that for the Fourth Circuit, have expressed the view that intent need not be established in the FHA context if there is proof of a discriminatory impact. *Metro. Hous. Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir.1977) ("*Arlington Heights II* "); *Clarkton*, 682 F.2d at 1065.

■ However, not all discriminatory effects can ground § 3604 liability. The Court must determine whether it is appropriate to impose liability on the basis of a discriminatory impact, upon consideration of four factors:

1. The strength of Plaintiffs' showing of discriminatory or segregatory effect;

2. The evidence of discriminatory intent, though falling short of the Constitutional standard—*i.e.*, some kind of *"mens rea,"* though not necessarily the discriminatory "purpose" required by *Washington v. Davis* and its progeny;

3. Defendants' interest in undertaking the conduct complained of; and

4. The burden that Defendants would bear if Plaintiffs prevail.

*Arlington Heights II*, 558 F.2d at 1290.

■ Where discriminatory "intent" alone is the basis for § 3604 liability, it is defined consistently with the definition used in Equal Protection cases. Moreover, so long as a state actor undertakes conduct "because of" race, it need not directly demonstrate racial animus or hatred. *E.g., Adarand*, 515 U.S. at 229, 115 S.Ct. 2097.

If a plaintiff establishes a *prima facie* case as described above, the burden shifts to a Title VIII defendant to prove, by a preponderance of the evidence, that its conduct was justified. Such "justification must serve, in theory and practice, a legitimate, *bona fide* interest of the... defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact."[27] *Rizzo*, 564 F.2d at 149. If the

---

26. Even the "benign discrimination" of affirmative action programs and policies is subject to Constitutional scrutiny. *E.g., Adarand Constructors, Inc.*, 515 U.S. at 229, 115 S.Ct. 2097.

27. Some decisions suggest that a defendant be required to show a "compelling," rather than merely a "legitimate" interest. *E.g., Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir.1988) (citing *United States v. City of Black Jack, Mo.*, 508 F.2d 1179, 1185 (8th Cir.1974)). Howev-

defendant does show that no such alternative course of action can be adopted, the burden once again shifts to the plaintiff to demonstrate that other practices are available. *Id.*, at 149 n. 37.

### (2). *Section 3608*

■ Section 3608 of Title VIII is enforceable through the Administrative Procedure Act ("APA"), which regulates the administration and operation of federal agencies, because the provision requires Federal Defendants to affirmatively administer the agency's programs so as to promote fair housing. Under § 706(2)(A) of the APA, the reviewing court "shall...hold unlawful and set aside agency action...found to be...arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;..." Nevertheless, it is well established that a court may not substitute its own policy choices for that of the agency when reviewing an agency's actions under the "arbitrary and capricious" standard. *See Fort Mill Telephone Co. v. F.C.C.*, 719 F.2d 89, 91 (4th Cir.1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)). Rather, a court "must give deference ... to the agency's decision if supported by a rational basis in the record." *Id.* (citing *American Meat Inst. v. U.S. Dept. of Agriculture*, 646 F.2d 125, 126 (4th Cir.1981)). Thus the Court must afford a wide measure of deference to HUD's decision making process when reviewing whether the agency's actions fulfilled its statutory duties under § 3608 of Title VIII.

### 2. *Title VI (§ 601)* [28]

Section 601 states, "No person in the United States shall, on the ground of race, ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (2003). Section 601 reaches a wide range of discriminatory practices, and it has been applied to discrimination in the administration of public housing. *E.g.*, *Hills v. Gautreaux*, 425 U.S. 284, 296, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976) ("*Gautreaux*").

The Supreme Court and the Courts of Appeal have not been consistent in regard to whether § 601 liability requires a finding of intentional discrimination or merely disparate impact. The United States Court of Appeals for the Fourth Circuit most recently has stated that " § 601 prohibits only intentional discrimination, not 'disparate impact' practices." *Peters v. Jenney*, 327 F.3d 307, 315 (4th Cir.2003), citing *Alexander v. Sandoval*, 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Thus the *"mens rea"* required for a § 601 violation in the Fourth Circuit is more than enough to meet the Title VII standard (which Plaintiffs urge the Court to apply) and is akin to the discriminatory purpose required for Constitutional liability: " § 601 [applied to state actors] 'proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment[.]' " *Peters*, 327 F.3d at 315, quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)(opinion of Powell, J.).

er, the prevailing view, and the view most consistent with the case law of this Circuit and District, is that a legitimate interest suffices to rebut a *prima facie* establishment of liability, provided of course that there are no less restrictive means available for pursuing this interest. *See Potomac Group Home Corp.*

*v. Montgomery County, Md.*, 823 F.Supp. 1285, 1299 (D.Md.1993).

**28.** For procedural reasons discussed below, Plaintiffs may assert § 601–based claims only against Local Defendants.

■ Accordingly, to establish § 601 liability, Plaintiffs must show that Local Defendants, within the limitations periods, engaged in conduct proscribed by the section with a "discriminatory purpose," as defined in *Washington v. Davis* and its progeny.

### 3. *United States Housing Act ("USHA") Provisions*

■ The Court, in its Memorandum and Order of November 26, 2003 (at 9–11), held that USHA certification provisions implied neither a right of action nor any other basis for Plaintiffs to seek relief from Local Defendants. On the same rationale, the Court holds that the USHA provisions relied upon by Plaintiffs do not provide a right of action against Federal Defendants. In the absence of a showing of legislative intent, the Court cannot accept Plaintiffs' invitation to imply such a right. Plaintiffs have no potential cause of action under the USHA certification provisions.

### 4. *The Housing and Community Development Act ("HCDA") Provisions*

■ As recognized by Plaintiffs, "[HCDA] Section 5304(b)(2) is nearly identical to [the pertinent USHA provisions]" [29] in many respects. As with § 1437 *et seq.* of the USHA, there is no legislative history indicating the provision of a right of action; § 5304(b)(2) merely sets a standard for federal funding of state and local government activities.

■ The U.S. Supreme Court has noted that such funding conditions do not readily imply a private right of action against the noncompliant entity, as the chief "penalty" for noncompliance contemplated by Congress is the withdrawal of federal funds. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Accordingly, on the rationale of the November 26, 2003 Memorandum and Order, the Court holds that § 5304(b)(2) neither confers a right of action nor a basis for suit under 42 U.S.C. § 1983. Nor can HUD regulations implementing the provisions do so. Where Congress does not confer upon individuals a particular type of access to the federal courts, an agency acting upon that congressional mandate is without power to confer such a right. *Sandoval*, 532 U.S. at 291, 121 S.Ct. 1511.

Accordingly, Plaintiffs have no potential cause of action under the HCDA.

### D. *Procedural Enforcement Mechanisms*

Plaintiffs seek to enforce their claims against Federal Defendants by virtue of the Administrative Procedure Act ("APA") as well as alleged direct causes of action implied from the Constitution and pertinent statutes. Plaintiff seek to enforce their claims against Local Defendants through the enforcement mechanism provided by 42 U.S.C. § 1983 as well as alleged direct causes of action implied from the Constitution and pertinent statutes.

The following table summarizes Plaintiffs' positions in this regard:

| Substantive Source of Right | Enforcement Mechanism, vs. Fed. Defs. | Enforcement Mechanism, vs. Local Defs. |
| --- | --- | --- |
| Equal Protection [30] | Direct implication of right of action; APA | § 1983 |

---

**29.** Pls.' Pretrial Mem., at 53.

**30.** *See* Pls.' Pretrial Mem., at 31–32 n. 5.

| Title VIII [31] | Direct implication of right of action; APA; § 3613 | Direct implication of right of action; § 1983; § 3613 |
|---|---|---|
| Title VI [32] | Direct implication of right of action; APA | Direct implication of right of action; § 1983 |

### 1. Constitutional Claims

#### a. Local Defendants

 Pursuant to 42 U.S.C. § 1983, persons acting "under color of" state law—including municipalities [33] and state and local officers and agencies—may be held accountable for infringement both of Federal Constitutional and statutory rights.

Accordingly, Plaintiffs may proceed on their Constitutional claims against Local Defendants by virtue of 42 U.S.C. § 1983.[34]

#### b. Federal Defendants

 It is settled that provisions of the U.S. Constitution setting forth individual rights generally also empower individuals to sue Federal officers and agencies for violations of these rights, particularly if (as here) the relief sought is injunctive. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *see also, Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Federal Defendants concede they may thus be sued for Constitutional violations. Tr., at 4176. Moreover, Federal Defendants do not, and cannot, dispute that Constitutional violations may provide a basis for an APA claim.

Accordingly, Plaintiffs may proceed on their Constitutional claims against the Federal Defendants.

### 2. Statutory Claims

#### a. Local Defendants

 In its Memorandum and Order of November 26, 2003, the Court held that the substantive Title VIII provisions cited by Plaintiffs afforded rights cognizable under § 1983.[35] Memorandum and Order at

---

**31.** Plaintiffs state that "Section 3608 is directly enforceable pursuant to itself, the [federal] Administrative Procedure Act, and/or 42 U.S.C. § 1983." Pls.' Pretrial Mem., at 42 n. 11. Plaintiffs further specified, for the first time at trial (Tr., at 4189), that they seek to enforce Title VIII via 42 U.S.C. § 3613.

**32.** Plaintiffs state, "Section 602 is enforceable pursuant to the APA and § 1983." Pls.' Pretrial Mem., at 49 n. 18. The Court understands Plaintiffs to make the same contention with respect to § 601.

**33.** A local government may be held liable under § 1983 where, as here, allegedly offensive acts are pursuant to that government's "policies." *See, Monell v. Dep't of Soc. Services*, 436 U.S. 658, 707–708, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**34.** Plaintiffs sweepingly cite §§ 1981 and 1982 in connection with their Constitutional claims. *E.g.,* Pls.' Pretrial Mem., at 31–32 n. 5. These sections are not, like § 1983, merely procedural vehicles for civil rights enforcement, but rather are, if anything pertinent, potential and distinct statutory bases for action. No such claims have been pled—at least not adequately, in a manner that would give Defendants meaningful notice and opportunity to respond. 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 125, at 145 (2d ed.1990). Accordingly, and noting that these sections would not appear to add anything meaningful to Plaintiffs' case, the Court will consider neither § 1981 nor § 1982 as bases for relief.

**35.** The pertinent Title VIII provisions confer upon Plaintiffs distinct and enforceable rights, and neither their text nor their legislative history suggest that access to § 1983 should be foreclosed. *See, e.g., Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 17–18, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

11–13. Title VI provisions similarly afford Plaintiffs cognizable rights.[36] Upon a finding of liability, § 1983 would empower the Court to afford Plaintiffs the injunctive relief for which they ask.[37]

Accordingly, Plaintiffs may proceed on their statutory claims against the Local Defendants by virtue of 42 U.S.C. § 1983.[38]

### b. *Federal Defendants*

#### (1). *The Administrative Procedure Act*

The APA authorizes "action[s] in a court of the United States seeking relief other than money damages[.]"

> A person suffering legal wrong because of [federal] agency action, or adversely affected or aggrieved by agency action... is entitled to judicial review thereof.
>
> \* \* \* \* \* \*
>
> The reviewing court shall... hold unlawful and set aside agency action... found to be... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] contrary to constitutional right[.]

5 U.S.C. §§ 702, 706(2)(A) and (B)(2003).

▬▬▬ Statutory violations, of course, may constitute agency action "not in accordance with law" within the meaning of the APA. However, the APA, by its own terms, precludes such statute-based rights of action in two pertinent circumstances: 1) where decisions are committed to agency discretion, and 2) where alternate remedies under Federal law are adequate to redress plaintiffs' grievances.

#### (a). *Commitment to Agency Discretion*

Federal Defendants contend that certain of HUD's actions challenged by Plaintiffs (chiefly, its supervision of HABC operations) are inherently committed to HUD's own discretion and therefore may not be reviewed by this Court under the APA.

Federal Defendants liken the instant case to *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), where the Supreme Court precluded APA scrutiny of the Food and Drug Administration's failure to take investigatory and enforcement measures to prevent perceived drug use violations. The *Heckler* Court compared the FDA's enforcement discretion to that of a prosecutor, noting that the agency was most apt at determining how to spend its resources and that an agency's decision not to "prosecute" was neither coercive nor threatening to individual liberties. *Id.,* at 832, 105 S.Ct. 1649.

*Heckler* is inapposite to the instant case. HUD acts, primarily, not as HABC's investigator or "prosecutor," but as a collaborator in the production and administra-

---

**36.** Title VI binds state administrators to refrain from discriminating against individuals such as Plaintiffs on the basis of their race; this obligation is specific and feasibly enforceable and therefore may support a § 1983 action. *See Golden State Transit Corp. v. City of Los. Angeles.,* 493 U.S. 103, 108, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (citations omitted).

**37.** The statute states that offending persons shall be liable in "suit[s] in equity." *See also,* Erwin Chemerinsky, *Federal Jurisdiction* § 8.11, at 559 ("[s]ection 1983 creates broad

authority for courts to fashion remedies needed to prevent and redress violations of federal law").

**38.** Because of the applicability of § 1983, the questions as to whether the substantive provisions of Titles VI and VIII would directly confer upon Plaintiffs rights of action versus Local Defendants are moot. Furthermore, the Court need not reach questions as to whether Local Defendants may be held liable by virtue of 42 U.S.C. § 3613.

tion of housing policy.[39] HUD's position is not passive. Rather, HUD acts affirmatively, funding and providing operational support for housing initiatives. And if HUD, alone or in collaboration with Local Defendants, acts in violation of Federal civil rights laws, it would indeed threaten individual liberties.

Moreover, while HUD has discretion in regard to allocating its own resources, such allocations are constricted by the operation of Federal law and policies. Title VIII, in particular, gives HUD a discernable mandate that it must follow; the agency is required by provisions of Title VIII to act in conformity with the rules and principles embodied therein. *E.g.,* 42 U.S.C. § 3608 (2003).

Accordingly, HUD's actions implicated herein are not products of inherently unreviewable discretion.

### (b). *Adequacy of Alternate Remedies*

Section 704 provides that "final agency action[s] for which there is no other adequate remedy in a court are subject to judicial review [under the APA.]" Federal Defendants contend that Titles VIII and VI provide adequate means for Plaintiffs to assert their grievances, and that Federal Defendants' conduct therefore may not be scrutinized by federal courts under the APA. Thus, the Court must consider, in turn, whether provisions of Titles VIII and VI preclude APA review.

### i). *Title VIII*

■ While the issue has not yet been definitively addressed by the Fourth Circuit, a number of rulings from other Courts of Appeal indicate that, notwithstanding § 704 and the remedial provisions of Title VIII (§§ 3610–13), tenants may present APA claims against HUD for discrimination grievances. *See e.g., Latinos Unidos De Chelsea En Accion (Lucha) v. Sec'y of HUD,* 799 F.2d 774, 791 (1st Cir. 1986) (hereinafter, *"FLUCHA"*); *Alschuler v. HUD,* 686 F.2d 472, 477–78 (7th Cir.1982); *Darst–Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.,* 339 F.3d 702, 713 (8th Cir.2003). *But see, Am. Disabled for Attendant Programs Today (ADAPT) v. Dep't of HUD,* 170 F.3d 381, 390 (3d Cir. 1999); *Women's Equity Action League v. Cavazos,* 906 F.2d 742, 751 (D.C.Cir.1990). Indeed, the First Circuit has suggested that HUD's obligations to affirmatively further fair housing policies under § 3608 may *only* be scrutinized in the context of the APA. *Lucha,* 799 F.2d at 793.

The APA affords Plaintiffs a broad, direct and substantial opportunity to challenge HUD's actions, exceeding in a number of respects the opportunities provided by the Title VIII remedial provisions.[40] Accordingly, the Court does not construe § 704 to foreclose Plaintiffs' access to the APA with respect to HUD's alleged Title VIII violations.

In sum, in the instant case, Plaintiffs can hold Federal Defendants liable for Fair Housing Act violations under the APA.[41]

---

**39.** *See, e.g.,* 24 C.F.R. § 1.4(b)(2)(iii) (2003) ("[t]he responsible [HUD] official is authorized to prescribe and promulgate plans, exceptions, procedures and requirements" thereby acting more like a legislator than a prosecutor).

**40.** The APA neither leaves enforcement to the discretion of the Secretary as § 3612 does, nor does it limit review of grievances as do the § 3610 administrative enforcement provision (with its one-year limitations period) and § 3613 (with its two-year period).

**41.** Thus, the Court does not reach questions as to whether the substantive provisions of Title VIII directly confer upon Plaintiffs rights of action versus Federal Defendants. Nor does the Court reach questions as to whether Federal Defendants may be held liable per 42 U.S.C. § 3613.

ii). *Title VI*

■ The Fourth Circuit has ruled with respect to Title VI-based claims and the APA in *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180 (4th Cir.1999). Considering Congress' intent in crafting Title VI and alternate remedies available pursuant thereto, the *Jersey Heights* court held that aggrieved persons' "direct remedy against funding recipients is not only 'adequate' but... preferable to a direct suit against the agency itself." *Id.*, at 191–192.

Accordingly, Plaintiffs cannot here assert Title VI-based claims against Federal Defendants via the APA. The Court must consider Plaintiffs' alternate theory for enforcing Title VI against Federal Defendants.

■ Plaintiffs urge the Court to directly imply from Title VI (§ 601) a right of action against Federal Defendants. The Court declines to do so, as nothing in § 601's text would strongly support such an inference, and as Plaintiffs have not demonstrated any intent on Congress' part to create such a distinct right. *See, Touche, Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (the Court "is limited solely to determining whether Congress intended to create the private right of action asserted").

Thus, in the instant case, Plaintiffs cannot present their claims based upon Title VI against the Federal Defendants.

3. *Available Enforcement Mechanisms*

Pursuant to the foregoing discussion, the Court concludes that the following table sets forth Plaintiff's available enforcement mechanisms:

| Substantive Source of Right | Enforcement Mechanism, vs. Fed. Defs. | Enforcement Mechanism, vs. Local Defs. |
|---|---|---|
| Equal Protection [42] | Direct implication of right of action; APA | § 1983 |
| Title VIII [43] | Direct implication of right of action; APA; § 3613 | At least § 1983 [44] |
| Title VI [45] | None | At least § 1983 [46] |

E. *Limitations (Open Period)*

In the instant case, there are different limitations applicable to Local and Federal Defendants because of the different procedural mechanisms available for enforcement of claims against them. Accordingly, as discussed herein, Local Defendants can be held liable for action or inaction within

42. *See* Pls.' Pretrial Mem., at 31–32 n. 5.

43. Plaintiffs state that "Section 3608 is directly enforceable pursuant to itself, the [federal] Administrative Procedure Act, and/or 42 U.S.C. § 1983." Pls.' Pretrial Mem., at 42 n. 11. The Court assumes that Plaintiffs make the same representation regarding § 3604. Plaintiffs further specified, for the first time at trial (Tr., at 4189), that they seek to enforce Title VIII via 42 U.S.C. § 3613.

44. The Court finds it unnecessary to reach the question of whether Plaintiffs may sue directly under Title VIII without reference to § 1983.

45. Plaintiffs state, "Section 602 is enforceable pursuant to the APA and § 1983." Pls.' Pretrial Mem., at 49 n. 18. The Court understands Plaintiffs to make the same contention with respect to § 601.

46. The Court finds it unnecessary to reach the question of whether Plaintiffs may sue directly under Title VI without reference to § 1983.

a three year period from January 31, 1992 to the date of filing this lawsuit on January 31, 1995. In contrast, Federal Defendants can be held liable for action or inaction within a six year period from January 31, 1989 to January 31, 1995.[47] In the course of this writing, for simplicity of expression, the Court shall use the term "Open Period" to refer to that period which is open for limitations purposes as to one or more Defendants.

Finally, the Court notes, as discussed herein, either set of Defendants could be held liable for action or inaction during the period open as to them that violated an obligation imposed by virtue of the residual effects of certain types of action or inaction occurring prior thereto.

### 1. Local Defendants

■■■ Plaintiffs' claims against Local Defendants are enforced via 42 U.S.C. § 1983. In regard to Constitutional and statutory tort claims as involved in the instant case, Federal courts have "borrowed" appropriate state law limitations rules. *Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In Maryland, the Federal courts have adopted the three-year limitations period of Md.Code Ann., Cts. & Jud. Proc. § 5–101, applicable to analogous tort actions under Maryland law. *See Jersey Heights,* 174 F.3d at 187.

Accordingly, the limitations period applicable to Local Defendants, for all claims against them herein, is three years. Therefore, for Local Defendants the Open Period is January 31, 1992 to January 31, 1995.

### 2. Federal Defendants

■■■ Plaintiffs' claims against Federal Defendants are presented, by virtue of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.,* and also as implied Constitutional claims. Where a claim is based on a Federal statute that has no specific limitations provision, such as the APA, civil claims brought against United States agencies are subject to the general Federal six-year limitations period. *See* 28 U.S.C. § 2401(a) (2003).

With regard to such "direct implication" Constitutional claims, there is some question as to whether the Court should apply the six-year limitations rule set forth in § 2401 or a pertinent local rule (such as Maryland's three-year rule). *Compare United States v. Minor,* 228 F.3d 352, 359 (4th Cir.2000) *with Reinbold v. Evers,* 187 F.3d 348, 359 n. 10 (4th Cir.1999). In the instant case, all of Plaintiffs' claims contended to arise under the Constitution may also be enforced via the APA—due, essentially, to the fact that Plaintiffs seek only injunctive relief.

Accordingly, the limitations period applicable to Federal Defendants, for all claims against them herein, is six years. Therefore, for Federal Defendants the Open Period is January 31, 1992 to January 31, 1995.

### III. THE PARTIAL CONSENT DECREE

On June 25, 1996, some seventeen months after the instant lawsuit was filed, the Court issued a Partial Consent Decree

---

**47.** This could be significant in the instant case. For example, HABC, by 1990, had changed the process by which it assigned prospective public housing tenants to specific housing developments. Local Defendants' actions in administering the "old" (*i.e.,* pre- 1990) process prior to January 31, 1992 cannot provide the basis for liability. However, liability for actions by Federal Defendants in support of the "old" process as early as January 31, 1989 would not be time barred.

("Decree" or "PCD") resolving certain of Plaintiffs' allegations.

Under the Decree, Defendants undertook various obligations, primarily concerning the demolition of certain then-existing public housing developments [48] (the "Housing Projects" or the "High–Rises") and the provision of alternate housing opportunities ("Replacement Housing") for tenants thereby displaced. Decree § 1.4. In return, Plaintiffs released certain claims concerning the Housing Projects. Decree § 10.1 *et seq.* The Decree constitutes a binding settlement by the parties and a Judgment of the Court. The principle of *res judicata* thus bars the parties from relitigating claims settled by the Decree. *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). The Decree, however, expressly permits the introduction, at the trial of unsettled claims, of certain evidence relating to settled claims.

### A. *Pertinent Terms of the Decree*

In nearly identical language concerning Federal Defendants and Local Defendants, Sections 10.1/10.2 of the Decree outline the general scope of the release:

> Plaintiffs... release and forever discharge each of the [ ] Defendants ... from every claim,... cause of action, suit and issue, known or unknown, contingent or liquidated... with respect to the site selection, [*etc.* ...] with regard to the Housing Projects [High–Rises]...
>
> \* \* \* \* \* \*
>
> This release does not release ... [ ] Defendants as to other Baltimore City family public housing...

The release language of Sections 10.1/10.2 is quite broad, settling all matters "with regard to" the High–Rises. Of course, the Decree does not release Plaintiffs' discrimination claims relating to housing units other than those enumerated. In addition, under Sections 10.1/10.2, Plaintiffs remain free to assert claims with regard to tenant selection and assignment practices, including such practices pertaining to the High–Rises. Plaintiffs may also assert certain "equalization" and "neighborhood improvement" claims against the Local Defendants. Decree § 10.2.1.

In accordance with the principles of *Matsushita*, evidence pertaining to settled matters, such as those pertaining to High–Rises and Replacement Housing, would not be admissible unless excepted from exclusion by the terms of the Decree. In this regard, the Decree expressly provides for two exceptions from the release given by Defendants, a "Limitations Defense" exception and a "Pattern and Practice" evidence exception. These are discussed in turn.

### 1. *The Limitations Defense Exception*

■ Sections 10.3/10.4 of the Decree provide that:

> [The] Decree shall have no effect on the Court's consideration of any defense of laches [or] statute of limitations... raised by the [ ] Defendants that Plaintiffs may overcome by showing a continuing violation of the law[.] [Such rebuttal evidence] may not be used for any other purpose and may not be used to enhance the relief Plaintiffs seek[.]

The Defendants have contended that Plaintiffs claims are time-barred. *E.g.,* Local Defs.' Pretrial Mem., at 46; Fed. Defs.' Trial Brief, at 26. Accordingly, it is necessary to address the Limitations Defense Exception.

---

**48.** The demolished housing developments addressed under the Decree are: Lafayette Courts, Lexington Terrace, Murphy Homes, Flag House Courts, and Fairfield Homes.

This exception permits Plaintiffs to introduce otherwise inadmissible evidence, but only to rebut an asserted limitations defense[49] and only to show that a pre-Open Period action by a Defendant covered by the Decree is part of a "continuing" violation extending into the Open Period.

In the instant case, there is no evidence that warrants admission on the theory of a continuing violation. In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the U.S. Supreme Court significantly limited the circumstances in which a continuing violation may be found. *Morgan* held that a mere "relation" between two discrete discriminatory acts generally does not warrant their being considered as a unitary continuing violation. *Id.* at 102, 122 S.Ct. 2061 The Supreme Court contrasted violations that by "[t]heir very nature involve[ ] repeated conduct"; such violations, including for instance the establishment of a hostile work environment, rightly may be deemed "continuing." *Id.*, at 115, 122 S.Ct. 2061. None of Plaintiffs asserted violations fits this description of a "continuing violation."[50] The Defendants' conduct covered by the Decree is not so inherently and intricately linked to any alleged pre-Open-Period discrimination as to be appropriately considered part of the same violation.

Moreover, there is some indication that, in the Fourth Circuit, the continuing violation doctrine may be asserted by a plaintiff only when an otherwise limitations-barred incident's "character as a violation did not become clear until it was repeated during the limitations period." *Arellano v. Henderson*, 165 F.3d 910, 1998 WL 792233, at *2 (4th Cir.1998) (unpublished opinion; citations, to published out-of-Circuit case law, omitted); *see also, Derrickson v. Circuit City Stores, Inc.*, 84 F.Supp.2d 679, 687 (D.Md.2000). In the instant case, Plaintiffs do not contend that Defendants' pre-Open-Period discrimination was in any way ephemeral or obscured.

In sum, the continuing violation doctrine is not available to Plaintiffs as a vehicle for obtaining admissibility of evidence relating to claims settled by the Decree. However it is critical to note the distinction between admission of evidence of pre-Open Period conduct to establish a continuing violation and to establish the existence of vestiges of a past violation. In certain circumstances, discussed herein, an affirmative duty can be imposed upon a Defendant to dissipate the vestiges of past (pre-Open Period) discrimination. In these circumstances, the actionable violation is the current, Open Period, failure to take certain action and not the time barred prior discrimination. Proof of the prior violation would not be admissible to establish the continuation of the prior violation itself. However, such proof would be admissible to establish the fact of the past violation as an element of a "dissipation of vestiges" claim.

### 2. The Pattern and Practice Exception

 Sections 10.5/10.6 of the Decree provide, in pertinent part:

Nothing in Section 10.1/10.2 shall be construed to prohibit Plaintiffs from... introduc[ing] against [ ] Defendants evidence related to the Housing Projects... for the purposes of proving Plaintiffs' remaining [*i.e.*, non-released] claims [by showing] that... Defendants

---

49. In view of the applicability of statutes of limitation provisions, no Defendant has presented a laches, as distinct from limitations, defense.

50. That is, at least aside from Plaintiffs' "pattern and practice" allegation, which is addressed by different Sections of the Decree and discussed below.

established and failed to disestablish segregation or failed affirmatively to further fair housing in Baltimore City's public housing system as a whole.

*(§§ 10.5/ 10.6)*

Sections 10.5/10.6 refer to an allegation that Defendants' housing policies were segregatory or otherwise unfair "as a whole" which, in context, equates to Plaintiff's "pattern and practice" claim.[51] Thus, evidence relating to High Rise and Replacement Housing evidence could be admissible to prove "pattern and practice" liability.

It is important to note, however, that any "pattern or practice" liability must be based upon more than just conduct covered by, and resolved by, the Decree. In other words, it would be irrational to conclude that the "pattern or practice" exception could be utilized to eviscerate the settlement of the resolved claims. *See* Restatement (Second) of Contracts § 203(a) (1981) ("an interpretation [of an agreement] which gives a reasonable, lawful, and effective meaning to all [of its] terms is preferred to an interpretation which leaves a part... of no effect[ ]").

Accordingly, the Court shall consider admissible evidence with regard to matters settled by the Decree to the extent that such evidence may tend to establish an actionable pattern or practice that includes unsettled matters. Of course, should the Court find any such pattern or practice it must, in fashioning a remedy, give the Defendants appropriate "credit" for the relief provided by the settlement of those portions of the pattern or practice covered by the decree. Decree § 10.7.

## IV. RESOLUTION OF CLAIMS

### A. Constitutional (Equal Protection) Claims

Plaintiffs assert claims based upon the denial of their right to Equal Protection of the laws guaranteed by the Fifth Amendment (as to Federal Defendants) and the Fourteenth Amendment (as to Local Defendants). These Constitutional claims are based upon: 1) alleged violations committed from 1989 to 1995, during the administration of Mayor Kurt Schmoke ("Schmoke")[52] and 2) the vestiges of prior violations, including the maintenance of *de jure* segregation until 1954.

### 1. Violations During the Schmoke Administration

■ To establish liability for a violation of Plaintiffs' Constitutional Equal Protection rights, Plaintiffs must prove that Defendants, to Plaintiffs' detriment, drew distinctions on the basis of race, and Defendants did so with a "discriminatory purpose."

Plaintiffs base their Constitutional claims upon the following matters:

1. The Hollander Ridge Fence Episode

2. Demolition of Public Housing Without Replacement

3. The School 47 Decision

4. Tenant Assignment Policies

5. Pattern and. Practice of Discrimination

6. The 1950 City Council Ordinance

These contentions shall be addressed in turn.

---

**51.** This is consistent with the parties' understandings as expressed in closing argument. Tr., at 4214–4222.

**52.** Schmoke served as Mayor of the City of Baltimore between 1987 and 1999.

### a. The Hollander Ridge Fence Episode

As discussed herein, in 1997–98, HABC, with the approval and financial support of HUD, constructed a substantial wrought iron fence around the perimeter of the Hollander Ridge property in Baltimore City on which a sizeable public housing development was located. *E.g.*, Local Defs.' Ex. 547. Plaintiffs contend that this fence, which blocked access to, and from, the contiguous, predominantly White Rosedale community of Baltimore County, was constructed in violation of the Equal Protection rights of the African–American residents of Hollander Ridge. Thus, Plaintiffs claim, the purpose of HABC and HUD was physically to separate, *i.e.*, literally to segregate, the African–American residents of Hollander Ridge from the White residents of Rosedale for racially discriminatory reasons. Of course, there is no doubt that the fence did, in fact, achieve a physical separation; however, the evidence does not establish Plaintiffs' claim of intentional discrimination.

In the 1970s, HABC decided to acquire some fifty-plus acres at the eastern edge of Baltimore City (bordering Baltimore County) that became known as "Hollander Ridge." Tr., at 2737–38. The site is, essentially, separated from the rest of Baltimore City by Interstate Route 95. *See* Local Defs.' Ex. 165 (containing maps of the property).

One of the reasons, but not the only reason, that HABC selected Hollander Ridge for a public housing site was the need to comply with HUD's policies to provide a "balance" for public housing that was located in Baltimore City areas that had more than the city-wide average percentage of Black residents.[53] Hollander Ridge was in a census tract that likely would meet contemporaneous HUD standards for being "non-impacted."[54] Moreover, if one looked solely at the immediate area around Hollander Ridge, that is the adjacent Rosedale Community in Baltimore County, the "neighborhood" could be described as virtually all White.

HUD approved the Hollander Ridge site and provided financing to assist with the construction of some 522 units of family housing,[55] as well as a high-rise building providing units for elderly and disabled residents. Local Defs.' Ex. 165, at 5. Hollander Ridge was opened for occupancy in 1976. Pls.' Ex. 216, at 8. By the time Mayor Schmoke took office, virtually all of the family housing unit residents were African–American; the high-rise was occupied primarily by African–Americans, but had a substantial number of Korean–American residents. Local Defs.' Ex. 588; Tr., at 3278–79.

The relationship between the African–American residents of Hollander Ridge and their White neighbors in Rosedale was a troubled one. *See e.g.*, Local Defs.' Ex. 539 (an HABC memorandum concerning conflict mediation). At least a portion of the discord was due to racial animus harbored by some of the Rosedale residents.[56]

---

53. *See* Pls.' Ex. 207, at 5; Tr. 2740–41. There were other reasons as well, including the fact that the fifty-nine-acre Hollander Ridge site was essentially unoccupied, requiring minimal disruption of existing residences. *See id.*, at 2737.

54. An area is referred to as "impacted" if the portion of residents who are African–American is equal or greater to a threshold considered pertinent to the particular inquiry. The particular threshold used for characterization of an area as "impacted" or "non-impacted" has varied from time to time and from purpose to purpose as discussed herein.

55. These consisted of "townhouse type" dwellings. The units varied in size and contained up to six bedrooms. Local Defs.' Ex. 165, at 5.

56. The Court is, by no means, finding that all, or necessarily a majority, of Rosedale resi-

*See e.g., id.* The lack of neighborliness exhibited by some of the Rosedale community was, unfortunately, typical of the attitude that would have been expected from an analogous White working-class neighborhood in Baltimore City at the time. Indeed, those Hollander Ridge residents who regularly took the bus to Downtown Baltimore had to transfer at Armistead Gardens, a White working-class community in Baltimore City. The African–Americans from Hollander Ridge were unwelcome there and subjected to racial slurs and, occasionally, worse. *See* Tr., at 631.

Hollander Ridge may not have been an ideal public housing site due to such factors as its separation from the rest of the City and the inhospitality of the neighboring Rosedale community, but it did have amenities. These included a health clinic and recreational facilities (swimming pools, a basketball court, and playing fields). Local Defs.' Ex. 356. Indeed, many Hollander Ridge residents wished to remain at Hollander Ridge if only the crime problem (discussed below) could be solved. Even those former Hollander Ridge residents selected by Plaintiffs as representative witnesses testified that, despite the problems, they wished to stay in, or to return to, Hollander Ridge. Tr., at 650–51, 676.

By 1990, it became apparent that there was a severe crime problem at Hollander Ridge. *See* Local Defs.' Ex. 165, at 9–10 (listing crime statistics and projections for the early 1990s). The problem was largely caused by outsiders entering the Hollander Ridge property to commit crimes thereon. For example, drug dealers and prostitutes from outside of Maryland would enter Hollander Ridge on foot from cars stopping on Interstate 95, particularly on those days when the residents of the elderly housing would receive their monthly checks.[57] Tr., at 3217. On these "check days," the high-rise area was, in effect, an open air drug and sex market. Moreover, on a regular basis, drug dealers and other criminals regularly came to Hollander Ridge from various areas of Baltimore City (and elsewhere) on other days as well. *See id.,* at 3216.

While the level of crime at Hollander Ridge was somewhat lower than that of the worst areas of Baltimore City, it was far higher than tolerable for the residents of Hollander Ridge and for those residing in the adjacent Rosedale community.

In 1994, HUD undertook a pilot project to seek solutions for the high level of crime in HUD-supported public housing nationwide. Local Defs.' Ex. 165, at 1. HUD, with input from HABC, selected Hollander Ridge as the focus of one of the pilot projects. *Id.* Thereafter, the United States Department of the Treasury detailed a team from the Secret Service to study the site and make suggestions with regard to the improvement of the public safety situation at Hollander Ridge. The Secret Service team issued a report entitled "Operation Safe Home," which confirmed the existence of serious public safety problems at Hollander Ridge.

The Secret Service recommended, among other things, that at Hollander Ridge:

1. A database of residents be maintained,

2. Mechanisms be developed for residents to notify management of pending visitors and to verify unannounced visitors,

---

dents were motivated by racial animus. However, there was a not insubstantial vocal segment of the Rosedale whose racist views were made readily apparent.

**57.** Social security, welfare etc.

3. A metal detector be installed in the lobby of the high-rise,

4. Security doors and windows be installed in family units, and

5. A "fence perimeter [be established] around the community limiting pedestrian access."

*Id.*, at 13–14, 18, 21.

More or less concurrently with Operation Safe Home and related projects, Baltimore County residents of the Rosedale community and other nearby locations expressed concerns to county, state, and federal elected officials regarding the Hollander Ridge situation. Certainly, some of these Baltimore County residents were motivated by racial animus directed against the African–American residents of Hollander Ridge. *E.g.*, Tr. at 3271. Others, including at least some African–American Baltimore County residents, were not motivated by racial animus but by legitimate concerns about the public safety problems at Hollander Ridge. *Id.*, at 3272.

Certain elected officials, whose constituencies included the Rosedale neighborhood,[58] actively sought to respond to the views expressed by their constituents. *E.g.*, Local Defs.' Ex. 169 (a letter from Congressman Ehrlich to HABC); *see also,* Local Defs.' Ex. 529. In this regard, these elected officials first sought to eliminate the Hollander Ridge development altogether and, when that proved impossible (as discussed below), sought to obtain a perimeter fence around Hollander Ridge. *E.g.*, Tr., at 3262–64.

Mayor Schmoke and HABC Commissioner Daniel Henson ("Henson")[59] were both directly and personally involved in pertinent events concerning the Hollander Ridge fence proposals, including meetings with the elected officials who espoused the objectives of their Rosedale constituents.[60] Tr., at 3262, 3414.

The initial objective of certain of the Rosedale residents to eliminate completely any residential use of Hollander Ridge whatsoever, was not achieved. Schmoke absolutely rejected the idea that HABC would end up with no residential use of Hollander Ridge. *Id.*, at 3414–15. In fact, in September 1996, HABC presented a Hope VI application to HUD seeking funds to recondition and rebuild the development so as to provide 238 units for mixed-income family housing. Pls.' Ex. 349, at 1–2.

Confronted with Schmoke's determination not to abandon the Hollander Ridge site, the elected officials (on behalf of their constituents) pursued a secondary objective of obtaining a perimeter fence around Hollander Ridge. Of course, the fence would have two sides and two effects. It would keep outsiders from getting into Hollander Ridge and also keep Hollander Ridge residents from going to Rosedale.

There is no doubt that some Rosedale residents continued to be motivated by racial animus. However, there is also no doubt that there were others who were motivated by reasonable nondiscriminatory safety concerns. There was, after all, the undeniable fact that criminal activities at Hollander Ridge (even though largely

58. In particular, these officials included Baltimore County Councilman Lou DePazzo ("DePazzo") and then-U.S. Representative Robert Ehrlich ("Ehrlich").

59. Henson served as Baltimore City Housing Commissioner between 1993 and 1999.

60. For convenience, albeit somewhat imprecisely, these Baltimore County constituents (calling alternately for the elimination of Hollander Ridge and the erection of the fence) are sometimes hereinafter referred to as "Rosedale."

caused by outsiders) were having spillover effects in Rosedale.

The elected officials were, most certainly, motivated by the desires and concerns of their Rosedale (and other) constituents. Therefore, while the Court does not find that the elected officials, themselves, had any discriminatory motives for constructing the fence, they were responding to a group of constituents, some of whom did have such motives.[61] In any event, the action at issue—the construction of perimeter fence—was undertaken by Defendants HUD and HABC and it is their intention that is at issue.

The HABC decision to erect the Hollander Ridge fence was made by Mayor Schmoke with the concurrence of Housing Commissioner Henson. The fence could not have been built unless Mayor Schmoke had decided to build it. This decision was not, as contended by Plaintiffs, based upon Schmoke's acquiescence to demands from other public officials in response to Rosedale constituents who were motivated by racial animus.[62] Indeed, Mayor Schmoke was not, to any degree whatsoever, acting with a racially discriminatory motive. Nor was any part of the motivation for HABC's decision to build the fence based upon an intent to segregate the Hollander Ridge residents from Rosedale because of their race or to acquiescence to the racially discriminatory desires that were harbored by

certain members of the Rosedale community.

Schmoke and Henson viewed the fence as an amenity that would greatly enhance the Hollander Ridge site as a location for the senior village that Schmoke wished to build there.[63] Tr., at 3223, 3417. So far as HABC was concerned, the Hollander Ridge fence was intended to be, and in fact was as long as the location was utilized, a positive feature providing safety to Hollander Ridge residents. By no means was the fence intended or viewed by HABC as a mechanism for racial discrimination.[64] Rather, Schmoke and Henson effectively "leveraged" the political fallout from the Rosedale residents' efforts to get the County and HUD to pay a good part of the cost of a fence that would benefit the residents of Hollander Ridge. *E.g. id.* at 3229.

HUD's decision to provide financing for the construction of the Hollander Ridge fence stemmed from less than praiseworthy motives. The evidence establishes that HUD, purely and simply, caved in to political pressure and took what was for it an unprecedented action. In 1996, Maryland's U.S. Senator Barbara Mikulski ("Senator Mikulski"), then Chair of the Senate Committee having oversight over HUD and its budget, rather firmly directed HUD to get the fence built. In her

61. It would be unreasonable to accuse the elected officials of having a racially discriminatory motive merely because they sought a result that was desired by others who had such motivation.

62. In fact, the basic Rosedale position was not for a fence, but for the removal of all Hollander Ridge residents.

63. As Commissioner Henson indicated, perimeter fences generally are viewed as providing privacy and safety for the residents of "gated communities." Tr., at 3224.

64. In 1970, HABC had built a fence between the Coldspring New Town mixed-income housing development (an integrated community) and the adjacent Cylburn Arboretum, to ensure that residents would not have access to Cylburn's flora. Tr. at 2702—03. The Coldstream fence was, albeit not for racially segregative reasons, built with the expressed intent to preventing residents from being able to obtain access to a neighboring property. The Hollander Ridge Fence was not built for this purpose, at least as far as HABC was concerned.

September 3, 1996 letter to then-Secretary of HUD Henry Cisneros, she stated:

> It is my understanding that you agree the Department of Housing and Urban Development will fund this project [the Hollander Ridge Fence] ... Please reconfirm your commitment to this project and your willingness to work with me to set up a public announcement of the project in mid fall ... As you know, the Senate is currently considering the [Department of Veterans Affairs] / HUD appropriations bill. *I must receive some written commitment from you before we conclude this bill.*

Local Defs.' Ex. 167; Tr., at 1394–95 (emphasis added).

HUD, confronted by a choice of funding the fence or facing problems with its appropriation, chose the politically expedient course of action. HUD set aside $300,000 dollars for the project, an expenditure that Federal Defendants' own witness, a HUD official, described as "atypical." *Id.,* at 2075–76.

The fact that HUD agreed to provide funds for the fence at the direction of Senator Mikulski leads the Court to consider whether the Senator acted for a racially discriminatory reason. Senator Mikulski—who had constituents in both Baltimore City and Baltimore County—was requested to get the fence built by Rosedale residents, some of whom had a racially discriminatory motive. On the other hand, the "other side" of the fence—led by Schmoke and Henson[65]—did not oppose (and, indeed desired) the fence. Moreover, as noted above, there were indeed legitimate nondiscriminatory reasons for building the fence.

Accordingly, Senator Mikulski—most likely grateful for a peace making solution to a vexing problem—took the sensible course of giving both sides what they wanted. By no means does the Court find that Senator Mikulski had a racially discriminatory motive. *A fortiorari,* HUD, in this instance simply marching to the Senator's tune, cannot be found to have had any such motivation either.

The Court finds, therefore, that Plaintiffs have not proven that the Defendants erected the Hollander Ridge fence for racially discriminatory purposes.

Finally, the Court notes the ironic circumstances that the Hollander Ridge fence no longer separates residents of Hollander Ridge from Rosedale, because there are no longer any Hollander Ridge residents. *See, e.g.,* [Written Direct] Test. of Karl Taeber, at 87 (the Hollander Ridge structures were demolished on July 9, 2000). Had Baltimore City not been blocked by Plaintiffs and their counsel from utilizing funds made available by HUD to build needed elderly public housing on Hollander Ridge, the fence would, today, be an amenity for a gated community serving a predominantly African–American group of senior citizens.

Thus, in terms of the bottom line in regard to the use of Hollander Ridge, Plaintiffs and their counsel ended up "achieving" the objective most desired by those Rosedale residents who were driven by the worst of racial animus—the elimination of all African–Americans from the property bordering Rosedale.

b. *Demolition Without Replacement ("DWR")*

Plaintiffs contend that Defendants infringed upon the Constitutional rights of actual and prospective public housing tenants by demolishing certain housing struc-

---

**65.** The evidence does not establish that there was any contemporaneous objection to the fence by a majority or substantial number of Hollander Ridge residents.

tures [66] without providing replacement public housing.

Plaintiffs are not contending—nor could they—that under the Fifth and Fourteenth Amendments individuals are entitled to housing, because there is no such right. *See Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (declining to recognize a Constitutionally cognizable "fundamental interest" in "decent shelter" or "possession of one's home"). Rather, Plaintiffs allege that Defendants were aware that Baltimore's public housing and public housing-eligible populations were predominantly African–American and denied these individuals housing because of their race. Tr., at 4259, 4329.

Plaintiffs have not established their DWR claim. At the threshold, Plaintiffs have not proven that there was any racially discriminatory impact stemming from the "failure" to provide replacement housing. *See Palmer*, 403 U.S. at 224, 91 S.Ct. 1940 (finding Equal Protection is not compromised where state action does not produce a discriminatory effect).

Plaintiffs have not established that there were any state-imposed distinctions between African–American and White Baltimoreans in regard to DWR. Moreover, Plaintiffs have not proven that anyone was "denied" housing as a net result of Defendants' DWR practices. A number of the demolished structures were not habitable at all by the time they were torn down (or perhaps, at any time during the Open Period), but rather were vacant and abandoned—and, often, in dangerously unsound physical shape and crime-infested.[67] *See e.g.*, Tr., at 3173, 3381–3385, 3399.

Furthermore, even assuming that DWR produced some discriminatory effect, Plaintiffs have not established any racially discriminatory purpose for the policies. There is no proof that Defendants acted, even in part, "because of" Plaintiffs' race, as would be required to ground Constitutional liability.

Plaintiffs submit that the Court should draw an inference of Defendants' discriminatory purpose from their failure to replace the housing at issue, because the residents eligible for such housing were predominantly Black.[68] *Id.*, at 4352. Equal Protection jurisprudence permits a trier to infer that a defendant acted with discriminatory purpose. *See Arlington Heights I*, 429 U.S. at 266, 97 S.Ct. 555. The Court may find discriminatory purpose where "a clear pattern [of state action is] unexplainable on grounds other than race[.]" *Id.* In other words, it can be fair

---

66. The demolished structures at issue include the developments at Hollander Ridge and at Cherry Hill, as well as the C.K. Anderson housing project. Tr., at 4319.

67. Plaintiffs suggest that Defendants were under Constitutional obligation to replace even non-habitable structures with public housing, inasmuch as Local Defendants included non-habitable structures in their housing "inventory" for the purpose of obtaining federal funds. Tr. at 4332–33. Plaintiffs note, understandably, that even federal funds pegged to non-habitable structures are meant to go toward public housing. *Id.* at 4333. Yet, when structures valuable only as bases for funding are demolished, the most Defendants theoretically could be Constitutionally obligat-

ed to "replace" with respect to such structures is the value of the federal funding attributable to them, *not* the full value of decent housing, which (as Local Defendants point out, *see id.* at 4340) may be much higher. Here, the value of such federal funds may be deemed "replaced"—*i.e.*, distributed to individuals in need of public housing—via housing initiatives such as the Section 8 voucher programs.

68. For the purpose of addressing this particular contention (only), the Court assumes that Defendants failed to replace structures in which Plaintiffs might actually have been able to live.

to infer unconstitutional race-based discrimination without direct proof only if other reasonably plausible bases for state action are excluded by the evidentiary record. However, the instant case does not present such a situation.

The evidence establishes at least the plausibility, if not the truth, of Defendants' position that HABC demolished public housing without replacing it because, facing budgetary constraints, it sought to allocate extremely scarce resources to alternate (legitimate) public policy goals.[69] Indeed, various witnesses have testified, quite credibly, to the tight financial circumstances the Defendant government entities found themselves in during the Open Period.[70] *E.g.,* Tr., at 2690, 3564–66; *see also* Pls.' Ex. 569, at 53. Accordingly, the Court does not infer the existence of a racially discriminatory motive for Defendants' demolition without replacement practices.

Finally, the Court notes that Federal Defendants contend that "demolition without replacement" claims are barred by virtue of provisions of the 1996 Partial Consent Decree relating to replacement housing. *Id.,* at 4347. In view of the decision that the claim has not been established, it is not necessary to reach the issue of whether the DWR claim is barred by the Decree.

c. *The School 47 Decision*

■ Plaintiffs claim that Defendants violated their Equal Protection rights by

virtue of a 1992 decision not to build replacement housing for tenants of Fairfield Gardens at the site of School 47 on Eastern Avenue, on the south side of Patterson Park.

In 1987, HABC, with HUD's support, began in earnest the process that led to the demolition of Fairfield Gardens, a 300–unit low-income development whose residents were predominantly African–American. *See* Tr., at 900–01. HUD imposed on Local Defendants the obligation to provide replacement housing for the displaced residents and required that one-third (100) of the replacement units be placed in a non-impacted area. *Id.,* at 899.

Pursuant to the Partial Consent Decree, Local Defendants have placed twenty-four of these replacement units on East Preston Street in the Johnston Square neighborhood, an impacted area. Decree § 4.1(a). The Defendants did not choose, as they might have, to place some or all of these units at the available School 47 site in a non-impacted area. Plaintiffs contend that the School 47 site decision by the Schmoke Administration was made in furtherance of a pattern and practice of racially discriminatory siting.

The Defendants contend that the instant claim is barred by virtue of the Decree settlement. The Court will assume, however, that Plaintiffs may pursue their School 47 contentions as part of their pattern or practice claim.

The original School 47 building[71] was constructed in 1918. [Local Defs.' Ex. 438,

---

**69.** While Defendants could not racially discriminate in order to attain other legitimate policy objectives (*Arlington Heights I,* 429 U.S. at 265–66, 97 S.Ct. 555), the plausible evidence that Defendants acted solely to attain such legitimate objectives precludes the Court from inferring, in the absence of contrary affirmative proof, that Defendants acted with a discriminatory purpose.

**70.** The Court appropriately considers such historical background and the context for state action in the course of determining what kind of intent Defendants harbored. *Arlington Heights I,* 429 U.S. at 267–68, 97 S.Ct. 555.

**71.** This school was also called the Hampstead Hills Elementary School.

at 2] when the Patterson Park neighborhood was a working-class White row house neighborhood. *See e.g.,* Local Defs.' Ex. 172. The School 47 site originally included the school building and a playground. *See e.g.,* Local Defs.' Ex. 438, at 2. Thus, the 1918 site use design called for a playground adjacent to the school,, avoiding the need for children to cross Eastern Avenue [72] to get to a recreational area.

In or about 1988, the City decided to replace the original School 47 building with a new structure, to be built on the location of the original playground. *Id.* This presented the question of the use to be made of the original School 47 building. There was, understandably, neighborhood interest in the matter. As a result, Mayor Schmoke was personally involved in dealing with the neighborhood and in making the ultimate decision. *E.g. id.* at 3420–22.

In this context, some person or persons hostile to Mayor Schmoke [73] circulated flyers (or similar publications) stating, falsely, that the City was planning to build a high-rise, low-income housing structure on the site of the old School 47 building. Tr., at 3419–20; Local Defs.' Ex. 433 (copies of the flyer itself). In fact, at the pertinent time, Schmoke was considering the conversion of the old school structure into an apartment building for senior citizens. Tr., at 3419. There was significant neighborhood opposition to the incorrectly-perceived plan for placement of a low-income housing development on the School 47 site. *Id.* There was less, albeit some, opposition to the proposal of developing the site for senior housing.[74] As Mayor

Schmoke expressed it, there were a lot of views as to what the site should *not* be used for, but only one substantial affirmative position. In this regard, the School 47 parents and teachers wished the City to demolish the old building and use the "footprint" for a school playground and for teacher parking. *Id.,* at 3421. Mayor Schmoke decided to use the site as favored by the teachers and parents. *Id.,* at 3422. Accordingly, there was no construction of low-income (or any other) residential units at the School 47 site.

The Court finds no racially discriminatory motivation underlying Mayor Schmoke's decision regarding School 47. Of course, there may well have been some neighborhood residents who, for racially discriminatory reasons, opposed the nonexistent plan for low-income housing on the site. Indeed, it is probable that the person(s) who distributed the false information regarding the City's plans intended to foment racial animus. Nevertheless, there is nothing to cast doubt upon Mayor Schmoke's unequivocal testimony that he personally made the decision, made it without regard to any racially discriminatory views, and decided solely upon his understanding as to what was best for all of the citizens of the City.

Furthermore, even if confronted with a stark choice between siting Fairfield Gardens replacement units at School 47 or at the Preston Street (Johnston Square) location, Mayor Schmoke would not have acted in a discriminatory manner by choosing Johnston Square. Schmoke was seeking, in Johnston Square and elsewhere, to use

---

**72.** Eastern Avenue, at all relevant times, was a heavily trafficked street.

**73.** Mayor Schmoke testified that he believed he knew the identity of the person or persons. Inasmuch as the identity was immaterial, he was not asked to name the person(s) at trial. *Id.,* at 3419–20.

**74.** For one thing, as Schmoke testified, the community "just would not believe that all I wanted to [place] there was elderly housing." Tr., at 3422.

limited resources to do the most good for the most citizens of Baltimore City. Johnston Square was a distressed African–American neighborhood, but like so many others in Baltimore, it was not beyond saving. Indeed, Johnston Square (like similar neighborhoods) was not, and is not, a wasteland populated only by criminals and the hopeless. Rather, there are homeowners (and, presumably, some tenants) who hung on after their neighborhood deteriorated and who sought assistance in its revitalization. *Id.,* at 3402–03. There were neighborhood organizations and citizens who wanted to stay and who wanted to retake the streets from the drug dealers and others who preyed on them and their families. *Id.,* at 3402. Mayor Schmoke believed, in good faith, that the placement of twenty or so units of Fairfield replacement housing in Johnston Square would not only provide the displaced former high-rise tenants with housing better than they had endured, but also would serve the function of hastening the neighborhood's resurrection.

It appears that Mayor Schmoke's plan to revitalize Johnston Square did not turn out as well as had been hoped although he did have better results in other areas. *See* Tr., at 3382–86 (detailing the Schmoke Administration's efforts in the Sandtown neighborhood). Nevertheless, the decision that was made was not motivated, in any sense whatsoever, by racial discrimination. And it was not, in any real sense, a continuation of any past pattern or practice of discriminatory placement of low-income housing.

Finally, the Court observes that Mayor Schmoke's decision as to the use of the School 47 site—which is, after all, the decision at issue—is the same as had been made 80 years earlier by a predecessor administration in a context totally devoid of any racial factors. In 1918, when the neighborhood was all White and the only consideration was the best use of the site, the City decided that it was appropriate to have a school building with an adjacent playground across Eastern Avenue from Patterson Park. Mayor Schmoke's decision essentially constituted a *restoration* of the original design of the site. It cannot, by any stretch of the imagination, be viewed as part of any pattern or practice or racial discrimination.

To the extent that Federal Defendants could be considered involved with School 47 siting,[75] there is nothing to indicate that they had any particular role in Mayor Schmoke's decision. In any event, they have not been shown to have had a racially discriminatory intent in regard to the matter.

d. *Tenant Assignment Policies*

 Plaintiffs contend that HABC low-income housing tenant assignment policies have violated their Constitutional rights. In particular, Plaintiffs contend that HABC has utilized tenant assignment policies that promoted segregation by race.

During the period of *de jure* segregation, HABC's tenant assignment was, without question, racially discriminatory. There was a waiting list for White tenants for vacancies in White-only apartments, and there was another list for Black tenants for Black-only apartments. *See e.g.,* [Written Direct] Test. of john a. powell [*sic* ] ¶ 111.

Within months of the *Brown I* decision, HABC decided to desegregate its low-income housing units. Tr., at 4087. HABC, particularly in the context of the 1954–55 time frame, took prompt and aggressive action in this regard. Indeed, HABC was

75. *E.g.,* by providing support for Local Defen- dants in regard to the Johnston Square siting.

chosen to receive the 1955 Sidney Hollander Foundation Award [76] for "its success in bringing White and colored families together in the same projects." Local Defs.' Ex. 602, app. II, at tenth (unnumbered) page. HABC was selected for the Hollander Foundation award by a jury headed by Walter Sondheim (then-president of the Baltimore City Board of School Commissioners) that included, among other civic leaders, Robert Watts, a noted Baltimore African–American civil rights leader and later distinguished jurist. *Id.*, at third (unnumbered) page.

Plaintiffs criticize the 1950s HABC leadership because, in the transition to desegregation, it focused its attention on moving Black tenants into formerly *de jure* White housing developments but did not put forth equivalent efforts to promote the movement of White tenants into formerly *de jure* Black developments. Tr., at 4715. Even if the Court could find, in the Twenty–First Century with the benefit of a half-century of hindsight, that HABC might have proceeded somewhat differently, Plaintiffs' criticism is not justified.

In the immediate post-*Brown* era, HABC was at the forefront of progressive and affirmative action to break down existing racial barriers. By no means does the Court find that HABC's early post-*Brown* tenant assignment policies constituted deliberate violations of the Constitutional rights of African–American tenants because those policies did not require, or promote, White movement into formerly Black-only developments. To the contrary, the Court finds the 1950s civic leaders of Baltimore City worthy of commendation and appreciation for their prompt progressive action to undo race based segregation in housing.

While the Constitution does not necessarily impose upon HABC an affirmative duty to influence White low-income housing tenants to move into majority-Black areas, by the 1960s HUD promulgated policies in this regard. *See e.g.*, Pls.' Ex. 160. Plaintiffs contend, with some justification, that HABC's tenant assignment procedures have not been, and are not yet, in compliance with these HUD policies.

HUD's policies, and Local Defendants' compliance therewith, are relevant to questions of Constitutional liability, at least, for reasons set forth in *Brinkman.* In essence, Defendants should not frustrate their own desegregation policies. *Id.* at 538, 99 S.Ct. 2971. In this subsection, the Court, after describing the formulation and implementation of tenant assignment policies, shall consider whether any frustration thereof constitutes *purposeful* discrimination.

Since as early as 1967, HUD has required local housing authorities to use one of two tenant assignment plans, denominated "Plan A" and "Plan B." *E.g.*, Tr., at 857. In locations such as Baltimore City in which there were long waiting lists,[77] these Plans were designed to promote a somewhat random assignment of tenants to vacant apartments. *See* Pls.' Ex. 160, at 1.

Under Plan A, a "one strike" plan, an applicant who came to the top of the waiting list was notified of the first available

---

76. The Sidney Hollander Foundation was a Baltimore civil rights organization. Hollander Ridge was named in honor of Mr. Hollander.

77. During the 1980s and 1990s, the City's waiting list grew to the point that applicants needed to wait many years for housing; in 1993, according to Commissioner Henson, some 50,000 applicants were on the list. Tr., at 3173.

438

apartment[78] and given the choice to reside in that apartment or go to the bottom of the waiting list. Tr., at 857.

Under Plan B, a "three strikes and out" plan, an applicant who came to the top of the waiting list was notified of the first available apartment[79] and twice was given the option to reside in that apartment or await the next available apartment. If the applicant rejected an offered apartment three times, the applicant was put at the bottom of the waiting list. *Id.*

By about 1980, the HABC high-rise low-income housing developments—although integrated in the sense that none was completely White—remained racially identifiable. The tenant makeup was:

| Housing Development | % African–American in 1981 |
|---|---|
| Brooklyn | 21% |
| Claremont | 40% |
| Fairfield | 100% |
| Flag House | 99% |
| Latrobe | 99% |
| O'Donnell | 32% |
| Perkins | 97% |
| Westport | 100% |

Written Direct Test. of Shelley Lapkoff, at 52.

By 1981, HUD directed HABC to utilize Plan B, the three-strike plan, as an affirmative desegregative step. Pls.' Ex. 164. HABC did not, however, utilize a pure Plan B system and, also, did not properly operate the system that it was using.

In terms of the system itself, HABC offered applicants a choice of four "re-gions,"[80] within each of which were several public housing developments. *See* Pls.' Ex 162, at seventh page. While the regions were by no means gerrymandered, and while they related reasonably to anticipated tenant neighborhood preferences,[81] there were racial differences. The developments in the Northwest and Central East regions were essentially 100% Black, the Southeast region included the Brooklyn project (which was approximately 90% White) and other (predominantly Black) developments, and the East region included the O'Donnell and Claremont developments and was majority White. *See* [Written Direct] Test. of Karl Tauber, at 59.

The net effect of the regional choice was to allow some applicants the opportunity to use the racial composition of a development as a factor in the assignment process. *See, e.g.,* Tr., at 1259. Accordingly, those who wished to live in an all-Black development could choose the Northwest and Central East regions. Those who wished to live in a development with as few Blacks as possible could choose the Southeast or East region and then utilize their three strikes to increase the probability of ending up in projects with the lowest percentages of Black residents (e.g., Claremont, O'Donnell, or Brooklyn).

HUD was aware of HABC's "regional choice" gloss on Plan B, expressed con-

78. Presumably, the applicant was notified of apartments of the size meeting his/ her accommodation criteria.

79. Presumably, the applicant was notified of apartments of the size meeting his/ her accommodation criteria.

80. For purposes of clarity, the word "regions" is used herein to designate an area including several developments—though the parties have, confusingly and inconsistently, employed a number of other terms, such as "locations." *See* Tr., at 2170.

81. The regions were the Northwest, Central East, East, and Southeast. *See* Pls.' Ex 162, at seventh page. There were, and are, strong resident preferences for particular regions. Hence, tenants living in the Northwest region might have found a transfer to the East region—even if the new location were similar from a racial and demographic point of view—an undesirable change. *See* Tr., at 100 ("there was a reluctance of Negro families from either East or West Baltimore to move to the other side of the City").

cerns [82] and, finally, by 1990 succeeded in getting HABC to convert to a pure Plan B system. *Id.*, at 1486–87. However, the regional choice gloss was not the only problem with HABC's tenant assignment policy.

In addition to perhaps inevitable individual incidents,[83] there was a systemic inability to maintain an accurate waiting list and to fairly administer it. The Court must note, however, that there has not been proof of a single incident in which an African–American applicant was denied an available apartment or otherwise treated unfairly by virtue of his or her race. Nevertheless, it is a fact that HABC did not have an accurate waiting list. *Id.*, at 862. Notably, it was not accurately keeping track of "strikes," so that, in effect, applicants could not only pick a region, but also continue to reject any offered apartment until they were offered one in a development of their choice. *See, id.* at 862–63.

As a result of the regional choice feature and the absence of adequate waiting list management, Defendants cannot refute Plaintiffs' contention that White applicants were able to obtain assignment to a disproportionate number of apartments in developments such as Claremont and O'Donnell, at least through 1990. Such shortcomings in Local Defendants' administration of "Plan B" would appear to constitute violations of HUD policies. Moreover, even if HABC otherwise had been operating pursuant to HUD policies, the absence of verifiable data was, itself, a violation of said policies.

HABC has undertaken to correct these problems. Notably, by June 2003, HABC began utilizing a computer system designed to better handle demographic data and thus more appropriately manage tenant selection processes. *Id.*, at 1510.

As of the time of trial, the matter of HABC compliance with HUD tenant assignment policies had not been entirely resolved. HABC claimed that it reached full compliance by June 2003, while HUD deferred making any finding as to whether HABC's newly implemented data management system complied with federal policy. In any event, there is no evidence whatsoever that at any time, and most certainly not after Mayor Schmoke took office in 1987, there was any intentional action that prevented any African–American applicant from obtaining assignment to an apartment due to race. Moreover, Plaintiffs have not proven that Local Defendants' administrative failures were inspired by racial animus or any other manner of "discriminatory purpose."[84]

Finally, the Court finds that the Plaintiffs have not proven that Federal Defendants' failure to get Local Defendants "in line" with federal policies constitutes any kind of intentional race discrimination. In fact, HUD has made good faith efforts to improve HABC's tenant selection practices.

---

**82.** Indeed, HUD officials ultimately communicated with HABC quite forthrightly, for instance stating, "you *immediately* must cease using the project/locational preferences[.]" Pls.' Ex. 166 (emphasis in original).

**83.** There is no doubt that, over the years, due to such causes as innocent human error, negligence, bribery, political influence and the like, some applicants were given favored treatment. *See* Tr., at 863 ("selections were not being made from the [waiting] list"). The evidence does not establish that this was consistent with the policy of any HABC administration.

**84.** To the contrary, the Court finds that at least certain of Local Defendants' shortcomings, though unreasonable, are more likely products of administrative negligence than of a more nefarious *"mens rea."*

In sum, Plaintiffs have not proven state action relating to tenant assignment policies, during the Open Period, that purposefully contributed to segregation within Baltimore City's public housing developments. Accordingly, the Court holds that Plaintiffs have not proven that Defendants violated Plaintiffs' Constitutional rights by virtue of the tenant assignment policies at issue.

e. *Pattern and Practice of Discrimination*

 Plaintiffs allege that Defendants, during the Open Period, perpetuated a pattern and practice of affirmative and purposeful discrimination against them in violation of the Equal Protection guarantees. As discussed herein, the Court finds (1) that Defendants' Open Period conduct was not part of any such pattern or practice and (2) that the Defendants did not intend to perpetuate a pattern or practice of race based segregation. *E.g., Washington v. Davis*, 426 U.S. at 229, 96 S.Ct. 2040.

Initially the Court must note that many of the Plaintiffs' claims based upon an alleged "pattern and practice" were resolved by the 1996 Partial Consent Decree. For example, certain units at issue (*see* Tr., 4589–4603) are replacement housing for the demolished Fairfield Homes development (*see* Decree § 1.4). Moreover, other allegedly discriminatory conduct evidencing a pattern or practice, such as the Hollander Ridge Fence and the School 47 siting decisions, have been determined not to constitute racially discriminatory conduct and to have been based upon legitimate nondiscriminatory reasons.

Some policies claimed by Plaintiffs to be part of a segregatory pattern or practice did not have a substantial (if any at all) discriminatory effect. For instance, Defendants' tenant assignment policies during the Open Period did not add to the existent segregation of Baltimore's public housing population.

The litany of housing-related state actions relied upon by Plaintiffs to establish a pattern or practice of segregation do not establish a viable claim. Of course, it is theoretically possible that Defendants could have confronted housing decisions with a one issue, dogmatic, approach wherein the cause of racial integration trumped all other considerations. Had they done so they could have, conceivably, decided not to use some, or all, of the 36 sites that Plaintiffs' expert opined were available and not selected for public housing. There is no doubt that, had such choices been made, Baltimore City would be far different from what it is today. Yet can it realistically be said that this hypothetical Baltimore would have been better for members of the Plaintiff class much less for all residents without such resources as Cross Keys,[85] the Canton resurrection[86] and the uses put to the other 34 locations identified as "available" for public housing by Plaintiffs' expert? Or, is it not more realistic to conclude that had Defendants made such decisions, the city would have suffered economic and quality of life detriments that would have greatly augmented the problems faced by Defendants in their efforts to provide better housing opportunities in the city for all, including— but not limited to—members of the Plaintiff class.

---

**85.** Now, the 72 acre site for a mixed use community of housing units ranging in price from about $100,000 to $500,000. *See* Nathanson [Written Direct], at 2.4.

**86.** For example the Canton Square site that is now used for a 133 unit upscale townhouse development extending over 9 blocks that is a key part of the revitalized Canton community. *See* Nathanson [Written Direct], at 1.3.

The Court finds that during the Schmoke administration there was no intent to establish, or continue, a pattern or practice of race based discrimination. Rather, the administration was acting—in a nondiscriminatory way—to allocate the use of limited resources in a balanced way for the benefit of all city residents. Some of the actions were directly intended to benefit persons who would be members of the Plaintiff class. For example, Mayor Kurt Schmoke and Housing Commissioner Henson testified that siting policies were crafted to maximize low-income individuals' access to housing (Tr., at 3178, 3435) and to revitalize neighborhoods in need (Tr., at 3188–91). Other actions were, of course, devoted to other civic needs.

There is no doubt that virtually every policy decision made in regard to housing is subject to reasonable debate. Moreover, there are few, if any, certainties. Nevertheless, in the context of the Baltimore city population that is overwhelmingly African–American, it is simply unwarranted to claim that Mayor Schmoke (ironically, the first elected African–American Mayor of Baltimore City) made policy choices, including those at issue herein, with the intent to discriminate against African–Americans.

In sum, Plaintiffs' have not proven that the Schmoke Administration intended to, or did, create or perpetuate a pattern or practice of racial segregation in regard to public housing.

### f. The 1950 City Council Ordinance

██ Plaintiffs contend that Ordinance No. 1077 ("the Ordinance"), passed by the Baltimore City Council in 1950 and still in effect, violates their Equal Protection rights under the U.S. Constitution. Plaintiffs ask the Court to strike down the

Ordinance as unconstitutional. Tr., at 4405. For the reasons discussed herein, the Court shall not do so.

Essentially, the Ordinance gives the City Council final say over the siting of public housing projects; per the Ordinance, the Council may effectively "veto" the HABC's plans. See Pls.' Ex. 115. Plaintiffs argue that the Ordinance "has always been used to concentrate... African–American public housing residents in [impacted [87] areas of the City]," [88] that it is therefore part of Defendants' discriminatory conduct, and that the Court should accordingly invalidate the Ordinance in reliance upon precedents such as *United States v. Yonkers*, 624 F.Supp. 1276 (S.D.N.Y.1985) ("*Yonkers*"), and *Gautreaux v. Chicago Hous. Auth.*, 296 F.Supp. 907 (N.D.Ill.1969) ("*Gautreaux*").

### (1). Affirmative Purposeful Discrimination

In both *Yonkers* and *Gautreaux*, local government defendants had "veto power" over siting similar to that possessed by the Baltimore City Council. See *Yonkers*, 624 F.Supp. at 1294; *Gautreaux*, 296 F.Supp. at 910. However, in both *Yonkers* and *Gautreaux*, this power was actively exercised, to affect segregation. See *Yonkers*, 624 F.Supp. at 1370 (housing projects, with "extreme consistency [were] rejected, abandoned, or otherwise opposed" in White areas of the city); See also, *Gautreaux*, 296 F.Supp. at 912. Moreover, in both of those cases, the local legislature's power was infused with an active system of councilman "courtesy," whereby the legislature would exercise its veto in accordance with the wishes of the legislator in whose district or ward the dwellings were cited. *Yonkers*, 624 F.Supp. at 1369; *Gautreaux*, 296 F.Supp. at 910.

---

**87.** See footnote 3, *supra*.

**88.** Tr., at 4409.

During the Open Period, there were no public housing proposals for the Council to act upon except for those governed by the Partial Consent Decree in this case. The veto power was never wielded by the City Council to block proposals of the Mayor or the HABC.[89] Moreover, as Mayor Schmoke testified, local councilman "courtesy" never played a role in major housing decisions. Tr., at 3486.

Of course, it is theoretically possible that the existence of the Ordinance could present a practical barrier to certain proposals that might have been put before the City Counsel. Nevertheless, Plaintiffs have not proven that there was any particular proposal (or group or type of proposals) that was blocked by virtue of the veto power. Moreover, the fact that the population of Baltimore City was predominantly African–American renders it unlikely, indeed, that elected officials, including the Mayor and members of the City Council, would have engaged in race based discrimination against the majority of the voters. Therefore, Ordinance No. 1077 was simply not part of an actionable, consummated Constitutional violation.

In the absence of any ascertainable discriminatory effect, the Ordinance cannot be declared unconstitutional. *Palmer*, 403 U.S. at 224, 91 S.Ct. 1940.

### (2). *The Ordinance as a Vestige*

■ The Court shall assume, as Plaintiffs urge,[90] that Ordinance 1077 is "traceable" to the era of *de jure* segregation, *i.e.,* that the Ordinance had been conceived and initially operated as a mechanism of state-supported discrimination. Even with this assumption taken, the Court will not invalidate the Ordinance.

The continued legal effectiveness of the 1950 Ordinance posed absolutely no threat to Plaintiffs' Constitutional liberties during the Open Period and poses none thereafter. The City Council's possession of a veto on housing decisions is unlikely to affect discrimination, primarily because the demographics of the City's body politic—and of the Council it elects—have changed so remarkably in the last few decades.[91] *See* Local Defs.' Ex. 172 (census data); *see also* Local Defs.' Exs. 592–94

Demographic change has rendered the 1950 Ordinance racially benign, insofar as a Council elected by a majority-minority electorate is unlikely in the extreme to invidiously discriminate against the bulk of its constituency. *Cf., United States v. Carolene Products Co.,* 304 U.S. 144, 153 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (citing the relative political vulnerabilities of "discrete and insular minorities," toward whom legislative processes may be particularly unresponsive).

Finally the Court notes that not even Plaintiffs' counsel could suggest a "better" way to structure the City's decisional authority regarding housing policy. Tr., at 4407–09. Most certainly, there would be no ascertainable "improvement" if the democratically elected legislative entity were stripped of its authority and decisional power were exclusively the prerogative of the executive or given to a group selected by the Court. Moreover, if this Court

---

**89.** Mayor Schmoke testified, "I just don't recall the council[,] other than... confirm[ing] the housing commissioner,... having any other policy approval. [W]e did not often have disputes with the city council about public housing." Tr., at 3485.

**90.** Tr., at 4261.

**91.** The Court rightly considers demographic changes over time in the course of construing Defendants' remedial obligations under *Brown II* and its progeny. *See Freeman,* 503 U.S. at 494–96, 112 S.Ct. 1430.

were to impose a judicially monitored system on the City to avoid racial discrimination against African–Americans, how could it improve upon a process placing decisional authority in a group elected by the citizens, the majority of whom are African–American? The Ordinance, even if viewed as a remnant of the discriminatory system that existed more than a half century ago, is not, today, a vehicle for discrimination. The City has no Constitutional duty to rescind or change Ordinance 1077.

### 2. *Duties Related to Past Discrimination*

There is no doubt that, prior to 1954, African–Americans in Baltimore City were subjected unconstitutionally to second-class status by virtue of being separated from their neighbors on the basis of their race. This segregation was effected by, among other things,[92] a public housing system (administered by Local Defendants, with Federal Defendants' support) that, *de jure,* housed Blacks and Whites in different and separated developments. *See e.g.,* [Written Direct] Test. of Karl Taeuber, at 20–27. Defendants' pre-*Brown* discrimination was purposeful and of such nature as to potentially adversely impact numerous African–Americans over prolonged periods of time.

Purposeful discrimination of a pervasive and chronic nature may confer upon governments an affirmative duty to remedy past wrongs. *See Brown II* at 298, 75 S.Ct. 753. Since Plaintiffs have demonstrated past affirmative and purposeful segregatory actions by Defendants in the administration of housing policy, the Court must determine the extent and nature of Defendants' obligations on the basis of the circumstances here presented. Equal Protection liability will lie if Plaintiffs demonstrate that Defendants, regardless of their Open Period intent, failed to fulfill such obligations during the Open Period.

The Court holds that during the Open Period, with one notable exception, Defendants generally acted fairly and in good faith, undertaking justified and acceptable measures to rectify the inequities inherited from the past. There was, nevertheless, a significant exception.

Federal Defendants failed to take adequate action to disestablish the vestiges of the discrimination they had participated in imposing. Specifically, in administering its housing policies during the Open Period, HUD failed adequately to consider policy options whereby low-income African–American families from Baltimore City might be afforded housing opportunities beyond the City limits. Indeed, Federal Defendants did not improve, and may have worsened, the racially discriminatory situation by making no more than token efforts to take a regional, rather than merely a city limited, approach to the siting of housing for members of the Plaintiff class.

As discussed more fully below, the failure adequately to take a regional approach to the desegregation of public housing in the region that included Baltimore City violated the Fair Housing Act and requires consideration of appropriate remedial action by the Court.

#### a. *Historical Context*

Shortly after the U.S. Supreme Court's decision in *Brown I,* and even before the *Brown* principle that separate was inherently unequal definitively had been applied beyond public schools, Local Defendants voluntarily began efforts to dismantle the

---

**92.** By virtue of so called "Jim Crow" laws and local customs, African–Americans in Baltimore City (and the rest of Maryland as well) were subjected to racial segregation in regard to such places as schools, parks, restaurants, theaters etc.

*de jure* segregation of Baltimore's public housing. Baltimore City was one of the very first of the then *de jure* segregated cities to step forward and take positive steps to integrate housing. Measured by their own time—and even with the "twenty-twenty" hindsight of half-a-century—it is clear that the contemporaneous Baltimore City leadership acted rapidly, responsibly and effectively. Public housing applicants, for the first time, were given choices of dwellings without regard to their race. Local Defs.' Ex. 138, at first page. Perhaps more importantly, City employees were made aware of their obligations to inform minority applicants of their new choices and met their obligation. *Id.,* at third page; Local Defs.' Ex. 141, at first page. Civil rights leaders and religious leaders were invited to facilitate the processes of desegregation. Local Defs.' Ex. 143. Moreover, housing developments were sited adjacent to majority-White neighborhoods. Flag House was sited adjacent to Little Italy in 1956, and (with Federal Defendants' encouragement) Hollander Ridge was sited adjacent to the Rosedale section of Baltimore County in 1971. *See* Written Direct Test. of William M. Rohe, at 20–21, 23–24, 50, 53.

The commendable history of desegregative efforts in post-*Brown* Baltimore is a "local condition" duly considered by the Court in assessing Defendants' remaining *Brown II* obligations. *Brown II,* 349 U.S. at 298, 75 S.Ct. 753. The fact that genuine and reasonable efforts have been made by Defendants warrants a measure of deference to those decisions by Defendants that reflect a good faith balancing and implementation of legitimate, sometimes competing policy imperatives.[93]

### b. *Policy Justifications*

■■■ The Federal and Local housing policies at issue herein are, of course, the products of legitimate and often difficult policy decisions. Consistent with *Fordice,* the Court must consider "sound [housing] justification[s]" in assessing whether Defendants have unmet remedial obligations under the Constitution. *Fordice,* 505 U.S. at 731, 112 S.Ct. 2727.

### (i). *Revitalization*

As former Baltimore City Housing Commissioner Daniel Henson testified, a key goal underlying the housing policies of the Open Period was the revitalization of Baltimore's neglected neighborhoods. Local Defendants sought to revive these (predominantly African–American) neighborhoods—and address racial disparities—by rehabilitating dwelling structures, by drawing higher-income residents back into the neighborhoods, and by thus providing existing residents, particularly younger ones, positive role models and a safer environment. Tr., at 3162–63, 3188–91.

### (ii). *Maximizing Available Housing*

Commissioner Henson testified, and former Baltimore Mayor Kurt Schmoke confirmed, that a further consideration informing the decisions of housing policymakers was the goal of housing as many as possible of the individuals and families that needed public housing. Henson stated, "[W]hat we were looking for was for decent, safe housing for people[;] we were simply looking to be able to put a roof over people's heads with the waiting list being what it was in the early and mid '90s." *Id.,* at 3178. *See also id.* at

---

93. By contrast, where defendant government entities have not faithfully promoted, but rather have obstructed, desegregation, more rigorous judicial intervention has been deemed appropriate. *See, e.g., Green,* 391 U.S. at 438, 88 S.Ct. 1689; *Griffin,* 377 U.S. at 234, 84 S.Ct. 1226.

3435 (Schmoke: "I saw it as our goal to try to provide decent affordable [housing] opportunities for people regardless of where it was in the city...").

Certainly, there has been tension between the goals of equalizing racial distribution in Baltimore and providing the maximum number of housing opportunities for public housing tenants. Specifically, as Local Defendants contend,[94] predominantly White and wealthy areas of Baltimore (such as Guilford, Homeland and Mount Washington) are characterized by a relatively low supply of rental dwellings and relatively high values of suitable properties. *See, e.g.,* Eric Siegel, *30 Low–Income Rent Units Cost City $7 Million: Buying and Fixing Up Vacant Houses to Scatter Subsidized Tenants Among Middle–Class Neighborhoods Proves Expensive,* Balt. Sun, Mar. 20, 2004, *available at* 2004 WL 72799311. Siting public housing in such neighborhoods may be seen as furthering desegregation,[95] but, in view of the costs involved, it may (especially given budgetary restraints)[96] also mean that fewer needy people receive adequate housing. Of course, the Court does not hold, or even suggest, that placing public housing in relatively well-off neighborhoods (*e.g.,* as Defendants have done pursuant to the Partial Consent Decree) is unwise or inappropriate.

### (iii.) *Enabling Tenant Choice*

Defendants, by their housing policies, sought to recognize the fundamental dignity in choice regardless of race. Mayor Schmoke testified:

> [W]hat government officials should be doing is providing opportunities for people to live wherever they want to live... [W]hat I'm trying to get away from is the suggestion that it ought to be the role of government to provide some sort of particular racial formula or balance, or get some specific goal or quota for every neighborhood. I don't think that's the role of government.

*Id.,* at 3433–34.

Certainly, a government defendant may not immunize itself from Constitutional scrutiny by including within its policies a technical or non-meaningful element of "choice." *See, e.g., Green,* 391 U.S. at 441, 88 S.Ct. 1689. Yet, it does not follow that Defendants are proscribed, within their policy calculus, from valuing the conferral upon public housing tenants of real choices as to where they might live. The principles of the *Brown* decisions do not require a *Korematsu*-style[97] housing policy,

---

94. Tr., at 4685–86.

95. The Court notes, however, that segregation is not universally defined in terms of demographics alone, but perhaps also in terms of socio-economics and culture. *Id.,* at 3529 (testimony of Dr. Lenneal Henderson, professor at the University of Baltimore). Defined in this way, desegregation may be promoted by housing policies that improve the economic conditions of inner-city African–Americans, as well as by policies that locate African–Americans in White neighborhoods.

96. In this vein, the Court must note that to some extent Defendants' policies were made amid constraints that were beyond their control. Notably, both Federal and Local Defendants are dependant on federal funding and must therefore base their own decisions upon appropriations decisions made (wisely or otherwise) by Congress and the President. *See id.,* at 3154 (demonstrating HABC's dependence on federal money); Pls.' Ex. 47 (demonstrating HUD's dependence on the legislative budget process). Such limitations have made more difficult the choices by which Defendants balanced the aforementioned housing goals against the imperative to desegregate, and thus these limitations are rightly considered by the Court.

97. *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

whereby public housing tenants are coerced into certain developments so that the supposed "greater good" might be served. In this narrow respect, there may well be some distinction between the primary education and housing Equal Protection cases: While states have readily required children to go to (certain) schools, the rights of individuals to enjoy real property (and the free choices that make such rights meaningful) lie at the heart of the Fourteenth Amendment's guarantees, "regarded by the framers of that Amendment as [ ] essential pre-condition[s] to the realization of other basic civil rights and liberties . . ." *Shelley v. Kraemer*, 334 U.S. 1, 10, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). It may well be appropriate, therefore, for government defendants to value tenants' choices in structuring public housing policies.

The Court holds that the Defendants had a legitimate justification for their efforts to empower public housing tenants to decide for themselves where they live, and in seeking to revitalize neighborhoods and maximize housing opportunities.

### c. *Demographic Change Over Time*

As discussed above in regard to Defendants' *Brown II* obligations, the Court must consider the passage of time and demographic changes inasmuch as these might dull the lingering effects of past segregation and render judicial intervention less appropriate. *See Freeman*, 503 U.S. at 494–96, 112 S.Ct. 1430. In fact, the fifty years that have passed since the *Brown* cases were decided have seen remarkable changes in the makeup and attitudes of the city government and Baltimore City as a whole. *See* Local Defs.' Ex. 602, at 3–4 (Eleanor Roosevelt writes on Baltimore's progress in addressing racial discrimination as early as the mid–1950s).

Demographic change is relevant herein for two reasons. First, the democratically elected branches of the local government are directly accountable to Baltimore's majority-minority (African–American) electorate. This renders judicial scrutiny over the policies undertaken by Local Defendants less appropriate than would be the case if non-minority voters dominated the electorate. *Cf., Carolene Products Co.*, 304 U.S. at 153 n. 4, 58 S.Ct. 778.

Second, as Baltimore City's public housing tenants (and those awaiting public housing to become available) are now predominantly African–American,[98] the effects of any "internal segregation" (*i.e.*, segregation within the public housing system, as opposed to "external segregation"—public housing tenants' exclusion from surrounding communities) have been particularly dulled. There are no longer any all-White or majority White public housing projects. Moreover, in view of the almost all Black public housing population, there is no conceivable method of administration that would enable meaningful internal desegregation of public housing in Baltimore City. The Court notes, however, that were Federal Defendants to take a regional approach it would be possible to make progress toward desegregation *within* public housing in the region that would benefit members of the Plaintiff class.

---

**98.** *See, e.g.*, Local Defs.' Ex. 588 (as of December 31, 1991, approximately 92% of Baltimore City public housing tenants were Black). The fact that Baltimore public housing communities and Baltimore's low-income public-housing-eligible population have become disproportionately African–American is clearly cause for concern. This warrants political action at multiple levels of government to address racial disparities. But Plaintiffs do not allege that Defendants unconstitutionally affected this demographic development, and so the Court does not consider it further herein.

In short, time and demographic change have rendered less harmful the vestiges of past state-supported discrimination within public housing. Moreover, such change has made it essential futile to seek to effect meaningful internal desegregation of public housing unless a regional approach—including public housing outside of the city limits—is taken.

### d. *Impeding Desegregation*

The Court must consider whether, and to what extent, Defendants have undermined their own disestablishment policies or otherwise impeded desegregation. *Brinkman,* 443 U.S. at 538, 99 S.Ct. 2971. As the history of Defendants' desegregative efforts suggests, the record of the instant case does not establish conduct by Defendants that even potentially might have impeded desegregation—*except* with respect to:

1. The manner by which tenants were selected for the various housing developments in Baltimore City, and

2. Federal Defendants' failure to consider regional public housing policies.

### (1). *Tenant Assignment Policies*

HABC operated under two Plans for tenant assignment:

1. Under Plan A, a "one strike" plan, an applicant who came to the top of the waiting list was notified of the first available apartment[99] and given the choice to reside in that apartment or go to the bottom of the waiting list.

2. Under Plan B, a "three strikes and out" plan, an applicant who came to the top of the waiting list was notified of the first available apartment[100] and twice was given the option to reside in that apartment or await the next available apartment. If the applicant rejected an offered apartment three times, the applicant was put at the bottom of the waiting list. Tr. at 1258.

William Tamburrino, Director of HUD's Baltimore Office of Public Housing ("Tamburrino"), acknowledged that "[HABC's] method of administering a tenant selection and assignment plan posed a potential problem in that it could tend to exacerbate existing racially segregated conditions[.]" *Id.,* at 1259. Essentially, the risks in the plan's design lay in the plan's choice provision. Thus, Whites might choose "White projects," Blacks might choose "Black projects," and the internal segregation of public housing thereby might be perpetuated. *See id.,* at 1259. Defendants sought to mitigate these risks, and to minimize tenants' chances to use the process to make a race based decision[101] by their "three strikes and you're out" provision, whereby a tenant who refused three units would be placed at the end of the line.

However, HABC did not administer the tenant selection system effectively for at least some significant part of the Open Period. Inadequate records were kept as to prospective tenants places on the waiting list and the number of "strikes" (*i.e.,* refusals of suitable housing) they had. As

---

**99.** Presumably, the applicant was notified of apartments of the size meeting his/ her accommodation criteria.

**100.** Presumably, the applicant was notified of apartments of the size meeting his/ her accommodation criteria.

**101.** Of course, the policy also reduced the ability of a tenant to make choices based upon other, more benign, criteria. Thus, if a tenant preferred to be in a particular location for family or church reasons, the tenant had to be "lucky" with one of the three choice made available.

a result, Defendants could not monitor, and thus could not counteract, such exercise of tenants' choices as might perpetuate segregation.[102] They could not enforce the "three strikes" provision designed to further desegregation.

Nevertheless, because by the 1990s the Baltimore public housing population was predominantly African–American,[103] the flaws in Defendants' tenant assignment policies did not have substantial effects as a practical matter. Accordingly, during the Open Period the proportion of African–American public housing residents in Baltimore City was so high that there was no possibility of accomplishing any meaningful desegregation in the context of the City's public housing projects.

(2). *Regionalization*

As discussed below in the context of Plaintiffs' claim under the Fair Housing Act, Federal Defendants' failure to consider regional public housing policies during the Open Period had potentially significant adverse effect on the elimination of vestiges of *de jure* segregation in public housing.

e. *Consent Decree Remedies*

In the 1996 Partial Consent Decree, Defendants agreed to undertake a number of steps to ameliorate the effects of past segregation of public housing. Specifically, Defendants promised to demolish the crime- and poverty-infested High Rises and to provide Replacement Housing for public housing tenants at sites throughout Baltimore. Decree § 1.4. Defendants have (albeit with delay) made progress in performing on these promises, and this Court

has retained jurisdiction over Defendants with respect to the Decree, so that it may ensure that Defendants fully live up to these promises. *See, e.g.,* the Court's Order of January 30, 2004. Moreover, the Partial Consent Decree (with its amendments) remains in effect and will continue to be implemented by the Court.

The Court considers the remedies that have been undertaken by Defendants in the course of determining whether Defendants have any unmet obligations under *Brown II* and its progeny. *See Freeman,* 503 U.S. at 494–96, 112 S.Ct. 1430. The Court finds that Defendants have made significant efforts to meet their remedial obligations in connection with their promises in, and performance on, the 1996 Consent Decree.

f. *Effectiveness of Defendants' Policies*

The Court should not evaluate Defendants' desegregative efforts in terms of good intentions alone, but must also consider the extent to which these efforts have been effective in disestablishing segregation. *Brinkman,* 443 U.S. at 538, 99 S.Ct. 2971. However, it is neither required nor proper for this Court to be a Monday morning quarterback. Rather than merely pointing out shortcomings in Defendants' policies as they become evident with hindsight, this Court must assess the propriety of Defendants' actions in the context of the times in which they were taken

Of course, with the benefit of a half-century of post-*Brown* experience, it is possible to argue that even more might have been done if (and, perhaps it is a

---

**102.** Tamburrino testifies, "[HABC] was not maintaining updated information, and that... waiting list included a lot of records that had not been updated, and it was just making a big difference in the ability of their data system to do any good work." Tr., at 862. *See*

*also,* Federal Defs.' Exs. 212–13, 218 (correspondence between HABC and HUD, discussing this shortcoming); *Id.* at 218 (same).

**103.** *See, supra* note 7 and accompanying text.

major "if") the public will would have permitted at the time. However, as is graphically illustrated by the evidence in the instant case, even the most progressive of civil rights leaders of the time simply did not have the sensitivities that are commonplace today. For example, the booklet entitled *Toward Equality*, published in 1960 by the Sidney Hollander Foundation as a tribute to civil rights leaders, had on its cover a photograph of Black and White children together at camp engaged in a Native American dance. In the booklet, the photo is captioned, "Integrated Redskins." Local Defs.' Ex. 602, at 47. In today's world, such a reference to Native Americans in a publication by a civil rights advocacy group would be unthinkable. But, in this regard, as in regard to the policies of the Baltimore City leadership in the immediate post-*Brown* time frame, it is only fair to judge the actors in the context of their time. So judged, the Baltimore City leadership of the post-*Brown* era deserves accolades, not criticism.

Also, in light of Defendants' evidenced good faith, the Court must afford some measure of deference to Defendants' reasonable decisions. *See, Belk v. Charlotte–Mecklenburg Bd. of Educ.*, 269 F.3d 305, 318 (4th Cir.2001).

Local Defendants' early desegregative efforts were lauded by contemporaries as both well-intentioned and effective. In 1955, the HABC received the Sidney Hollander Foundation Award for "voluntary and effective integration in public housing occupancy." Local Defs.' Ex. 602, app. II, at third (unnumbered) page.

The Defendants' Section 8 voucher programs have had some positive desgregative effects. Dr. Shelley Lapkoff[104] testified: "In both theory and practice, the two Section 8 programs provide tenants with more opportunities to live in Census tracts with below-average percentages of African–Americans than do public housing." Written Direct Test. of Shelley Lapkoff, at iii.

Plaintiffs characterize Defendants' cooperatively administered "Section 8" rent voucher programs as a "complete train wreck" (Tr., at 4645). Certainly, Defendants do not deny that the voucher programs are flawed. *See* Tr., at 4690. However, the Section 8 programs administered in the Baltimore area are not, as a matter of Constitutional law, unconscionably deficient. Nevertheless, the potential of the Section 8 programs is limited by the relative unavailability, in the counties surrounding Baltimore City, of housing toward which Section 8 vouchers may be applied. Regarding the siting of public housing, the bulk of Defendants' decisions were based upon sound policy justifications, and in some cases Defendants' actions clearly ameliorated external segregation (*i.e.*, the separations between predominantly Black public housing developments and predominantly White neighborhoods).[105] Moreover, pursuant to their promises in the 1996 Partial Consent Decree, Defendants have placed public housing dwellings in virtually every sector of Baltimore City. However, the effectiveness of Federal Defendants' siting polices is limited by HUD's less than adequate

---

104. Dr. Lapkoff, formerly a professor at the University of California at Berkeley, is president of Lapkoff & Gobalet Demographic Research, Inc.

105. Two such cases are Flag House and Hollander Ridge. Though the Court does not find that either site was without significant problems, it can hardly be denied that—for better or for worse—the decisions to site these developments led to increased interactions between predominantly Black tenants and their predominantly White neighbors.

consideration of public housing opportunities beyond the City limits.

With respect to tenant assignment, Defendants sought to balance desegregatory goals with the policy goal of promoting individual and family choice concerning housing, and the dignity that accompanies such choice. In this regard it is appropriate to note that there is a distinction between telling a person that he or she may not live in place because of race and giving the person a choice so long as the place in question is, in fact, available to anyone without regard to race.

Mayor Schmoke testified regarding his view of the importance of providing choices in housing that were limited by economics, not by race. *See e.g.*, Tr. 3457–58. Schmoke acknowledged that choice in where one lives—whether it be in public or private housing—often results in communities where residents are predominantly one race but that "the fact that you're in a predominantly black community by itself doesn't mean that you're going to suffer all those harms." *Id.* at 3456–57. Schmoke noted that he personally could live wherever he wanted and chose to live in a predominantly African–American community, pointing out that "the fact that it's a predominantly Black neighborhood doesn't by itself lead to [ ] negative issues." *Id.* at 3456.

Defendants' "three strikes" policy, designed to mitigate the risks of perpetuating segregation, was frustrated by their own shortcomings—chiefly, poor record-keeping. However, there was little, if any, practical harm resulting from such shortcomings during the Open Period by virtue of demographic changes in the tenant population. Moreover, ministerial shortcomings were corrected by Defendants (at least to some extent) by the spring of 2003 when the relevant technology was improved. *Id.*, at 1510.

### g. *Fairness to Plaintiffs*

Plaintiffs contend that they were treated unfairly in that Defendants' failed adequately to dismantle the vestiges of discrimination. Plaintiffs' contend "that the Defendants' actions by not putting a substantial or even a significant number of units in non-minority areas has in fact placed public housing residents in... very bad neighborhoods... and subjected them to extremely adverse living conditions." *Id.*, at 4650–51.

The Court disagrees with the contention that no significant developments were sited in non-minority areas, or that developments were sited without justification in predominantly minority areas. More elementally, the Court disagrees with Plaintiffs' suggestions that the adversities faced by victims of past state-sponsored discrimination stem primarily from Defendants' failures, since 1989, to integrate Baltimore City.

Without doubt, Baltimore City has a poverty problem. Baltimore City also has severe drug and crime problems that demand serious attention from our local, state, and federal officials. These problems require City leadership to make difficult decisions and to formulate creative policies. Until these problems are solved and, somehow, a way is found to provide adequate resources for the poor, life will not be "fair" to Baltimore's underprivileged, whatever their race may be.

Plaintiffs have not shown, however, that they were intentionally treated unfairly or wronged by Defendants during the Open Period *because of their race*. Plaintiffs have not proven that the conditions that Baltimore's poor African–Americans face arise principally from state-sponsored, modern-era *racial* discrimination, rather

than from their poverty and society's inadequate efforts to address this poverty.

The United States Constitution gives the Courts broad powers to rectify intentional race based wrongs. However, neither the Equal Protection Clause, nor any other Constitutional provision, empowers the Courts to redistribute wealth; nor is there any principled basis upon which the Court can define and apply a concept of economic "fairness" to require greater use of public funds for the poor. *See Rodriguez*, 411 U.S. at 33, 93 S.Ct. 1278 ("[i]t is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws[ ]"); *Lindsey*, 405 U.S. at 74, 92 S.Ct. 862 ("[The Court does] not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill[.] Absent constitutional mandate, the assurance of adequate housing... [is a] legislative, not a judicial function...").

### h. Conclusion

The Plaintiffs could establish an Equal Protection claim if circumstances warranted holding that, even without proof of a contemporaneous discriminatory intent, Defendants failed to meet their obligation to remove vestiges of prior *de jure* segregation in public housing.

The Court finds that, in view of the foregoing discussion, Plaintiffs have not proven that Local Defendants violated their Constitutional rights with respect to the vestiges of prior *de jure* segregation.

In the instant case, as discussed below, the Court holds that Federal Defendants have violated the Fair Housing Act by failing adequately to consider a regional approach to the problem of segregation in public housing. The statutory violation, as distinct from a Constitutional violation, need not be based upon a finding that a discriminatory purpose underlay Federal Defendants failure adequately to consider a regional approach to desegregation.

The Court's finding of a statutory violation means that the trial will proceed to the remedial phase. In that phase, the Federal Defendant's intent will be at issue as a factor in the Court's remedial determination. Thus, the Court will allow the parties to present evidence on Federal Defendants' intent in the remedial phase. The Court will not now resolve the questions relating to Federal Defendants' intent that would be pertinent to the Constitutional claim. Moreover, it is possible that the Court may not reach the Constitutional claim.[106]

Accordingly, in the remedial phase, the Court will hear non-cumulative evidence on the specific issue of intent as it relates to HUD's failure to consider the effects of its programs on the racial and socio-economic composition of the surrounding area.

### B. Statutory Claims

#### 1. Title VI (§ 601)

Plaintiffs have withdrawn their Title VI claims except those based on § 601. Tr., at 4781. Section 601 prohibits race-based discrimination in federally funded programs, such as public housing in Baltimore City. 42 U.S.C. § 2000d (2003). As held in Section II, the Court concludes that Plaintiffs, for procedural reasons, cannot pro-

---

**106.** For example if there would be no difference between the remedy for a statutory and a Constitutional violation, it might be appropriate to avoid the constitutional issues by analogy to the principle of *United States ex rel.* *Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909) (A court should avoid a statutory interpretation raising a Constitutional issue, if possible).

ceed against Federal Defendants under Section 601. Accordingly, the Section 601 claim is discussed only with regard to Local Defendants.

 Under Fourth Circuit case precedent, a state actor's conduct violates Title VI only where this conduct constitutes purposeful discrimination in violation of the Equal Protection guarantees of the U.S. Constitution. *See Peters,* 327 F.3d at 315 (citations omitted). The Court has found Local Defendants' conduct implicated herein not to violate the Constitution. Accordingly, Defendants have not violated Title VI.

### 2. *Title VIII (Fair Housing Act)*

Plaintiffs have claimed that Defendants are liable under the Fair Housing Act on three bases:

1. The denial of housing
2. Discrimination in housing conditions and services
3. The failure to promote fair housing.

42 U.S.C. §§ 3604 [107], 3608 [108] (2003).

These three bases shall be discussed in turn.

### a. *Denial of Housing*

 There can be a constructive illegal "denial" of housing—*i.e.,* a government entity may violate § 3604(a) of the Fair Housing Act by denying a plaintiff a housing opportunity, for example by withdrawing from a multi-municipal housing authority. *See Smith v. Town of Clarkton, N.C.,* 682 F.2d 1055, 1065–66 (4th Cir. 1982). In contrast, as held in *Edwards v.*

*Johnston County Health Dep't,* 885 F.2d 1215 (4th Cir.1989), there was no *denial* of housing when migrants were afforded substandard housing.

The Court finds that Plaintiffs have not established a valid FHA claim for *denial* of housing in the instant case. The claim that they were discriminated against in regard to public housing is distinctly different, and is discussed hereafter.

### b. *Discrimination*

 To establish liability under the Fair Housing Act, Plaintiffs need not prove that Defendants had a discriminatory intent; proof of discriminatory impact can suffice. *Arlington Heights II,* 558 F.2d at 1290; *Clarkton,* 682 F.2d at 1065. However, when Plaintiffs rely upon proof of discriminatory impact, liability can be imposed only if the Court finds it appropriate to do so upon due consideration of the following factors, sometimes referred to as "the *Clarkton* factors:"

1. The strength of Plaintiffs' showing of discriminatory or segregatory effect;

2. The evidence of discriminatory intent, though falling short of the Constitutional standard—*i.e.,* some kind of "*mens rea,*" though not necessarily the discriminatory "purpose" required by *Washington v. Davis* and its progeny;

3. Defendants' interest in undertaking the conduct complained of; and

4. The burden that Defendants would bear if held liable.

---

**107.** Section 3604(a) states: it shall be unlawful "[t]o refuse to sell or rent... or otherwise make unavailable or deny... a dwelling to any person because of race[.]"

**108.** Sections 3608(d) and (e)(5) require Defendants to "administer [housing] pro-

grams... in a manner affirmatively to further the policies of this subchapter," among these the policy "to provide, within constitutional limits, for fair housing throughout the United States." 42 U.S.C. § 3601 (2003).

*Clarkton,* 682 F.2d at 1065, *Arlington Heights II,* 558 F.2d at 1290.

In the instant case, the Court does not find that any of the Defendants acted with a racially discriminatory purpose during the Open Period. The Court will assume, however, that some of the Defendants' actions [109] could be found to have a racially discriminatory impact. Even with such an assumption, the Court finds it inappropriate to impose FHA liability with regard to alleged discrimination upon due consideration of the *Clarkton* factors as discussed herein.

(1). *Application of Clarkton Factors*

(a). *Strength of Discriminatory Effect*

Plaintiffs contend that segregatory effects were produced by the fencing of Hollander Ridge, the siting of public housing developments, the 1950 City Council Ordinance governing the siting process, the administration of the Section 8 voucher programs, and tenant assignment practices. The Court finds there to have been little, if any, segregative effect from these actions.

As discussed in detail above, the Hollander Ridge fence was intended, when built, to separate the site from a major highway and from the surrounding Baltimore County Rosedale (White) community. *See, e.g.,* [Written Direct] Test. of john a.

powell [sic] ¶ 135. Indeed, the fence was designed to be a formidable enough boundary to render Hollander Ridge a relatively crime-free "campus style environment." Local Defs.' Ex. 165, at 51 (the Secret Service recommended that a wrought iron fence range from six to seven feet and contain an additional foot of sharp material "to deter potential fence jumpers"). In any event, and ironically by virtue of Plaintiffs' efforts, the bottom line is that public housing on the Hollander Ridge site was demolished, available funds were not able to be used for senior public housing and the fence ended up surrounding vacant land. Thus, such segregative effect as could be said to result from the fence was short lived indeed.

It is fair to conclude that Defendants' decisions regarding the siting of public housing have had segregative effects. There is no doubt that public housing was sited in sections of Baltimore City with predominantly African–American populations, like Johnston Square.[110] *See* Tr. at 3404 (Mayor Schmoke's testimony that the Johnston Square neighborhood was predominantly African–American). However, such siting decisions were not part of a pattern or practice whereby housing developments were *uniformly* placed in Black areas. Indeed, Defendants also sited projects in, or adjacent to, White neighborhoods.[111] *See* Written Direct Test. of Wil-

---

**109.** The Court notes, for example, that Defendants' failures to administer the "three strikes" provision of their tenant assignment system and Local Defendants' subordination of desegregation goals to other policy objectives could be viewed as "failure[s] to promote fair housing" under § 3608 even though such conduct would not be Constitutionally offensive. The Equal Protection Clause essentially permitted Defendants to weigh desegregation goals against other important policies. *Fordice,* 505 U.S. at 731, 112 S.Ct. 2727. However, through Title VIII, Congress elevated the priority to which Defendants must afford desegregative efforts. *See,*

*NAACP v. HUD,* 817 F.2d 149, 155 (1st Cir. 1987). *See also, Rizzo,* 564 F.2d at 149 (regarding the relatively high burden Defendants must meet to rebut a *prima facie* case of FHA liability). *Clarkton,* though, limits the circumstances in which the Court may impose FHA liability.

**110.** Moreover, public housing was relatively non-existent in the predominantly White areas beyond the boundaries of Baltimore City.

**111.** This is true without even considering the decisions made by Defendants in connection with the Partial Consent Decree, whereby

liam M. Rohe, at 20–21, 23–24, 50, 53. Thus, the segregatory effect of siting decisions such as that concerning Johnston Square was significantly mitigated.

No appreciable segregatory effect stems from the 1950 Ordinance. The provision at issue, creating the City Council's "veto" over housing plans, has not been evoked at any relevant time, much less been wielded in a discriminatory manner. Tr., at 3485. Nor have Plaintiffs established that the dormant Ordinance "chilled" the desegregative efforts of the Mayor or the HABC.

The Section 8 voucher programs have not been proven to have any significant discriminatory impact. To the contrary, the Section 8 programs have served to place at least some African–Americans in non-impacted areas, particularly outside of Baltimore City. There is no doubt much to criticize regarding the scope and the management of the Section 8 programs. *E.g., id.*, at 4690. However, while the programs could have done far more to aid the cause of desegregation and could be part (albeit not the entirety) of a regional program, they have not been shown to have a segregative impact.

Finally, the Court finds that Defendants' administration of the tenant assignment system, though undoubtedly flawed,[112] did not—and could not—have significantly impacted the "internal segregation" of the public housing community. By the time of the Schmoke Administration, the public housing population was so predominantly African–American that there was no realistic chance of providing less segregated living in the public housing projects within Baltimore City. Local Defs.' Ex. 588.

*(b). Defendants' "Mens Rea"*

Plaintiffs have not proven that, during the Open Period, Defendants had any intent or purpose to discriminate against or segregate Plaintiffs. That is, except possibly as to Federal Defendants' inadequate consideration of public housing opportunities outside Baltimore City, there was neither a purpose as might suffice to ground Constitutional liability under *Washington v. Davis* and its progeny nor evidence of any other, lesser, discriminatory purpose or intent.

At most, Defendants could be said to have known that the obvious consequence of building the Hollander Ridge fence was to separate the site from Rosedale. Nevertheless, there were legitimate nondiscriminatory reasons for building the fence. *E.g.*, security reasons as evidenced in the Secret Service's "Operation Safe Home" report. *See* Tr., at 3224–25; Local Defs.' Ex. 165.

Defendants' Open Period siting decisions were, of course, made with a knowledge of the racial make up of Baltimore City. As testified by then Housing Commissioner Henson:

> Baltimore is a city of either Black neighborhoods or White neighborhoods... [I]t's a segregated housing market... So the likelihood that we were going to be able to build... a community that would be 50/50 White and Black simply because of the way that we did anything that we would do, it just wasn't going to happen. *So what I decided to do was to accept things for what they are...*

Tr., at 3166 (emphasis added). Nevertheless, Defendants' siting decisions and poli-

---

public housing was made available in neighborhoods throughout Baltimore City.

**112.** *E.g.,* Local Defendants' inadequate record-keeping precluded Defendants from pe-

nalizing prospective public housing tenants who might have sought to utilize tenant selection procedures to segregate themselves.

cies served legitimate ends. Moreover, the Court finds that Mayor Schmoke and his administration simply did not have any intent to discriminate against public housing residents by virtue of their race. While there is, inevitably, ample room to debate the housing policy decisions of the Mayor Schmoke's (or, presumably, any mayor's) administration, there is no basis to find that the decisions were motivated by racial animus.

Certainly, Local Defendants' tenant assignment system was mismanaged. *See* Tr., at 862. However, the Court cannot conclude that, during the Open Period, there was any intent on the part of Local Defendants deliberately to circumvent the system in order to promote racial segregation.

The Court finds that the "failure" of the Baltimore City Council (which was, and remains predominantly African–American) to repeal the 1950 Ordinance was not based upon any discriminatory intent.

Finally, the Section 8 programs, with all of their problems and inadequacies, were quite reasonably considered by the Defendants as vehicles to provide—rather than obstruct—integration opportunities.[113]

#### (c). *Defendants' Legitimate Interests*

In administering each of the contested policies as they did, Defendants had legitimate interests and justifications, relating in part to remedying racial, social, and economic problems.

At Hollander Ridge, Defendants sought to render more secure a low-income community that, by virtue of its proximity to interstate highways, had fallen prey to drug-dealers, prostitutes, and other tran-sient criminal entrepreneurs from New York City, Philadelphia, and other locales. *Id.*, at 3216. Pursuant to the U.S. Secret Service's recommendation, Defendants addressed the peculiar crime predicament of Hollander Ridge by designing a safe fenced community and by building the barrier at issue, together with a guard house. *Id.*, at 3223–24; *see also*, Local Defs.' Ex. 165.

Defendants' public housing siting decisions were made for legitimate nondiscriminatory reasons. The Defendants sought to revitalize areas of Baltimore City that were in dire need by replacing decaying, often abandoned, and crime-infested structures with decent housing developments. Tr., at 3162–63, 3188–91. In addition, Defendants, while confronted with the reality of limited resources, sought to maximize the provision of opportunities for affordable decent housing to individuals and families in need. *Id.*, at 3178, 3435.

The 1950 Ordinance is a quintessentially democratic measure, enacted and retained during the Open Period by elected representatives answerable to a preponderantly African–American constituency.

#### (d). *Burden on Defendants*

By the instant lawsuit, Plaintiffs seek injunctive relief, relating *inter alia* to Defendants' siting, tenant assignment, and voucher administration practices. *E.g. id.* at 4223–49. The Plaintiffs, appropriately, have reserved for the remedial phase [114] the specification of the precise relief sought. Nevertheless, it is apparent that if there were to be a remedy it would have to be one that would substantially affect the discretion of Defendants in determining the use of resources available for the

---

**113.** Mayor Schmoke (*Id.*, at 3458), Professor Henderson (Tr., at 3571) Dr. Lapkoff [Written Direct] at iii) all testified to the potential positive effects of Section 8 programs.

**114.** If reached with regard to Plaintiffs' FHA claims.

provision of housing to members of the Plaintiff class.

In *Arlington Heights II*, the court stated that:

The courts ought to be more reluctant to grant relief when the plaintiff seeks to compel the defendant to construct integrated housing or take affirmative steps to ensure that integrated housing is built than when the plaintiff is attempting to build integrated housing on his own land and merely seeks to enjoin the defendant from interfering with that construction.

*Arlington Heights II*, 558 F.2d at 1293. In addition, *Clarkton* holds that liability is more appropriate where a plaintiff seeks "only to restore the status quo ..." 682 F.2d at 1065. Liability is less appropriate, by contrast, where a government defendant is required to affirmatively perform "from its own treasury." *Id.* And, as stated by Justice White in *Missouri v. Jenkins*:

[O]ne of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local [and federal] government institutions. Especially is this true where, as here, those institutions are ready, willing, and— [subject to] the operation of [external constraints] curtailing their powers— able to remedy the deprivation of constitutional [and statutory] rights themselves.

495 U.S. 33, 51, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990).

The Court finds that there would be a substantial burden on Defendants were the Court to provide a remedy that would affect the discretion of the Defendants, and in particular Local Defendants directly answerable to the overwhelming African–American voters of Baltimore City, in regard to the choices of resource allocation for the public good.

### (ii). *Conclusion*

Taking into account the *Clarkton* factors as discussed herein, the Court concludes that even if Defendant's actions were found to have a racially discriminatory impact, it would be inappropriate to impose Fair Housing Act liability for discrimination in housing conditions and services in the instant case.

### c. *Failure to Promote Fair Housing (§ 3608)*

■ The intent of Congress in enacting the Federal Fair Housing Act, as articulated by its legislative sponsors at the time it was passed and as subsequently identified by the Supreme Court, was to replace the ghettos "by truly integrated and balanced living patterns." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (*citing* 114 Cong. Rec. 3422 (Sen.Mondale)) and "to remove the walls of discrimination which enclose minority groups." 114 Cong. Rec. at 9563 (Rep.Celler).

To accomplish this objective, Section 3608(e)(5) of the FHA requires Federal Defendants to "administer [housing] programs... in a manner affirmatively to further the policies of this subchapter," among these the Act's broad policy "to provide, within constitutional limits, for fair housing throughout the United States." 42 U.S.C. § 3601 (2003). "Fair housing," within the meaning of § 3601, means the provision of housing free from discrimination.[115]

---

115. "That is all it could possibly mean." 114 Cong. Rec. 4975 (Mar. 4, 1968) (statement of Sen. Mondale, principal sponsor of the legislation).

■ It has been judicially recognized that Section 3608 prescribes an affirmative duty. As stated by then Judge, later Justice Breyer: "Title VIII imposes upon HUD an obligation to do *something more than simply refrain from discriminating* (and from purposely aiding discrimination by others.") *N.A.A.C.P.*, 817 F.2d at 155 (Breyer, J.) (emphasis added). This affirmative statutory obligation to provide housing free from discrimination accords with the vision of the law's supporters, who considered ending discrimination as a means toward truly opening the nation's housing stock to persons of every race and creed. *Id.* (*citing* 114 Cong.Rec. 2274, statement of Sen. Mondale) Thus "[a]ction must be taken [by HUD] to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation[.]" *Otero*, 484 F.2d at 1134. *Accord Shannon v. HUD*, 436 F.2d 809 (3rd Cir.1970); *Alschuler v. Dep't of Housing and Urban Dev.*, 686 F.2d 472, 482 (7th Cir.1982); *Resident Advisory Board v. Rizzo*, 429 F.Supp. 222 (E.D.Pa.1977), 425 F.Supp. 987 (E.D.Pa. 1976), *aff'd on other grounds*, 564 F.2d 126 (3rd Cir.1977), cert. denied, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Blackshear Residents Org. v. Housing Authority of Austin*, 347 F.Supp. 1138 (W.D.Tex.1971); *Sadler v. 218 Housing Corp.*, 417 F.Supp. 348 (N.D.Ga.1976).

Section 3608 of the FHA is enforceable through the Administrative Procedure Act ("APA"). Under § 706(2)(A) of the APA, the reviewing court "shall...hold unlawful and set aside agency action...found to be...arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;..."

■ It is well established that a court may not substitute its own policy choices for that of the agency. when reviewing an agency's actions under the "arbitrary and capricious" standard. *See Fort Mill Telephone Co. v. F.C.C.*, 719 F.2d 89, 91 (4th Cir.1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)). Rather, a court "must give deference ... to the agency's decision if supported by a rational basis in the record." *Id.* (citing *American Meat Inst. v. Dept. of Agriculture*, 646 F.2d 125, 126 (4th Cir.1981)). Nonetheless, the agency is required to "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). Thus a court's deference to the agency's decision making process "does not require it to countenance the agency's failure to consider an important aspect of the problem [...]". *Id.*

While HUD has broad discretionary powers to administer its grants as it sees fit, it is not immune from review for abuse of discretion in exercising those powers. When a court analyzes HUD's public housing siting decisions and the manner in which it has used its resources in Baltimore under the standard articulated in § 706(2)(A) of the APA, HUD is required to offer a satisfactory explanation for its actions. The court's examination of the agency's explanation must focus on whether HUD's actions have "furthered the statutory goals." *N.A.A.C.P.* 817 F.2d at 158, *see also, Bankruptcy Estate of United Shipping Co., Inc. v. General Mills, Inc.*, 34 F.3d 1383, 1390 (8th Cir.1994).

The standard for reviewing HUD's desegregation policies can be drawn directly from the statutory requirement that HUD "administer" its programs "in a manner affirmatively to further the policies" of "fair housing." *Id.* at 158 (*citing* 42 U.S.C. §§ 3608(e)(6), 3601.) As stated by then

Judge Breyer in the First Circuit opinion in *N.A.A.C.P.*, "[t]his standard, like many, may be difficult to apply to borderline instances, yet a court should be able to ascertain a clear failure to live up to the instruction over time." *Id.* The case calls for a "straightforward evaluation of whether agency activity over time has furthered the statutory goal, and, if not, for an explanation of why not and a determination of whether a given explanation, in light of the statute, is satisfactory." *Id.* To meet the statutory goal of providing for fair housing throughout the United States, HUD is under the affirmative duty to refrain from any discriminatory action. Such discriminatory action would include in its scope the "failure to consider [the] effect [of a HUD grant] on the racial and socio-economic composition of the surrounding area." *N.A.A.C.P,* 817 F.2d at 156.

The instant case involves HUD's policies, administration, decisions and actions affecting the Plaintiff class consisting of:

> African–Americans who resided in Baltimore City family public housing units ... between January 31, 1995 and [June 25, 1996], who presently reside in Baltimore City family public housing units or who will in the future reside in Baltimore City family public housing units prior to [such time that certain of the Defendants' desegregation obligations are fulfilled or expire].

The Plaintiff class was, and will in the future be, affected by more than just HUD's policies and actions with regard to the area within the city limits. Indeed, it is readily apparent that HUD's responsibility to promote fair housing extends beyond the city borders.

The Court finds it appropriate to define the term "Baltimore Region" for purposes of the instant discussion to include, in addition to Baltimore City, Anne Arundel, Baltimore, Carroll, Harford and Howard Counties. The Baltimore region is essentially the same (except for the omission of Queen Anne's County) [116] as the Baltimore Metropolitan Statistical Area for which the parties presented statistical evidence. *E.g.,* Written Direct Test. of Shelley Lapkoff, at 43.

The Court finds that HUD must take an approach to its obligation to promote fair housing that adequately considers the entire Baltimore Region. The need for such consideration requires, at a minimum, that HUD "assess negatively those aspects of a proposed course of action that would further limit the supply of genuinely open housing and to assess positively those aspects of a proposed course of action that would increase the supply." *Id.* Ultimately, the Court must draw a legal conclusion based on its examination as to whether HUD's activities were "an abuse of discretion or otherwise not in accordance with law", which, the Court reiterates, requires HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [the FHA.]" 5 U.S.C. § 706(2)(A); 42 U.S.C. § 3608(e)(5).

### 1. *The Regional Effects of Federal Defendant's Activities*

The FHA was enacted with the intent to further the dual goals of preventing the increase of segregation in housing and attaining open, integrated residential housing patterns. *Otero,* 484 F.2d at 1134. As

---

**116.** Queen Anne's County is across the Bay Bridge and is neither similar to, nor realistically connected to Baltimore City in the context of racial relations. Nevertheless, the relatively small population of Queen Anne's County renders it appropriate to utilize, for discussion purposes, statistical data for the Baltimore Metropolitan Statistical Area that includes Queen Anne's County.

discussed herein, the evidence establishes that HUD excessively has focused its desegregation efforts within Baltimore City rather than the Baltimore Region as a whole. The question thus becomes whether HUD's long-term practice of focusing its efforts on Baltimore City has furthered fair housing on a regional basis by moving away from segregation and towards open, integrated residential housing for all. A brief review of the history and statistical data presented at trial is relevant to this inquiry.

Through 1954, Baltimore City was a majority White, *de jure* racially segregated city. Racial segregation permeated virtually every aspect of city life—schools, housing, restaurants, stores, recreation, *et cetera*. While there were persons actively seeking desegregation among the leadership of the majority and minority communities, it took the Supreme Court decision in *Brown I* to provide the catalyst for change. However, once the Supreme Court spoke with regard to schools, Baltimore City leadership literally leaped forward to start the process (not yet completed) of ameliorating the effects of past segregation.

Baltimore City was not reluctant and did not have to be forced to recognize that the principle of *Brown I* was not limited to public education. In particular, HABC immediately began the process of desegregating public housing. While, with the benefit of a half-century of hindsight and changes in public attitudes, one can say that we (of today) might have done things differently, HABC was, in its time, a recognized leader in desegregation efforts.[117]

Of course, over the course of the past half-century, Local Defendants and Federal Defendants as well, have taken some steps to ameliorate the vestiges of *de jure*

segregation as required by *Brown II* and its progeny. In regard to public housing, to the extent that there have been desegregative steps, in the context of the numbers involved, these efforts have consisted overwhelmingly in placing African-American low-income housing residents in public housing units located in Baltimore City. Geographic considerations, economic limitations, population shifts, etc., have reduced, as a practical matter, Federal Defendants' capacity to ameliorate the effects of past segregation and fulfill its statutory obligation under § 3608(e)(5). It is simply inadequate to try to solve the problem by redistributing the population of Baltimore City within the city limits. Nevertheless, except for the limited relief provided by the use of Section 8 vouchers outside of the Baltimore City for those few who were able to locate affordable private housing in the counties, such desegregation and integration as has resulted from Federal Defendants' policies has taken place exclusively within the Baltimore City limits.

The Section 8 program provides vouchers/certificates to tenants who find their own housing in the private market. The Court notes that any increase in federally-assisted housing opportunities during the 1990s came as a result of the Section 8 voucher/certificate program. In 1989, 2,414 vouchers/certificates were allocated to Baltimore City. By 1999, that number reached 9,715. *See* Written Direct Test. of Shelley Lapkoff, at 27. Funding for public housing units remained as a key program for HUD, with some 2,367 units sited during the 1990s and some 2,600 units demolished during the same period. *See* Written Direct Test. of Shelley Lapkoff at 29.

Although Section 8 voucher-holders have the opportunity to pursue housing wherev-

---

**117.** HABC was chosen to receive the 1955 Sidney Hollander Foundation Award from his eponymous Baltimore civil rights organization.

er they chose, in 2002 about 56% of the MSA's Section 8 voucher-holders resided in Baltimore City. Pls.' Ex. 436, at eleventh page (able III). The majority use within the city limits may be explained by noting that HUD considers the Baltimore metropolitan area to have a tight housing market that makes it very difficult, even for families with vouchers, to secure housing. Ex. 476, Harold Young, HUD Baltimore Field Office, *The Electronic Dispatch*, August 2002 (PL 058428–058440 at PL 58428) (describing tight market). Indeed, HUD itself recognized that one of the "lessons learned" from its HOPE VI program is that housing vouchers are "not viable replacement housing options" in tight housing markets like Baltimore's. Ex. 59, *Hope VI: Best Practices and Lessons Learned 1992–2002,* Submitted to the Committee on Appropriations, U.S. House of Representatives, and Committee on Appropriations U.S. Senate in House Report 107–272, Title II (June 14, 2002) (HUD 30170–256 at HUD 30202–03). In sum, it appears that the relative expense and lack of affordability of housing outside of Baltimore City may present a significant barrier to Section 8 voucher-holders who might wish to pursue private housing in the Baltimore Region but outside the city.

Just as rearranging the siting of public housing units within Baltimore City is insufficient to advance the cause of desegregation, Section 8 vouchers are inadequate to achieve this end. Given Baltimore City's demographic composition, it is not surprising that the majority—more than 67 percent—of the City's Section 8 voucher holders live in census tracts that are 70 to 100 percent Black. Ex. 474 Clark Rep. at Table 10.

Baltimore City contains only approximately 30% of the Baltimore Region's households. *See* Pls.' Ex. 436, at tenth page (Table II). In 1940, 19 percent of the population of Baltimore City was African–American. *See* Written Direct Test. of Shelley Lapkof, at i. During the fifty-year period ending in 2000, Baltimore City lost one-third of its population, while experiencing a significant increase in the African–American population. *Id.* at 15. By 2000, the population of Baltimore City was 64 percent African–American, while the population of the rest of the Baltimore Region was 15 percent Black. *Id.* at 5. Such was the racial composition that Federal Defendants faced during the Open Period when purporting to fulfill their statutory duty under § 3608 to consider the effect of a HUD grant on the racial and socio-economic composition of the surrounding area. *N.A.A.C.P.*, 817 F.2d at 156.

As the First Circuit pointed out in similar circumstances, if HUD had, in fact, fulfilled this duty, HUD's actions would have tended to increase, or at least not significantly decrease, the supply of open housing. *Id.* The Court thus turns to relevant features of the Title VIII housing supply during the Open Period.[118]

During the 1990s, 89% of public housing units developed with HUD's support in the Baltimore Region were in Baltimore City. In sharp contrast, none at all was sited in contiguous Baltimore County. Pls.' Ex. 436, at eleventh page (Table III). During the same period, seven of Baltimore City's largest public housing developments and two smaller developments were demolished.[119] *See* Written Direct Test. of Shel-

---

118. The Court notes that the time frame of the available statistics does not align perfectly with Federal Defendants' Open Period, which does not cover the entire decade of the 1990s but only encompasses January 31, 1989 to January 31, 1995.

119. The demolished sites were Lexington Terrace (677 units), Fairfield (300 units), Flag

ley Lapkof, at 26. The 4,869 units that were demolished were, by-and-large, replaced by lower density housing in virtually the same sites, although Fairfield and Hollander Ridge saw no replacement housing on their former sites. *Id.* at 27. Several smaller public housing developments also were constructed during the 1990s.[120] *Id.* The largest of these (some 39 units) was located in a Census tract with below-average African–American percentages, while the other two (some 43 units combined) were sited in Census tracts with above-average percentages of African–Americans. *Id.*

All told, some 86 percent of all hardscape public housing units sited in Baltimore City during the 1990s were cited in Census tracts with African–American percentages above the citywide average in 1990. *Id.* at 29. Within the public housing units themselves, in 2002, 98 percent of Baltimore's family tenants in public housing developments were African–American, and each public housing development was at least 91 percent African–American. *Id.* at iv. Moreover, 56% of the Baltimore Region's Section 8 voucher-holders resided in Baltimore City. Pls.' Ex. 436, at eleventh page (Table III).

The statistical evidence demonstrates that during the Open Period, the majority of those who benefited from any of HUD's federally-assisted housing activity ended up living in Baltimore City; that the vast majority of the public housing units in the Baltimore Region were occupied by African–Americans; that these public housing units remained concentrated within Baltimore City (where a majority of residents are African–American); and that 85 percent of these units were cited in Census tracts within Baltimore City with above average percentages of African–American residents. *Id.* at 29. In contrast, a relatively meager percentage of public housing was sited outside of Baltimore City, where a minority of the residential population is African–American, and only 44 percent of those holding Section 8 vouchers in the Baltimore Region resided outside of Baltimore City.

The statistical evidence demonstrates that HUD's various housing programs, as implemented, failed to achieve significant desegregation in Baltimore City. This is true during the Open Period as it had been in the preceding decades.[121] HUD's pattern of grant activity in the Baltimore Region indicates "a failure, over time, to take seriously its minimal Title VIII obligation to consider alternative courses of action in light of their impact on open housing." *N.A.A.C.P.,* 817 F.2d at 157.

The Court finds an approach of regionalization to be integral to desegregation in

House (487 units), Lafayette Courts (816 units), The Broadway (429 units), Hollander Ridge (1,000 units), Murphy Homes (758 units), Spencer Gardens (20 units) and Julian Gardens (23 units). A total of 4,869 units were demolished, of which 4,061 were family public housing units. *See* Written Direct Test. of Shelley Lapkof at 26–27.

120. They were: Montpelier (13 units), Arbor Oaks (39 units) and Hillside Park (30 units). *Id.* at 27.

121. In the 1950s, 78 percent of public housing units in Baltimore City were sited in Census tracts with African–American percentages above the citywide average in 1950. *See* Written Direct Test. of Shelley Lapkoff at 20. In the 1960s, 90 percent of all public housing units cited in Baltimore City were cited in Census tracts with African–American percentages above the citywide average in 1960. *Id.* at 22. In the 1970s, 65 percent of all public housing units cited in Baltimore City were cited in Census tracts with African–American percentages above the citywide average in 1970. *Id.* at 24. In the 1980s, 76 percent of all public housing units cited in Baltimore City were cited in Census tracts with African–American percentages above the citywide average in 1980. *Id.* at 26.

the Baltimore Region and that regionalization was an important alternative course of action available to Federal Defendants. By the term "regionalization" the Court refers to policies whereby the effects of past segregation in Baltimore City public housing may be ameliorated by the provision of public housing opportunities beyond the boundaries of Baltimore City. Testimony by HUD officials at trial indicates that Baltimore City itself recognized the importance of regionalization. But, of course, it was HUD and not Local Defendants, that could have meaningfully acted upon a regional approach.

As Professor john a. powell [122] [sic], wrote: "[N]o single jurisdiction can solve the housing problems, and no single organization can halt the forces of segregation and concentration of poverty... Instead we must work together on a regional level." john a. powell [sic], *Opportunity–Based Housing*, 12 J. Affordable Housing & Community Develop. L. 188, 191 (2003). It was manifestly within the jurisdictional authority of HUD to site public housing—the residents of which in the Baltimore MSA are overwhelmingly African–American—outside the boundaries of Baltimore City—where African–Americans compose a smaller proportion of the residential population than in Baltimore City. Through regionalization, HUD had the practical power and leverage to accomplish desegregation through a course of action that Local Defendants could not implement on their own, given their own jurisdictional limitations. *See NAACP v. HUD*, 817 F.2d 149, 151 (1st Cir.1987) (citing to *NAACP v. Harris*, 567 F.Supp. 637, 644 (D.Mass.1983)) (noting HUD's failure to use its "immense leverage" to provide desegregated housing, in violation of Title VIII).

According to Joe O'Connor, Director HUD's Community Planning and Development Division, in or around 2002 HUD was approached by the jurisdictions in the Baltimore region to see whether or not HUD could be of any assistance in helping them rethink the analysis of impediments to fair housing and to look at which of those impediments might best be addressed on a regional basis. Tr. at 2468. This indicates that, in terms of a remedial action looking to the future, the counties in the Baltimore Region may be constructive participants in a regional approach.

The evidence establishes that before, throughout and after the Open Period, HUD has not affected such region-wide involvement. Rather, the statistics discussed above establish that HUD (except, to an extent, in regard to Section 8 vouchers) focused its desegregative public housing efforts within the Baltimore Region almost exclusively on building (and sometimes demolishing) brick-and-mortar housing within Baltimore City. See Tr., at 390 (testimony of Dr. Rolf Pendall: [123] "HUD has approved projects predominantly inside the City"). HUD failed to consider regionally-oriented desegregation and integration policies, despite the fact that Baltimore City is virtually surrounded by Baltimore County and there is public transportation between the two.[124] In effectively wearing blinders that limited their vision beyond Baltimore City, Federal Defendants, at best, abused their discretion and failed to meet their obligations

---

122. john a. powell (a man who chooses to spell his name without capital letters) is a professor at Ohio State University and the Executive Director of the Kirwan Institute for the Study of Race and Ethnicity.

123. Dr. Pendall is a professor of land use and housing policy at Cornell University.

124. The Court takes judicial notice of this fact.

under the Fair Housing Act to promote fair housing affirmatively.

It is high time that HUD live up to its statutory mandate to consider the effect of its policies on the racial and socio-economic composition of the surrounding area and thus consider regional approaches to promoting fair housing opportunities for African–American public housing residents in the Baltimore Region. This Court finds it no longer appropriate for HUD, as an institution with national jurisdiction, essentially to limit its consideration of desgregative programs for the Baltimore Region to methods of rearranging Baltimore's public housing residents within the Baltimore City limits.

### 2. HUD's Explanation for Not Pursuing Regionalization

In accordance with the requirements of the APA, the Court has reviewed the record to ascertain HUD's decisionmaking process with regard to regionalization. Federal Defendants presented virtually no evidence to substantiate whether or not they considered regionalization options in deciding which Title VIII programs to pursue in the Baltimore Region. Likewise, there is a dearth of evidence on the record of what process, if any, Federal Defendants employed in ultimately rejecting the pursuit of regionalization. Witnesses for Federal Defendants discussed the regional impact of their housing programs on only a few occasions during trial.[125] None of the regionalization efforts discussed took place during the Open Period.

Thus, HUD has failed to offer any substantial explanation of why it failed to consider regionalization alternatives. HUD will have a chance, however, to augment the record in this regard in the remedial phase of the trial. Such explanations (or their absence) may well affect the remedies to be provided.

The Court finds that HUD's explanation for its failure to consider pursuing regionalization options, such as it was, does not satisfy its statutory obligation under Title VIII to consider alternative courses of action in light of their impact on open housing. N.A.A.C.P., 817 F.2d at 157.

HUD had more policy options and leverage to provide Plaintiffs suburban housing opportunities than Local Defendants had,[126] and the record does not reflect that HUD pursued these options. Accordingly,

---

125. E.g., Rheba Glenn Millberry Gwaltney, Director of the Fair Housing Equal Opportunity Division in the Baltimore Division of HUD, testified that in 1983, Congressman Parren J. Mitchell held a Congressional hearing on what was specifically taking place in Baltimore City at which the field office manager testified with regard to the greater Baltimore metropolitan area. See Tr. 2202 et. seq.; Joe O'Connor, Director of HUD's Community Planning and Development Division discussed on a few occasions during the course of his testimony the fact that in or around 2002 HUD hired a consultant in response to a request from Baltimore City and the other Baltimore regional jurisdictions to assist them in their analysis of impediments, which the jurisdictions (not apparently HUD) thought might best be addressed on a regional basis. See e.g., Tr. at 2468 et. seq.; 2508; 2517.

126. The Court disagrees with Plaintiffs' suggestions (see, e.g., Tr., at 4236–38) that Local Defendants (should have directed their efforts beyond Baltimore City.) The Court finds Local Defendants' reasons for focusing their efforts primarily within the City, as opposed to considering options throughout the Baltimore MSA, understandable and reasonable. On balance, these policies were based upon choices made (in recent years by officials answerable to an African–American majority within the City) to use limited resources for the maximum benefit for all of the citizens of Baltimore City. The City government had no realistic options whereby it might have devoted its public revenues on projects outside of its jurisdiction by virtue of financial and political realities. It is perfectly obvious that, as a practical matter, Local Defendants did not

the Court finds that, during the Open Period, Federal Defendants failed to fulfill the duties imposed by § 3608(e)(5), as enforced through the APA, to seriously and thoroughly consider the regional effects of its desegregation policies and integration efforts. Thus, Federal Defendants violated their statutory obligations under § 3608(e)(5) of the FHA. Moreover, HUD has failed adequately to consider regionalization over the past half-century and, absent judicial compulsion, appears most unlikely to do so in the foreseeable future. For example, in 2002 the Maryland Center for Community Development prepared a report entitled "Baltimore Regional Fair Housing Action Plan, 2002" on behalf of the City of Baltimore, the City of Annapolis, Anne Arundel County, Baltimore County, Harford County and Howard County. Tr. at 2471. The report included a proposed Memorandum of Understanding ("MOU") among the jurisdictions that participated in the process, which listed a number of activities that would be pursued by the group. Id. The witness testified that he had heard secondhand that the City of Baltimore either had signed the MOU or was prepared to sign it. Id. at 2472. The witness was then asked whether "anybody at HUD [brought] to bear any pressure to try to move some of the other jurisdictions kind of off the mark and get them moving with respect to this particular document?" to which the witness responded: "I have not done that. I don't know whether anyone else in our office has done that." Id. at 2508.

### 3. Enforcement through the APA [127]

■■■ The APA requires the Court to "hold unlawful and set aside agency action ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The Court recognizes that, as a literal matter, it is unable to "set aside" specific agency action when in fact HUD has not taken any particular action to further regionalization. Nonetheless, the Court finds that it is here called on to set aside HUD's practice of ignoring regionalization actions because it constitutes an "abuse" of HUD's "discretion" (as conferred by 42 U.S.C. § 3608(e)(5)) to administer its housing programs affirmatively to further the goals of the FHA. N.A.A.C.P., 817 F.2d at 160. Moreover, the APA's definition of "agency action" includes an agency's "failure to act." 5 U.S.C. § 551(13).

In sum, the APA, by its terms, has as its purpose judicial review of agency action and inaction that falls outside the agency's statutory powers. Id. at § 706(2). Thus, the Court concludes that the APA is the appropriate enforcement mechanism to address HUD's failure to act to fulfill its statutory duty to consider the regional effects of its desegregation policies.

### 4. Appropriate Remedial Action

■■■ The APA empowers the Court to "set aside" agency action when such action or inaction is abuse of HUD's discretion. Id. In devising an appropriate remedy, the words "set aside" need not be interpreted narrowly. See N.A.A.C.P., 817 F.2d at 160. The Court may tailor its remedy to the unlawful agency behavior.

---

have the ability to affect regionalization that Federal Defendants had.

**127.** As discussed in Section II, the *Clarkton* factors are used by courts to analyze whether a defendant has fulfilled substantive provisions of the FHA such as § 3604. In contrast, the APA regulates the administration and operation of federal agencies and thus applies to § 3608, which requires HUD to affirmatively forward the statute's policy of fair housing.

*Id.* (citing *Indiana & Michigan Electric Co. v. FPC,* 502 F.2d 336, 346 (D.C.Cir. 1974)) ("[W]hile the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action") (internal citations omitted).

The Court must note that it is not finding, on the current record, that Federal Defendants did not intentionally discriminate. The existing evidence does establish that HUD has been heavily influenced by political pressure in regard to at least some of its pertinent actions.[128] However, the record does not establish the extent to which, if at all, HUD's failure adequately to consider regionalization was affected by political pressure and, if so, how that fact would relate to a finding of discriminatory intent on the part of the agency.

The absence of a finding of discriminatory intent is not an impediment to the Court's finding of a statutory violation. Under § 3608(e)(5) HUD has had, and continues to have, a duty to forward the goal of open, integrated residential housing, which can only be achieved by ameliorating the effects of past discriminatory segregation. Federal Defendants' abdication of their statutory responsibilities stems from their failure *to even consider,* in any adequate way, regionalization policies.

Accordingly, the instant case must proceed to the remedial phase.

## V. *SUPPLEMENTAL FINDINGS*

The parties, understandably, have sought extensive findings of fact by virtue of the wide range of issues presented herein. The Court has included pertinent factual findings in the discussion of the issues presented and, in so doing, necessarily has been selective rather than comprehensive. Moreover, by virtue of the Court's decision various factual findings are of relatively minor, if any, materiality in regard to the Court's conclusions on the outcome determinative issues.

The Court will, herein, set forth supplemental findings of fact based upon its evaluation of the evidence herein. If, as may occur due to the scope of the task, there is any inconsistency between the expression of factual findings herein and in the decisional discussion set forth above, the latter is to be given primacy.

### A. *Racial Segregation in Baltimore City*

At present, the racial composition of Baltimore's public housing is over 97 per cent Black. The family projects are 97 per cent Black and the overwhelming majority of them are located in high poverty Black neighborhoods. Ex. 5, Pendall Exec. Sum. at 2–3; Ex. 2, Taeuber at 86–90, Table 5. The scattered site program is 98 per cent Black, and the majority of scattered site units are located in high poverty Black neighborhoods. Ex. 5, Pendall Exec. Sum. at 3–4; Ex. 2, Taeuber at Table 5.

### 1. *Roots of Modern Public Housing*

On November 20, 1962, President Kennedy signed Executive Order No. 11063. Ex. 31A, Executive Order (Nov. 20, 1962) (PL 032112–117). This Executive Order

---

**128.** *See e.g.,* as discussed, in 1996 Senator Mulkulski, then-Chair of the Senate Committee having oversight over HUD and its budget, directed in her September 3, 1996 correspondence to then-Secretary of HUD Henry Cisneros that HUD get the Hollander fence built.

Specifically, she asked Cisneros to "reconfirm your commitment to [the fence] project" and stated "I must receive some written commitment from you before we conclude this [HUD appropriation] bill." Local Defs.' Ex. 167; Tr., at 1394–95.

recognized the harmful effects of racial discrimination in public housing. The Executive Order also specifically provided: "I hereby direct the Housing and Home Finance Agency and all other executive departments and agencies to use their good offices and to take other appropriate action permitted by law, including the institution of appropriate litigation, if required, to promote the abandonment of discriminatory practices with respect to residential property ... provided with Federal financial assistance." *Id.* at PL 032113.

In 1964, Congress passed Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, which prohibited racial discrimination in all programs that receive federal funding, including public housing. In 1968, Congress passed Title VIII of the Civil Rights Act, known as the Fair Housing Act ("FHA"). In his report submitted to Congress in 1985, then-HUD General Counsel Knapp stated that "[t]he general principle of Constitutional law in the area of racial discrimination is that the remedial obligation is not only to cease the discrimination but to remedy, insofar as practicable, the results of prior discrimination." Ex. 32, Knapp Congressional Testimony at HUD 31249 [31237–38].

### 2. HUD's Policies and Racially Segregated Public Housing

In 1970, HUD Secretary George Romney admitted that "the Federal government—through past or present policies— has contributed to the creation of segregated housing patterns," and that past Federal housing policies were "clearly indefensible." Ex. 28, Statement of George Romney, Secretary, Department of Housing and Urban Development, Before the Senate Select Committee on Equal Educational Opportunity ("Romney Statement"), at 2 (Aug. 26, 1970) (PL 036033–036049 at PL 036036).

Secretary Romney admitted, moreover, that the FHA had engaged in "both official and informal Federal encouragement of racial segregation" by doing such things as refusing to provide insurance in integrated neighborhoods, promoting the use of racially restrictive covenants, and red-lining practices. Ex. 28, Romney Statement at 3, PL 036037; *see also,* Ex. 45, Memorandum from Joseph R. Ray, Racial Relations Service, to Albert M. Cole, Administrator, re: Racial Policy to Govern Administration of HHFA Programs (Aug. 13, 1954) (PL 035421–24) (before 1947, FHA provided a model covenant and "explicitly fostered racial covenants" to ensure "homogeneous and harmonious neighborhoods" and the "prohibition of the occupancy of properties except by the race for which they are intended").

Secretary Romney also admitted that "Urban Renewal, the interstate highway network and other Federal programs have contributed to the segregation and isolation of the poor and minority groups in our cities." Ex. 28, Romney Statement at 4.

In 1977, the HUD Office of the Assistant Secretary for Housing admitted that "the early standards" of the Public Housing Administration "did not reflect a concern for the impact of site selection on housing opportunity for minority families. By the mid–1960s, it became evident that much of the public housing available to minorities was being constructed in areas of minority concentration." Ex. 42, Department of Housing and Urban Development, Notice of Proposed Rule Making on Site and Neighborhood Standards for Subsidized newly-Constructed or Substantially Rehabilitated Housing, 42 Fed.Reg. 4296 at 4296 (Jan. 24, 1977).

Richard Stearns of HUD wrote in 1983 that the "FHA made no particular immediate effort to carry out its anti-discrimina-

tion policies and, consequently, its new policies had little effect in reversing the impact of its former practices." Ex. 48, Memorandum from Richard Stearns to Jenkins File (Sept. 13, 1983) at PL 034644–45 (PL 034638–50 at PL 034639, PL 034645–49). In 1997, HUD's Proposed Deconcentration Rule acknowledged that "[f]or the first 25 years of [the United States Housing Act of 1937], the Federal government permitted, if not encouraged, segregation by race in public housing developments." Ex. 36, 62 Fed.Reg. 1026, 1027; *see also* Ex. 37, 65 Fed.Reg. 20686 at 20686 (explaining that purpose of proposed rule is to eradicate the "persistently high levels of racial segregation and poverty concentration that have too long characterized public housing in many of our Nation's communities.").

In his testimony in November of 1985 to the Sub–Committee on Housing and Community Development of the Committee on Banking Finance and Urban Affairs in the U.S. House of Representatives, John Knapp, the then-General Counsel of HUD, outlined the manner in which HUD and its predecessors had addressed or failed to address racial segregation in public housing. Ex. 32, Knapp Congressional Testimony at HUD 31237–38. Knapp explained that, "[i]n the years between the beginning of the [federal housing] program" in 1937 to the 1960's, the federal policy "was that the 'character' of a neighborhood was not to be changed by the placement of public housing projects. Implicit in the idea that public housing in a locality would not be the agent of change, but should meld with existing patterns of racial occupancy." *Id.* at HUD 31238. These early policies, he testified, "did not reflect a concern for the impact of site selection on housing opportunities for minority families. By the mid-1960s, it had become evident that much of the public housing available to minorities

was being constructed in areas of minority concentration." *Id.* at HUD 31242.

In 1995, Secretary Henry Cisneros testified to Congress that "public housing is itself concentrated in high poverty neighborhoods. Due to deliberate siting decisions, public housing tends to be located in areas lacking jobs, economic opportunities and basic amenities." Ex. 27, Secretary Henry G. Cisneros, Testimony before the Housing and Community Opportunity Subcommittee of the Banking & Financial Services Committee, House of Representatives (Oct. 13, 1995) (HUD 1720–33).

Secretary Cisneros also acknowledged that the agency had been "complicit in creating isolated, segregated, large-scale public housing" and that "HUD has traditionally been part of the problem." Ex. 47, News Conference, HUD Secretary Holds News Conference to Discuss the Transformation of Public Housing, 1996 WL 158456 at 7 (April 3, 1996).

Secretary Cisneros recognized that whereas poor African–Americans have been concentrated in segregated, inner-city areas, poor Whites mostly live in middle-class, suburban neighborhoods. Ex. 27A, Henry Cisneros, HUD, *Regionalism: The New Geography of Opportunity* (March 1999) (PL 071856–74 at PL 071862). ("The most extreme poverty in America is now found in geographically isolated, economically depressed, and racially segregated inner cities and older declining suburbs." However, while "three out of every four poor Whites live in middle-class, mostly suburban neighborhoods" three out of four poor African–Americans live in "inner-city 'poverty neighborhoods.'").

Secretary Cisneros stated in 1999 that "America is not a Third World country where the poor are many and the middle class are few. In America the middle class are many and the poor are few. *What this*

*country lacks is not the capacity to end the isolation of the minority poor; it lacks the will* " (emphasis in original). Henry Cisneros, HUD, *Regionalism: The New Geography of Opportunity* (March 1999) (PL 071856–74 at PL 071863).

### a. *The "Neighborhood Composition Rule"*

A 1995 HUD report on minority and poverty-concentrated neighborhoods observed that the agency's predecessors carried out a policy based on a "neighborhood composition rule" which promoted relocation of displaced families in a manner that would not "disturb[ ] the prevailing *de jure* or neighborhood racial pattern." Ex. 34, John Goering, Ali Kamely, Todd Richardson, Office of Policy Development and Research, U.S. Department of Housing and Urban Development and the Department of Economics, Catholic University, *Poverty Concentration, Racial Segregation, and Public Housing in the United States* (Mar. 1995) (Adker 079319–49 at Adker 079321); *see generally* Ex. 50, Office of the Administrator, Racial Relations Service, Policy Questions; Staff Discussion or Staff Papers (Apr. 6, 1953) (PL 035026–28) (Racial Relations Service's conclusion that "racial equity" policy "allows local authorities . . . To restrict occupancy in these projects on the basis of race if they so desire").

Indeed, HUD's predecessor agencies, the Federal Works Agency and the USHA, directed local governments and housing authorities in their written policy manuals that public housing site selection and tenant selection policies should aim to preserve community social structures. Ex. 76, Federal Works Agency, United States Housing Authority, *Site Selection Bulletin* at 7–8 (Feb. 13, 1939) (PL 34731–36); Ex. 76A, National Housing Agency, Federal Public Housing Authority, *Low Rent*

*Housing Bulletin 18,* (Dec. 1, 1945) (HUD 36084–36097); Ex. 3, Hirsch at 22–23.

The USHA closely monitored the racial occupancy of its projects, requiring approval from the Washington office for "change[s] in predominant racial occupancy." Ex. 78, Federal Works Agency/USH Authority, *Procedure for Securing Approval from the Washington Office of a Major Change in a Project,* Order No. 267 (Dec. 20, 1939) (PL 34742–43).

Local housing authorities were also directed to "[r]ecord race or nationality depending upon whether or not a special racial or nationality group is to be rehoused in a given project." Ex. 79, FHA, USHA, *Suggested Procedures for Initial Tenant Selection and Renting* (Bulletin No. 31) at 24–25 (Dec. 17, 1939) (PL 034696–729 at PL 034720–21).

Thus the 'neighborhood composition rule' solidified earlier, historical patterns of racial segmentation and added a federal imprimatur to the convention that 'Negroes and Whites do not mix.' Ex. 34, Goering *et al., Poverty Concentration, Racial Segregation, and Public Housing in the United States* (Adker 079319–49 at Adker 079321).

Furthermore, internal memoranda recognized that, "[f]rom its inception, the public housing program accepted the separate-but-equal doctrine and, through its racial equity policy, undertook to insist upon uniform enforcement of the 'equal.' " Ex. 45, Ray Memorandum (PL 0354408–09); *see also* Ex. 54, Racially Integrated Public Housing Programs: Highlighting 15 Years of Experience (Draft No. 3, Feb. 1952) at 48 (PL 035261–339 at PL 035312) (internal memorandum concluding that "racial equity" policy led to discriminatory treatment of Blacks and recommending integration of projects by use of centralized waiting list on a 'first come, first served' basis, and recommending that "site selection offers

an ideal opportunity to provide the kind of situation requiring a minimum of special attention" to achieving racial integration. Best site is either an interracial neighborhood or a 'White' neighborhood near an interracial neighborhood. The difficulty of recruiting and retaining the White group when it feels itself to be in the minority must be realistically appraised.).

b. *HUD's "First-come, First-served" Tenant Selection*

HUD initially had a freedom of choice policy, under which housing applicants could apply for housing in a development of their choice, and their placement was to be based on the number of available units in the development that they selected and their place on the waiting list. Ex. 36, 62 Fed.Reg. 1026, 1027.

As reflected in a 1969 Handbook, HUD implemented a second tenant selection and assignment policy, through which offers for public housing were to be made on a 'first-come, first-served' basis to applicants on a community-wide waiting list. This policy provided that, depending on the local authority, public housing tenant applicants could be offered either one or three units in the projects with the highest number of vacancies. Applicants were to be moved to the bottom of the waiting list if, under either the one- or three-offer plan, the applicant refused the offer(s). Ex. 56, HUD, *Low–Rent Housing Administration Program Handbook* ch. 9, § 1, app. 2, § 1d(1)-(7) (June 1969) (PL 036235–39 at PL 036235–42).

A 1984 memorandum by the Office of HUD Program Compliance explained that the second tenant selection and assignment policy assumed that "offers of units in White projects would overcome the reluctance of Blacks to move into such projects." Ex. 55, Robert Covell, Management Control Assessment of the HUD

Tenant Selection and Assignment Policy (1984) (PL 036958–88 at PL 036965); *see also* Ex. 11, Pearl Dep., at 75. HUD acknowledged that assumption was incorrect because "White projects were not as underutilized as had been assumed." Ex. 55, Covell at PL 036965.

In 1991, long-time HUD official and Director of the Office of Program Compliance, Peter Kaplan, recounted the history of the agency's tenant selection and assignment policies. *See* Ex. 35, Kaplan Memorandum (PL 036152–036160). Kaplan stated that, from the beginning, public housing was generally segregated and that integration was avoided. *Id.* at PL 03152–53.

A 1997 HUD notice published in the Federal Register stated that the "freedom of choice" policy "did not address the effects of the site selection process, by which developments had been located in all-White and all-Black areas with tenants assigned accordingly." In many cases, the choice for tenants after these patterns were established was between an all-Black development in a Black neighborhood or an all-White development in a White neighborhood. An integrated development, much less an integrated neighborhood, was rarely an option.

Assuming fair administration of the policy, which was not always the case, it did not effectively address the complexities of the legacy of segregation." Ex. 36, 62 Fed.Reg. 1026, 1027.

3. *HABC's Racially Identifiable Housing Projects*

HABC has operated racially identifiable housing projects (Ex. 2, Taeuber at 9, 49–64) and HUD has consistently made such a finding during the 1980's and 1990's. Ex. 256, Letter from Thomas Hobbs to M.J. Brodie (Mar. 19, 1982) (HUD3341–3342) (1981 finding that the majority of HABC's

public housing projects were racially identifiable); Ex. 39, HUD, Fair Housing and Equal Opportunity Monitoring Report, Housing Authority of Baltimore City (Sept. 28, 1988) (0632-37 at 0634); Ex. 257, Letter from Harold Jackson to Robert Hearn with attached Fair Housing and Equal Opportunity Monitoring Review (Sept. 30, 1991) (HUD27553-27561) (HUD 1991 finding that HABC continued to operate racially identifiable projects, and that 45 of HABC's 48 public housing developments were racially identifiable); Ex. 40, HUD, Limited Management Review, Housing Authority of Baltimore City, April 21-June 3, 1992 (0178-0187); Ex. 41, HUD, Preliminary Letter of Finding, Housing Authority of Baltimore City, Title VI Case Number: 03-97-07-003 (Sept. 24, 1997) (HUD 04078-82 at HUD 04079).

HUD's internal analysis found a segregation index of 76 for Baltimore's public housing system as of 1993. Ex. 33, John Goering *et al.*, *The Location and Racial Composition of Public Housing in the United States* (Dec.1994) ( HUD 00038-147 at HUD 00106).

When only considering family housing developments within Baltimore's public housing system, HUD found the segregation index to be even higher at 85. By contrast, the segregation index for projects built for mixed family/elderly projects was 51. Ex. 2, Taeuber at 1-4, 64-68, Table 2.

HUD has recognized that "[l]iving in high-poverty neighborhoods increases the likelihood for teen parenthood, youth delinquency, dropping out of school and drug and alcohol abuse," as well as "deficiencies in school performance" by children, "low health indicators," the lack of "employed role models" for young children, and unemployment or "underemployment" due to limited skills. Ex. 59, *Hope VI: Best Practices and Lessons Learned 1992-2002*

at 25-26 (HUD 30170-256 at HUD 30204-05)..."

4. *HABC's Public Housing Projects: 1940-1954*

During the years 1940-1954, HABC sited, constructed, maintained, and operated 14 public housing projects with more than 7,000 units. Seven projects were built for and occupied solely by Blacks and seven projects were built for and occupied solely by Whites. Ex. 2, Taeuber at 2, 6, 8.

Prior to 1954, all but one of the seven projects occupied solely by Blacks were sited in areas of minority concentration. Ex. 1, Maps. The exception, Cherry Hill, was sited on a vacant land site. Ex. 2, Taeuber at 2, 21. Three projects that opened as designated-White projects (Claremont, Brooklyn and O'Donnell Heights) were 100 per cent White until 1966-67 and two (Brooklyn and O'Donnell Heights) continued to be majority White until the mid-1990s, despite a majority-Black waiting list and even though there were other housing projects with no White tenants. Ex. 2, Taeuber at 1, 2, 36-39; Ex. 3, Hirsch at 64-68, 71.

5. *HABC's Public Housing Programs Post-1955*

During the 1955-1970 period, the three formerly *de jure* White projects—Claremont, O'Donnell Heights, and Brooklyn—were in tracts which had fewer than 20 per cent Black residents. Ex. 2, Taeuber at 5.

From 1970 to 1985, 16 housing projects were built for the elderly and disabled. Ex. 1, Maps; Ex. 2, Taeuber at 2, 77-80. These elderly projects were not sited exclusively in minority-concentrated or isolated parts of the city. Ex. 2, Taeuber at 2, 77-80; Ex. 1, Maps. For example, Broadway, built in the 1970's as a high rise for elderly and family housing, was placed in a racially mixed census tract across

from one of the original Black projects (Douglass Homes). Ex. 2, Taeuber at 2, 74; Ex. 5, Pendall Family Projects at 6.

In addition to constructing housing projects, from 1970–1995, HABC opened over 2800 units of scattered site public housing. This program used ordinary row housing and small buildings, thereby allowing housing agencies to "scatter" public housing throughout a city. Ex. 2, Taeuber at 3–4; Ex. 5, Pendall Scattered Sites at 10. The majority of these scattered units were sited in minority-concentrated areas. Ex. 1, Maps; Ex. 2, Taeuber at 3, 8, 74–77; Ex. 5, Pendall Exec. Sum at 3–4; Ex. 5, Pendall Scattered Sites at 1, 4–8.

In addition to public housing projects and scattered site housing, the primary program that allowed low-income households to secure shelter in private-market rental housing was the federal Section 8 program and thus the Section 8 voucher program presented an opportunity to deconcentrate public housing. In 1998, the majority of Section 8 users in Baltimore lived in census tracts in which most residents were Black. Ex. 5, Pendall Exec. Sum at 4–5. In sum, the public housing options available in Baltimore have been public housing projects, scattered site housing and the Section 8 voucher program.

## B. *BALTIMORE CITY'S PUBLIC HOUSING SITE SELECTION THROUGH WORLD WAR II*

*De jure* racial segregation in housing existed in Baltimore City until the 1954 *Brown I* decision.

### 1. *Public Housing the 1930s*

In the 1930s, pursuant to the National Housing Act of 1934, the Federal government embarked on a program of underwriting mortgage insurance on private properties. The mortgage underwriting policies adopted by the FHA awarded higher ratings to private homes in neighborhoods with racially restrictive covenants. The Federal Housing Administration's *Underwriting Manual* stated: "Areas surrounding a location are investigated to determine whether incompatible racial and social groups are present, for the purpose of making a prediction regarding the probability of the location being invaded by such groups. If a neighborhood is to retain stability, it is necessary that properties shall continue to be occupied by the same social and racial classes. A change in social or racial occupancy generally contributes to instability and a decline in values." Ex. 72, Federal Housing Administration, *Underwriting Manual* (Feb.1938) (PL 032645–52); *see generally* Ex. 48, Stearns Memorandum (PL 34637–50).

### 2. *The "Red-lining" Map and Restrictive Covenants*

In 1937, Federal housing officials also issued a Residential Security Map for Baltimore, sometimes referred to as the "redlining" map. This map divided the City's residential areas into four grades, with the fourth and worst grade marked in red. Ex. 72A, Residential Security Map, Division of Research and Statistics with Cooperation of Appraisal Dept. Home owners Loan Corp. (May 1, 1937) (PL 061872).

The purpose of the "red-lining" map was to "graphically reflect the trend of desirability in neighborhoods" for purposes of issuing mortgages, with red, the least desirable, being "characterized by detrimental influences in a pronounced degree, undesirable population or an infiltration of it." Ex. 72B, Explanation of Residential Security Map, Baltimore, Maryland (undated) (PL 048001–02); Ex. 72C, *Real Estate Situation* (undated) (PL 048008–21).

In addition, Federal Housing Administration provided a model racially restrictive covenant to ensure "homogenous and harmonious neighborhoods" and the "prohibition of the occupancy of properties except by the race for which they are intended." Ex. 45, Memorandum from Joseph R. Ray, Racial Relations Service, to Albert M. Cole, Administrator, re: Racial Policy to Govern Administration of HHFA Programs (Aug. 13, 1954) (PL 034730–36).

### 3. *Long-term Effects of Early Policies*

By 1955, HUD acknowledged that "[t]he effects of a long history of rejections by Federal Housing Administration and by Federal Housing Administration mortgagees prior to the evolvement of more favorable attitudes toward Negro purchasers cannot be easily eradicated. For years, Negro brokers 'understood' that the Federal Housing Administration was not for them or their clients." Ex. 73, Memorandum from Frank Horne to William Ulman (May 9, 1955) (PL 35341–43); Ex. 30, Roberta Achtenberg, 143 U. Pa. L.Rev. at 1193 (PL 080139–44 at PL 080139–40).

In 1970, HUD Secretary George Romney, calling past federal housing policy "clearly indefensible," admitted that federal housing policy, including FHA "red-lining," "contributed to the creation of segregated housing patterns."

### 4. *De jure Segregated Projects*

Between 1937 and 1943, HABC built eight *de jure* segregated low-rent housing projects in Baltimore. Five of the projects were designated as "Negro housing" (Poe, McCulloh, Douglass, Gilmore and Somerset Homes) and three were set aside exclusively for Whites (Latrobe Homes, Perkins Homes and Armistead Gardens). Ex. 2, Taeuber at 17–20; Ex. 1, Map 2; Ex. 74, Federal Defendants' Answer, ¶ 43 (April 28, 1995); Ex. 75, Answer of the Housing Authority of Baltimore City and its Executive Director Paul W. Graziano to Plaintiffs' Amended and Supplemental Complaint and Answer of the Mayor and City Council of the City of Baltimore to Plaintiffs' Amended and Supplemental Complaint (hereinafter "Local Defendants' Answer") at ¶ 48.

An evaluation of the Perkins Homes site undertaken by the Joint Committee on Housing in Baltimore ("State Commission") and City defendants in 1934 reported: "This area by its location should house lower income industrial employees, and from a point of view of city wide balance of racial areas should be occupied by White families probably largely foreign born. It is not naturally a Negro area, but has, through obsolescence, been partly repopulated with Negroes immigrating to Baltimore .... The Negro inhabitants which would be evacuated from this area should form a part of similar development for low rental families in a more desirable location." Ex. 80, *Report of the Joint Committee on Housing in Baltimore* (PL 029615–32 at PL 029621); Ex. 3, Hirsch at 24–25.

Federal and Local officials developed McCulloh Homes on the northwest side of the central business district in a site identified by the State Commission. According to the State Commission, the site was "emphatically a Colored area." Ex. 80, *Report of the Joint Committee on Housing in Baltimore* (PL 029615–32 at PL 029618)

The two projects built as "White" housing, Latrobe and Perkins Homes, were placed by Federal and Local officials in what had been mixed race areas. The five projects built as "Negro" housing, Poe, McCulloh, Gilmore, Somerset and Douglass Homes, were all placed in existing African–American neighborhoods. Ex. 1, Maps; Ex. 2, Taeuber at 19; Ex. 3, Hirsch at 24.

The availability and proximity of "Negro" schools, parks and recreation facilities were also considered by the Local Defendants in selecting sites for "Negro housing." Sites outside areas of concentrated Black population were rejected because they were miles away from schools accepting "Colored pupils" and no funds were available for constructing "Colored schools." Ex. 86, Memorandum from Roger D. Black, Chief, Management Branch, to Chief, Branch 1, Subject: Project No. H–2704, Baltimore, Recreational, Educational and Social Facilities and Program (May 20, 1935), with attached memorandum from Lewis R. Barrett, Management Supervisor, Subject: Field Trip to Baltimore, Maryland, May 28, 1935 (June 5, 1935) (PL 32627–31) (recommending against location of a project for Negro tenancy because of lack of schools serving "Colored pupils" and lack of playgrounds and parks (park is restricted against use by "Colored People")); Ex. 87, Memorandum from Philip Darling to Oliver Winston (July 16, 1951) (PL 31528–31) (considers absence of Negro schools in evaluating sites for Negro housing).

Initially, no "Negro" housing project was built on vacant land. One project planned in the Washington Boulevard area was abandoned by the Local Defendants in 1939. Ex. 3, Hirsch at 25–26; Ex. 90, *Board Approves Housing Project,* Baltimore Sun (June 28, 1939) (PL 33668–71) (of five sites being considered, "[one] of the vacant sites was in the Washington Boulevard section and was intended for Negro occupancy. It was abandoned after many protests had been filed against it.")

### 5. *The Lanham Act*

In 1940, Congress enacted the Lanham Act, authorizing the federal government as well as local housing authorities, to construct housing for defense workers. Ex. 3,

Hirsch at 26–27. Four of the HABC public housing projects currently in use, Cherry Hill Homes, O'Donnell Heights, Brooklyn Homes, and Westport Homes, as well as the now closed Fairfield Homes, were built during World War II as *de jure* segregated housing for defense workers. Ex. 74, Federal Defendants' Answer, ¶ 56.

Brooklyn Homes was constructed on vacant land in the White Brooklyn neighborhood in south Baltimore.

O'Donnell Homes was built on vacant land in east Baltimore near the Baltimore County line.

Fairfield Homes was built on vacant land in a census tract containing both Black and White residents. Ex. 1, Map 2; Ex. 2, Taeuber at 27–28; Ex. 3, Hirsch at 26–27.

When White neighbors and politicians protested the clearance of White homes in Locust Point, this White war housing project was moved by Local Defendants to a vacant land site in southwest Baltimore, to what is now Westport Homes. Ex. 98, *HA proposes $1,400,000 New Slum Clearance,* Evening Sun (Oct. 22, 1940), *Residents' Protests End 'Slum' Project* (Oct. 31, 1940), *Westport Site is Chosen for BHA Project* (PL 044824). The site was adjacent to a Black neighborhood. Ex. 1, Map 2; Ex. 2, Taeuber at 27–28.

### 6. *Baltimore's African–American Population During World War II*

During the war years, the African–American population of Baltimore increased dramatically as thousands of families moved from the rural south to work in defense plants. Little new private market housing was constructed for these "in-migrant" defense workers. Ex. 97, Editorial, *Plight of the Non–Defense Workers,* Baltimore Evening Sun (Sept. 26, 1941) (PL 42779–80); Ex. 100A, Baltimore Urban

League, *Civil Rights in Baltimore, A Community Audit* (January 1950) (PL 030631–38) ("In the period from 1940–44 the proportion of dwelling units built for Whites as compared to those built for colored was . . . 16.4 to 1 by private builders. Since 1944 private building for Negro occupancy has virtually ceased.").

### 7. *Housing Opportunities for African–Americans During World War II*

By 1943, the only Black war housing that had been approved was Banneker Homes, 400 temporary units in the Fairfield area. Ex. 3, Hirsch at 29; Ex. 100, *Baltimore Housing Authority Yields to Racial Opposition,* Baltimore Afro–American (Mar. 27, 1943) (PL 42770–71); Ex. 100B, Memorandum from Ellis Ash to Oliver Winston, *Banneker Homes Disposition Plan* (April 21, 1952) (PL 032461–64) ("Because of the isolated location of the project, the inadequate transportation, the structural deterioration, and lack of community facilities, the structure is very unpopular.").

That same year, Federal officials abandoned plans to use a site at North Point Road and Eastern Avenue in Baltimore County in the face of opposition by White residents. Ex. 3, Hirsch at 28; Ex. 100D, *Seek New Site for Location of 1400 Homes* (Baltimore Afro–American) (PL 042791–92) (April 17, 1943): Ex. 100E, *Protest Set,* Baltimore Sun (April 24, 1943) (PL 042795–96) (The site was abandoned "after vigorous protests had been lodged against the possible selection of a location at Eastern avenue and North Point road for the construction of about 1,400 dwelling units for Negro war workers.").

The substitute site in Northeast Baltimore known as the Herring Run site proposed by the Commission on the City Plan was opposed. More than 800 opponents turned out for a meeting called to protest "Negro war housing" planned for the site. Ex. 101, *Crowd of 800 Boos Mayor for Favoring Colored War Homes,* Baltimore Afro–American (July 17, 1943) (PL 45131–35).

The City Council enacted legislation in 1943 requiring that any housing sites be submitted to it for approval. Ex. 52, *Council to Get War Housing Site Bill,* Baltimore Sun (July 22, 1943) (PL 44021–22).

The City also intervened in a Federal condemnation action regarding the Federal government's acquisition of land for the Herring Run site for Black housing. Ex. 104, *Housing Hearing Slated Sept. 23,* news article (Sept. 14, 1943) (PL 44027–28). Federal officials eventually withdrew the Herring Run site from consideration. Ex. 106, *FPHA Approves 4 Sites Recommended by HAB in Housing of Negroes,* Baltimore Sun (Oct. 26, 1943) (PL 45144–47).

The agreed-upon package of sites proposed by the opponents of housing for Black tenants on the previously proposed sites included permanent housing for Blacks limited to Cherry Hill and temporary housing for Blacks permitted in Turners Station, Sollers Point and Holabird Avenue. *Id.;* Ex. 106A, Map, Baltimore Low Rent and Defense Housing (PL 033966) (map showing locations of war housing projects Ernest Lyon, Banneker, Holabird, Sollers and Turner Homes); Ex. 106B, *Housing Programs in Baltimore, 1950* (PL 031640) (showing war housing locations).

These sites were opposed by civil rights leaders and housing activists who complained that the sites were too isolated and were subject to industrial pollution and other adverse environmental conditions. Ex. 105, *Pressure for Better Housing Will Continue,* Baltimore Afro–American (Oct.

20, 1943) (PL 45120) ("The Holabird Avenue area, where 400 homes are planned, is bounded on the west by a polluted stream... On the south are oil refineries and on the west is a railroad. The Turners Station area, for which 200 to 300 homes are planned, is all low land, infested with mosquitoes from standing water. The Municipal Airport hems it in on one side and the Patapsco River on the other. Cherry Hill, only one of the four sites where permanent homes (600 to 700) will be built, is bounded on the south by a city incinerator, the north by Patapsco River, the west by the B. and O. Railroad and the east by Hanover Street. When the wind is southeast, the mal-odors are nauseating. This site has long been recommended for industrial purposes only.").

The only site that was politically acceptable for the permanent introduction of "Negro housing" was Cherry Hill. Ex. 2, Taeuber at 21; Ex. 3, Hirsch at 30–32; Ex. 105, *Pressure for Better Housing Will Continue*, Baltimore Afro–American (Oct. 20, 1943) (PL 45120). This site was picked, according to local officials, "after exhaustive study of all available sites." Ex. 107, Letter from C.A. Mohr to Cleveland R. Bealmear (Oct. 3, 1943) (PL 29095). Cherry Hill was not opened until December 1945. Cherry Hill was segregated Black when it opened.

With the exception of Cherry Hill, the "Negro" war housing projects located in outer-city and suburban areas were demolished. Ex. 3, Hirsch at 32; Ex. 106D, Letter from Charles L. Levy to Mayor D'Alesandro (Oct. 30, 1953) (PL 031650) (Holabird demolition); Ex. 106E, Memorandum from Victor C. Adler to Burdon O. Young, *Proposal to Recommend Disposition of Banneker Homes* (July 3, 1952) (PL 031964–65).

## C. BALTIMORE · CITY'S POST WORLD WAR II PUBLIC HOUSING SITE SELECTION

By the end of World War II, Blacks in Baltimore faced a serious housing crisis. Baltimore's African–American population had surged during the war, but housing available to the African–American population had not increased commensurately. As expressed by the Citizens Planning and Housing Association: "Weekly some Negroes are coming into the city. No new homes are being built for them. No vacant homes are available for them. They must pile up on and share accommodations with those who already live in these densely populated and segregated areas. Where one family lived a few years ago, there now live three or four." Ex. 109, CPHA, *Negro Housing* (PL 45107–18); *see also* Ex. 110, CPHA *Memorandum on Negro Housing in Metropolitan Baltimore* (Aug.1944) (PL 42858–62); Ex. 111, Summary of Meeting re Sollers and Turner Homes (Feb. 16, 1954) (PL 32504) (acknowledges "acute shortage of housing for Negroes in Baltimore."); Ex. 111A, Ralph H. Weese, FHA, *Report on the Housing Market: Baltimore, Maryland Standard Metropolitan Area* (Sept. 1, 1953) (PL 047139–163); Ex. 116, Development Program, Project No. MD 2–14 (Armistead) (Sept. 27, 1950) (PL 30644–54 at PL 30648).

HUD admitted in 1996 that "[f]ollowing World War II, there was a very high demand for adequate housing at all income levels. For public housing, this demand was aggravated by urban renewal, which destroyed housing which was then available to the poor. Additionally, in the public housing program, a fad for high-rises clearly influenced housing design in the late 1940's and 1950's, allowing for the construction of many more units on the same piece of land... At the same time,

many large, high-density, low-rise projects for families were also constructed during this period." Ex. 51, Office of Development and Research, U.S. Department of Housing and Urban Development, *An Historical and Baseline Assessment of Hope VI, Vol. I, Cross-site Report* (August 1996) at 1–3 (PL 067839–068060 at PL 067861).

In April 1945, HABC announced its post-war housing plan to raze Black inner-city neighborhoods and to build higher density public housing projects on the slum clearance sites.

1. *Funding Baltimore's Post–War Housing Plan*

The Federal Housing Act of 1949 provided the funding for Baltimore to implement its post-war housing plan.

The Federal government funded the development of Federal Housing Administration-subsidized rental housing in Baltimore City and County at segregated sites. Ex. 120, J. Hugh Rose, FHA Housing Analyst, Report on the Current Housing Situation in the Baltimore Housing Market (Jan. 10, 1950) (PL 031778–031812 at PL 031805, 031778–79).

An Federal Housing Administration analyst wrote in 1950 that "land on which housing for the Negro population can be developed is much more difficult to obtain [than for White occupancy]. Traditional land use can be changed only gradually in this respect in Baltimore as in other cities." *Id.* at PL 031806.

2. *1950 Ordinance*

In 1950, the Baltimore City Council enacted an Ordinance authorizing HABC and the City to develop up to 10,000 units of additional public housing under the Federal Housing Act. As eventually passed, the Ordinance incorporated the requirement of City Council approval of all future public housing sites first adopted during the 1943 war housing controversy. Ex. 115, Baltimore City Council, Ordinance No. 1077 (Council No. 1772) (Mar. 20, 1950) (PL 33507–12). *See also,* Ex. 115A, *Dr. Fenn Quits H.A.B., Blames City Council,* Sunpapers (May 2, 1950) (PL033973) (Dr. Fenn quits as chair of Housing Authority Board in part because of City Council veto of any site proposed in the future by the authority).

The Ordinance allowed only 1550 units of public housing on pre-selected vacant land sites. All future sites were required to be slum clearance sites. Ex. 115, Baltimore City Council, Ordinance No. 1077 (Council No. 1772) (Mar. 20, 1950) (PL 33507–12). *See also,* Ex. 115B, *The Fight for Public Housing in Baltimore* (April 1, 1950) (PL 021041–1109).

In addition, the sites had to be located in Baltimore City. Ex. 3, Hirsch at 38–41; Ex. 115, Baltimore City Council, Ordinance No. 1077 (Council No. 1772) (Mar. 20, 1950) (PL 33507–12).

In 1989, HABC's counsel Thomas Perkins advised HUD's Office of General Counsel that the 1950 ordinance's purpose was "to provide for councilmanic oversight of the location of public housing units in various parts of the city," and further admitted that "this practice [of councilmanic oversight] has subsequently become questionable constitutionally." Ex. 123, Letter from Thomas Perkins to Betty Parker with attached ordinances (July 26, 1989) (HUD 20006–12); Ex. 124, Legal Basis for Housing Authority of Baltimore City (undated) (HA 05824–26).

Thus HABC substituted the Westport Extension site, adjacent to Westport Homes, and the Claremont Homes site, adjacent to the Armistead Gardens project, for Violetville and Belair–Edison sites. Ex. 116, Development Program, Project No. MD 2–14 (Armistead) (Sept.

27, 1950 (PL 30644–54)); Ex. 117, Development Program, Project No. MD 2–13 (Westport Extension) (Sept. 8, 1950) (PL 30660–71).

The Cherry Hill vacant land site, adjacent to the Cherry Hill war housing project, was approved for African–American occupancy. Ex. 3, Hirsch at 38–41; Ex. 119, Development Program, Project No. MD 2–12 (Cherry Hill) (Sept. 8, 1950) (PL 30489–99). Ex. 119A, Development Program, Project No. MD 2–17 (Cherry Hill) (July 19, 1951) (PL 080293–302) ("Another weighty reason for the selection is the fact that this site is at the present time the only politically acceptable vacant Negro site in the City.").

3. *Baltimore's 1950s Projects*

In 1950, Baltimore's first Urban Renewal Projects, Waverly and Hopkins–Broadway, were approved by the City Council. Ex. 3, Hirsch at 35–37; Ex. 125A, HABC Monthly Report (June 1950) (map showing locations of Broadway and Waverly urban renewal projects).

Between 1950 and 1956, Cherry Hill Extensions I and II were erected. Ex. 2, Taeuber at Table 4; Ex. 119, Development Program, Project No. MD 2–12 (Cherry Hill) (Sept. 8, 1950) (PL 30489–99); Ex. 119A, Development Program, Project No. MD 2–17 (Cherry Hill) (July 19, 1951) (PL 080293–302).

In or about 1961, the Federal Housing and Home Financing Agency (HHFA) approved the Waverly and Hopkins/Broadway projects. Ex. 3, Hirsch at 37; Ex. 128A, Letter from R.L. Steiner to Berl I. Bernhard (June 27, 1961) (PL030881–030902) (showing that between 1951 and 1960 3,722 non-White households and only 252 White households were displaced by specified urban renewal projects).

The Waverly project involved removing 100 African–American families from an area that had been racially mixed and replacing them with 291 housing units occupied by White families. Broadway involved removing 956 African–American families and 106 White families, and replacing them with 178 proposed units for African–Americans and 478 White units. Ex. 3, Hirsch at 35–36; Ex. 99, Memorandum from Charles C. Beckett to Richard H. Kline, *Report of Field Trip to Baltimore, Maryland, March 19–22, 1951*, at 3, Exhibit II (April 25, 1951) (HUDBAL 000471–88 at HUDBAL 00473).

D. *HIGH RISE DEVELOPMENTS*

In the 1950s and 1960s, Defendants collaborated to build four large high-rise public housing projects. Local Defendants designed the high density, high rise structures in order to reduce the land cost per dwelling unit and to maximize the amount of housing that could be built on the approved site. Ex. 3, Hirsch at 41; Ex. 51, Office of Development and Research, U.S. Department of Housing and Urban Development, *An Historical and Baseline Assessment of Hope VI, Vol. I, Cross-site Report* (August 1996) at 4–2 (PL 067839–068060 at PL 067940) ("Lafayette Courts is located in what has long been an industrial area. This is consistent with Baltimore's series of attempts to 'maintain' the increasing population of African–Americans within certain neighborhoods by building public housing developments designed as 'Negro housing.' ").

1. *Segregation of High Rise Projects*

Three of the high rise housing projects were designed as "Negro" housing (Lafayette Courts, Lexington Terrace and Murphy Homes), while one project (Flag House Courts) was designated as "White" housing. Ex. 3, Hirsch at 41–43; Ex. 129,

Development Program, Parts I–VII, Project No. MD 2–19, Program Reservation No. MD 2–A, Fremont Avenue, Baltimore 2, Maryland, submitted by Housing Authority of Baltimore City at 2 (May 29, 1952) (HA 12673–744 at HA 12673–77) (identifies projects MD 2–15 Lafayette, MD 2–18 Murphy and MD 2–19 Lexington as "Non–White" and project MD 2–16 Flag as "White").

Flag House Courts was built in a racially mixed area. Lafayette Courts, six high rise buildings of 11 stories each and seventeen low rise buildings, was to accommodate 805 families, more than one-third larger than the 582 families that had formerly lived on the site. Ex. 131, HABC, Development Program MD 2–17 (Lafayette), at 17 (Aug. 24, 1951) (PL 080168–244 at 080187).

The sites for Lexington Terrace and Murphy Homes, were approved by the City Council in 1952. Lexington Terrace, built on an urban renewal site adjacent to Poe Homes, was designed to house 677 Black families in five high rise and several low rise buildings. Ex. 129, Development Program, Parts I–VII, Project No. MD 2–19, Program Reservation No. MD 2–A, Fremont Avenue, Baltimore 2, Maryland, submitted by Housing Authority of Baltimore City at 2 (May 29, 1952) (HA 12673–744 at HA 12673–77).

Murphy Homes was built on the George Street urban renewal site, on fifteen acres sandwiched between McCulloh Homes and the Lexington Terrace high rises. At the urging of Federal officials, HABC increased the size of the project from 643 to 758 units. Ex. 132, *Housing Officials Begin Plans for Final Project*, Baltimore Sun (June 8, 1957) (PL 33870) (Federal officials rejected "experimental" plan which would have put larger families into homes with yards, because it provided for a density of only 35 families to an acre, rather than the federally approved 50); Ex. 133, *Agency Approves Home Plan Shift*, Baltimore Sun (Oct. 4, 1958) (PL 28904) (Federal government insisted that project size be increased from the originally planned 643 to 750 units); Ex. 133A, *New Home Project Due in the Fall*, Baltimore Sun (March 19, 1963) (PL 017024–25) (Murphy Homes "expected to serve as an important source for the relocation of families displaced from the proposed Madison–Park North renewal project").

E. *RESEGREGATION STEPS IN BALTIMORE*

On June 25, 1954, the Baltimore Housing Authority announced an official policy of "desegregation" and the Commissioners of HABC adopted a policy of open occupancy. Ex. 136, Racial Relations Service and Office of the General Counsel, *Nondiscrimination Clauses in Regard to Public Housing, Private Housing and Urban Development Undertakings* (Oct.1957) (NA 00041–42); Ex. 137, Oliver C. Winston, Executive Director, HABC, *Desegregation Address to HABC Employees* (June 30, 1954) (PL 030173–88) (policy not to be immediately effective); Ex. 161, Memorandum from Oliver Winston, Meeting with Community Agencies, with attached HABC Meeting of Staff on Visiting Community Agencies (Nov. 3, 1954) ("It must be pointed out that the policy is not to be applied promiscuously or that it will have application for every family. We are not going to require anyone to live anywhere against their wishes.") (PL 31509–27); Ex. 138, Letter from Oliver Winston to Charles L. Levy, Director (Nov. 16, 1954) (PL 030326–28) ("In view of the segregated cultural pattern prevailing in the City, we decided that implementation of this policy could not be undertaken without thorough and carefully planned training of the local staff in the philosophy of desegre-

gation and the techniques required for a successful· operation."); Ex. 138A, Memorandum from Edgar M.· Ewing to Ellis Ash, *Further Steps on Implementating Desegregation* (April 5, 1955) (PL030535–030560) (admission that· in April 1955 HABC still not "operat[ing] on the premise that every applicant will be advised of the availability of any project according to his preference.").

### 1. *Shifting Demographics*

In 1953, Local Defendants had acquired Fairfield Homes, the White war housing project built on vacant land in Fairfield. At the time the project was acquired, Local Defendants determined to convert·it from White to Black occupancy because of the pressing need for Black·housing. Ex. 3, Hirsch at 59; Ex. 141, Edgar Ewing, Untitled Report (Mar. 6, ·1953)·(PL 031580–87, at PL 031582–83,·031586)·(report notes that the area immediately adjacent to Fairfield "is almost entirely occupied by Negroes" and "[t]he· area around Fairfield Homes is primarily industrial.") After the United States Supreme Court announced its decision in *Brown. v. Board of Education* in May of 1954, the plan was changed to desegregate Fairfield Homes, which, in any event, became essentially Black. Ex. 2, Taeuber at 37; Ex. 138, Letter to from Oliver Winston to Charles L. Levy, Director, Washington Field Office, Public Housing Authority, from Oliver Winston, Executive Director (Nov. 16, 1954) (PL 030326–28); Ex. 145, HABC, Notes on Management Division Staff Meeting (Nov. 3, 1954) (PL 030319–21); Ex. 146, *Tabulation by Cost Center* (Dec. 31, 1955, June 30, 1956 and Dec. 31, 1956) (PL 030436–38); Ex. 147, Memorandum from Harry Weiss ·to Edgar Ewing (Feb. 1, 1957) (PL 030736–42); Ex. ·147A, Memorandum from Maulsby (Sept. 11, 1964) (PL 031204–06) (HABC document admitting that Fairfield not. part of the "real deseg-

regation program," but rather was a deliberate change in racial occupancy).

By December 1955, 44 units at Latrobe and 30 units at Perkins were occupied by Black families. A year later, 194 units at Latrobe and 139 units at Perkins were occupied by Black families. Ex. 2, Taeuber at 37–38; Ex. 146, *Tabulation by Cost Center* (Dec. 31, 1955, June 30, 1956 and Dec. 31, 1956) (PL 030436–38).

In 1955, HABC opened the two high rise projects (Flag and Lafayette) under a desegregation policy, but, eventually, the projects became· majority Black occupied. Lafayette Courts opened with 99 per cent African–American tenants in April 1955. Flag House, planned as *de jure* segregated White, opened three months later a few blocks away with 70 per cent White occupancy. Moreover, HABC quickly converted Flag· to Black occupancy; by 1964 it was 75 per cent Black. Ex. 2, Taeuber at 42–45; Ex. 146, *Tabulation by Cost Center* (Dec. 31, 1955, June 30, 1956 and Dec. 31, 1956) (PL 030436–38).

### 2. *Response to 1964 Civil Rights Act*

In 1964, Congress passed Title VI of the Civil Rights Act of 1964 barring racial discrimination in programs administered by the Federal government. Seemingly in response, HABC began actively to assist Black families to move to the all-White projects in all-White neighborhoods with much success. By August 30, 1968, there were 53 Black families in residence at O'Donnell, 19 at Brooklyn, and 18 at Claremont. Ex. 162, Memorandum from Van Story Branch to R.C. Embry, *Requirements for Administration of Low–Rent Housing Under Title VI ·of the Civil Rights Act of 1964—Selection of Applicants and Assignment of Dwelling Units* (Oct. 16, 1968) (HUD 01637–47 at HUD 01641).

### 3. HABC's "Three Choice" Tenant Assignment Plan

In 1968, HABC submitted its "three choice" tenant assignment plan to HUD. The plan grouped HABC's family projects into four "locations" (Northwest, Central, East and Southeast). The plan on its face allowed applicants to choose one or more "locations," and to reject two offers of housing without penalty. Ex. 162, Memorandum from Van Story Branch to R.C. Embry (Oct. 16, 1968) (HUD 01637–47 at HUD 01638, 01642).

Federal Defendants approved HABC's "three choice" tenant selection and assignment plan, and explicitly approved the grouping of the projects into the four "locations." Ex. 163, Letter from Vincent A. Marino to Robert C. Embry (Jan. 17, 1969) (0197–98).

Van Story Branch of HABC wrote to Housing Commissioner Robert C. Embry, Jr. in 1968 that "[b]y broadening the location base, we broaden the applicant's opportunities for housing. He has already defined the areas in which he will live, and he can still exercise choice. The prediction is that he will not find it necessary to reject three areas, whereas he might well reject three individual projects. Therefore, he is allowed a choice, and in this manner vacancy loss is reduced." Ex. 162, Memorandum from Van Story Branch to R.C. Embry (Oct. 16, 1968) (HUD 01637–47 at HUD 01643).

At the end of 1991, 86 per cent of the 2388 Whites in HABC's family public housing developments lived in either O'Donnell Heights, Brooklyn Homes or Claremont Homes. Ex. 169, HABC Semi–Annual Statistical Bulletin (Dec.1991) (PL 026918–70).

In 1995, Brooklyn Homes remained 62 per cent White (310 out of 500 units), O'Donnell remained 33 per cent White (292 out of 887 units) and Claremont remained 22 per cent White (97 out of 444 units). Ex. 169B, Housing Authority of Baltimore City, Division of Housing Management, Race of Families by Development (Aug. 21, 1995) (HUD 01616–01617); Ex. 8, Deposition of Lyle Schuman (Vol.3) at 445–493.

### F. HABC'S DEVELOPMENTS BEGINNING IN THE MID–1960s

Beginning in 1964, HABC developed, with HUD site approval and funding, nine family and family/elderly public housing developments comprising 2453 units— McCulloh Extension (516 units), the Broadway (429 units), Spencer Gardens and Julian Gardens (43 units), Mt. Winans (140 units), Rosemont and Dukeland (136 units), Oswego Mall (35 units), Somerset Extension (60 units), Hollander Ridge (1000 units) and Charles K. Anderson Village (121). Ex. 2, Taeuber at 42, 73. A brief history of each development is examined below.

During the same period, the Federal Defendants also approved and funded approximately 2800 units of "scattered site" family public housing units contained in 18 separate developments. *Id.* at 74–77.

### 1. McCulloh Extension

The Development Program for McCulloh Extension, which added 516 units of public housing adjacent to McCulloh Homes, a former *de jure* segregated "Negro housing" project, was submitted to HUD in December 1964. HABC and HUD knew that the site was next to five existing public housing projects housing 2,754 families, and that "all of these projects currently house Negro families." Ex. 176, HABC, McCulloh Extension Development Program MD 2–23 (Dec. 1, 1964) (HA 12648–72 at HA 12661).

A local official commented as to the McCulloh site that "[t]his is a good site for development provided there is no objection to the growing concentration of public housing in this area." Ex. 177, Memorandum from Edward Minor to Ellick Maslan (Aug. 12, 1960) (HA 09236–38 at 09237).

All residents of the McCulloh site prior to clearance were African–American, and the site was in a census tract that was 99 per cent African–American in 1970. Ex. 2, Taeuber at 74; Ex. 176, HABC, McCulloh Extension Development Program MD 2–23 (Dec. 1, 1964) (HA 12648–72 at HA12660).

HABC's development application, contemplating that up to 60 per cent of the African–American occupants of the site would be relocated to public housing was approved by HUD. Ex. 176, HABC, McCulloh Extension Development Program MD 2–23 (Dec. 1, 1964)(HA 12648–72 at HA12660–61).

The NAACP filed a formal complaint with the Secretary of HUD on behalf of African–American residents who were being forced off the site. Nevertheless, HUD allowed the project to go forward. Ex. 178, Complaint Filed with Department of Housing and Urban Development, McCulloh Homes Extension Public Housing project, Baltimore, Maryland (HA 22439–66); Ex. 178A, NAACP News Release (June 24, 1966) (HA 13328–13329); Ex. 179, *Relocation Fault Found*, Baltimore Sun (Feb. 7, 1967) (HA 22247–50 at 22249).

### 2. *The Broadway*

In August 1965, HABC submitted the development application for the Broadway Homes, MD 2–25. The site was just east of Broadway, and just south of the 1950 Broadway Urban Renewal Project. HABC and HUD knew that the site was in the vicinity of six existing public housing projects. The site was characterized as a

slum site. Additionally, the site was an existing Black neighborhood and all of the residents of the site at the time of the application were Black. Ex. 180, Development Program, Project No. MD 2–25 (Aug. 10, 1965) (HA 12580–625).

### 3. *Mt. Winans*

The development program for Mt. Winans was submitted to HUD in October 1966. HABC and HUD knew that the area was an existing African–American neighborhood. All 135 families residing on the site at the time the development program was submitted were African–American. Ex. 181, Development Program, Project No. MD 2–29 (Oct. 4, 1966) at 7 (PL 031490–507 at PL 031494). HABC and HUD knew that Westport and Westport Extension were adjacent to Mt. Winans. Ex. 181, Development Program, Project No. MD 2–29 (Oct. 4, 1966) at 2–3 (PL 031490–507 at PL 031492–93). Nevertheless, HUD approved the site. As of 1970, and up to the present, all 140 Mt. Winans public housing units have been occupied by African–American tenants. Ex. 2, Taeuber at Tables 3–6.

### 4. *Oswego Mall*

In August 1967, the Baltimore City Council approved the extension of the 1950 cooperation agreement to the Oswego Mall site. Oswego Mall was the first public housing project HABC developed using the "turnkey" method, whereby public housing was built by a private developer on land controlled by the private developer, and then sold to HABC. *See* Ex. 183, HABC Response to Neal Request for Admission No. 24; Ex. 184, Ordinance No. 1099 (Aug. 7, 1967) (PL 033571–73).

Local Defendants characterized the site as being "racially mixed." Ex. 5, Pendall Family Projects at Table 1; Ex. 185, Mem-

orandum from Edgar Ewing, *Map Showing Turn–Key Locations* (Dec. 13, 1967) (HA 22723–44).

In September 1967, the HUD Regional Office gave tentative site approval conditioned on the site's being coupled with a site in a White area—either the proposed Colmar Park Apartments site in Medfield or the Belle Vista site in Northeast Baltimore. Ex. 186, Letter from Vincent A. Marino, HUD to Richard L. Steiner (Sept. 11, 1967) (HA 16897–98); Ex. 187, Memorandum from Steiner to As Listed, with attached materials re Belle Vista site (July 24, 1967) (PL 046215–20); Ex. 188, Memorandum from Edgar Ewing to As Listed, with attached materials including Colmar (Dec. 13, 1967) (PL 046222–43).

Local Defendants complained to HUD's Assistant Secretary about the requirement of balancing segregated with desegregated sites. Ex. 189, Letter from Eugene Feinblatt to Don Hummell (undated) (PL 029254–56) (complaining that "[t]he intergroup relations [fair housing] section of the Housing Assistance Administration's regional office in Philadelphia has insisted that a turnkey project must either be in an all White neighborhood, or, if in a predominantly non-White neighborhood, must be paired with one in an all White neighborhood.").

HUD's Assistant Secretary reversed the regional office's decision, and allowed Local Defendants to go forward with the project. Ex. 190, Letter from Don Hummel to Eugene Feinblatt (Sept. 20, 1967) (PL 029257).

The Oswego Mall site was developed and, by 1977, all 35 units were occupied by African–American tenants. Ex. 193, Report on Occupancy (Aug. 5, 1977) (HUD 1574–1613 at HUD 1600).

HUD never required that Belle Vista or Colmar Park Apartments be acquired.

## 5. *Somerset Extension*

In 1969, the Baltimore City Council approved the extension of the cooperation agreement of 1950 to the Somerset Extension site.

When the Somerset Extension (MD–42) opened, it added sixty units to the 257 units at Somerset Court.

As of 1977, all 60 units were occupied by African–Americans. It has remained all Black ever since. Ex. 192, Ordinance No. 646 (Dec. 15, 1969) (PL 050105–08); Ex. 193, Letter from Van Story Branch to Dean Reger, with attached *Report on Occupancy* (Aug. 23, 1977) (HUD 01574–1613 at HUD 01606).

These units were originally proposed for a predominantly White area of Southwest Baltimore. After HABC was unable to obtain City Council approval of that site, HUD authorized the transfer of the units to the Somerset site, expanding this former *de jure* segregated project. Ex. 185, Memorandum from Edgar Ewing, *Map Showing Turn–Key Locations* (Dec. 13, 1967) (HA 22723–44); Ex. 194, letter from R.C. Embry to Vincent Marino, HUD (June 26, 1969) (PL 053004–05); Ex. 183, HABC Response to Neal Request for Admission No. 21.

## 6. *Rosemont*

In 1975, the construction of the Rosemont and Dukeland projects in Rosemont, a West Baltimore community of African–American homeowners, added another 136 units in a 98 per cent Black neighborhood.

This location was selected despite reservations about the suitability of the site—"They are three odd pieces of land overlooked when the surrounding areas were improved because of their unattractiveness.... Mr. Embry said he has misgivings because the projects would be difficult

to maintain after completion due to bad terrain problems (hills, railroad tracts, etc.)." Ex. 195, HABC Summary of Commission–Staff Discussion (Feb. 17, 1970) (HA 16938–43).

African–American residents of Rosemont opposed development of public housing in this all-Black neighborhood. The Rosemont Neighborhood Improvement Association wrote to city officials asking that they withdraw this site because of the "fostering of 'de facto' segregation" and the "[e]stablishment of a ghetto." Ex. 196, Letter Joseph Wiles, President, Rosemont Neighborhood Improvement Association to Robert Embry, DHCD (Mar. 6, 1970) (HA 13645–46 at HA 13646).

When this was not effective, the Rosemont Neighborhood Improvement Association asked HUD to stop the project, asserting that "[t]he building of a public housing project on this site, located in the heart of a Black community, would be perpetuating de facto segregation since these units would only house Black citizens. This act would be in strict violation of federal statutes governing the selection of sites for building such projects, and demands an immediate test of legality in a court of law." Ex. 197, Letter to Robert C. Embry, Jr., Commissioner, HUD, from Joseph S. Wiles, President, Rosemont Neighborhood Improvement Association (July 27, 1970) (HA 3614–19 at HA 3614–15).

Despite being explicitly warned that they were creating segregation, HUD and HABC moved forward with this development.

a. *Hilton Street Portion of Rosemont Package*

In 1969, HABC developed, and HUD approved and funded, a site located near Hilton Street, bordering the then-predominantly White Irvington neighborhood, as part of the Rosemont/Dukeland package.

After HABC purchased the Hilton site property and obtained City Council approval of the site, the project met strong opposition from neighborhood residents and elected officials. Ex. 198, Letter from Carl Friedler, State Senator to Donald Hummel (Jan. 10, 1969) (PL 050443–44).

HABC defended the Hilton Street site and argued the importance of locating some public housing outside of the inner-city. HUD took no stand, telling a state senator in 1969 that the issue was a matter of "local concern."

Immediately thereafter, the Baltimore City Council withdrew its earlier approval of the site and deleted the site from the cooperation agreement. Ex. 199, Letter from R.C. Embry to Donald Hummel (Jan. 17, 1969) (PL 050445–46); Ex. 200, Letter from R.C. Embry to William Donald Schaefer (Feb. 6, 1969) (PL 050449–50); Ex. 201, Ordinance No. 583 (PL 050447–48); Ex. 202, Letter from Don Hummel to Carl Friedler (Jan. 24, 1969) (HA 13544).

b. *Upton Area*

In 1979, HUD's Office of Fair Housing and Equal Opportunity recommended against placing an assisted housing project in the Upton area because of the high minority concentration and high low-income concentration. "The subject site is located in West Baltimore, in an area of high minority and low-income concentration, with over half of the population earning under 80 per cent of the mean family income. Upton presently has over 700 units of assisted rental units occupied almost exclusively by minorities... [T]here are six Section 236 projects in close proximity to the Upton project. The six projects have a 99.2 per cent minority occupancy. It can therefore be anticipated that the occupancy of the proposed project

could mainly attract minorities." Ex. 203, Memorandum from Maxine Cunningham to Thomas Hobbs, Fair Housing and Equal Opportunity Site Review—Upton—Section 236—180 units (Mar. 13, 1979) (HUDBAL 000512–14).

HUD authorized HABC to transfer 43 of the outer-city Hilton public housing units to urban renewal lots in the minority concentrated community of Upton. The 43 units were developed as Emerson Julian Gardens and Spencer Gardens.

In 1997, citing the blighting influence of Murphy Homes, HABC asked HUD for permission to tear down Emerson Julian Gardens along with the larger Murphy project. HUD approved the demolition application.

### 7. *Hollander Ridge*

The Hollander Ridge site was selected by Local Defendants. HABC explained that "HUD has not been granting approval for any new public housing unit in an area that is even arguably Black until that unit has been balanced by a unit in a predominantly White neighborhood. As our urban renewal effort is presently devoted almost exclusively to inner city areas where our city's worst housing is located, and as we try to provide housing for the same economic group which is being displaced . . ., there is a great need for new public housing units in these areas. Because of the HUD's requirement, it was necessary . . . to find a site in a White neighborhood for a large number of units to balance the significant amount of housing to be built on urban renewal lots (particularly in the Gay Street, Oldtown and Upton projects, already in execution)." Ex. 207, Rosedale Farms (MD 2–45) (HA 3585–89 at HA 3589).

HABC contemporaneously stated: "Recent experience, in Baltimore as well as in other cities, indicates increasing opposition to public housing from neighborhood groups, often resulting in City Council disapproval; the Ordinances for several promising local developments have been withdrawn, after a considerable investment by the HABC, developers and HUD staff, because of such opposition. The point is that numerous sites maximize the opportunity for opposition, delay and possible defeat in contrast to Rosedale Farms, which has already received City Council approval." Ex. 207, Rosedale Farms (MD 2–45) (3585–3589 at 3585); Ex. 210, Ordinance No. 643 (Dec. 8, 1969) (PL 033589–92) (Baltimore City Council Ordinance approving the Hollander Ridge site and granting exception to requirement in Section 3A of the 1950 Ordinance adopting the Cooperation Agreement that public housing be developed on slum sites).

HUD authorized HABC to develop 1000 units of public housing on this single site at Hollander Ridge as "balancing" units for sites developed in minority concentrated areas. Ex. 206, Letter from Vincent Marino to Robert Embry (Feb. 25, 1970) (HA 12512–13). Thus the Hollander Ridge project was approved by HUD and built by HABC.

### a. *HUD's Concerns with Hollander Ridge*

HUD staff did express "concern with the concentration of low-income families on a single site." Ex. 211, Letter from Harold Finger to R.C. Embry (May 28, 1970) (HA 12504–05 at 12505). They were also concerned about environmental concerns, drainage problems and erosion issues. Ex. 212, Letter from Allen T. Clapp to Robert C. Embry, with attached Memorandum (Dec. 26, 1972) (HA 12412–26).

As described in 1996 by a HUD consultant: "Hollander Ridge is located on the far northeast edge of the City of Baltimore

on a parcel of land bounded by express-ways on two sides and a major arterial road (Route 40) to the south....The property is approximately four miles from downtown Baltimore, but effectively cut off from the rest of the city by Interstate 95. Although technically a non-impacted site, it is an extremely isolated location that is inconvenient to schools, churches, shopping, laundry facilities, or other services, especially for those without cars. Vehicular access to the site is provided by a guarded checkpoint on the north side of Pulaski Highway (Route 40). Originally, the property was also accessible through residential streets that served the Rosedale community to the northeast. However, because of crime problems over the years, these access points have been blocked by barricades. A bus route runs into the property." Ex. 216, Abt Report, Public Housing Stock Viability Assessment, Hollander Ridge (September 24, 1996), at 8 (HUD 02148–254 at HUD 02157); Ex. 217, HABC's Responses to Plaintiffs' Requests for Admissions Concerning Facts No. 15; Ex. 218, Email from Harold Jackson to Candace Simms (Sept. 6, 1996) (HUD 06374–75).

b. *Opposition in Rosedale to Hollander Ridge Site*

Rosedale, a community adjacent to the Hollander Ridge site, was located in Baltimore County. From the beginning, the Hollander Ridge development was opposed by many Rosedale residents. Ex. 213, Robert N. Young, *Review and Comment Transmittal Memorandum, Metropolitan Clearinghouse* (HA 16647–73).

8. *Charles K. Anderson Village*

In 1980, HABC applied to HUD to acquire and convert to public housing the Patapsco Park Apartments, a 120–unit federally subsidized failed apartment complex in Cherry Hill. This application was approved by HUD, and resulted in the 120–unit Charles K. Anderson Village public housing development. *See* Ex. 2, Taeuber at Map 6; Ex. 219, Letter from M.J. Brodie to Thomas R. Hobbs (Nov. 28, 1980) (HUD 03907); Ex. 220, Memorandum of Understanding, Patapsco Park Apartments (April 6, 1981) (HUD 03881–90).

The plan was to acquire the apartment complex and convert existing tenants to public housing tenants. Ex. 220, Memorandum of Understanding, Patapsco Park Apartments (April 6, 1981) (HUD 03881–90).

Acquisition of the Patapsco Park Apartments complex did not increase the housing opportunities available to minority tenants. At the time of acquisition, its residents were already 100 per cent African–American. *Id.* at HUD 038876.

The Patapsco Park Apartment complex was located directly adjacent to the existing all-African-American occupied Cherry Hill Homes, Cherry Hill Extension, and Cherry Hill Extension II public housing developments, and brought the total number of segregated public housing units in that former "Negro housing" community to 1,718.

Charles K. Anderson was 100 per cent African–American occupied until it was recently emptied by HABC. *See* Ex. 2, Taeuber at 74–75.

At the same time that HUD approved development of Charles K. Anderson as minority family public housing in the minority and poverty-concentrated Cherry Hill neighborhood, HUD disapproved the development of elderly public housing in Cherry Hill. HUD determined that the Cherry Hill site "is located in an area containing an undue concentration of assisted families... According to our best estimates, 66 per cent of the families of the

proposed area qualify as low-income and 55 per cent of all housing units are HUD assisted." Therefore, according to HUD, the site failed to comply with the requirement that "[t]he site must promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons." *See* Ex. 2, Taeuber at Tables 4–6; Ex. 221, Letter from Thomas R. Hobbs to M.J. Brodie (Feb. 4, 1981) (HUDBAL 037030–37).

## G. *THE SECTION 23 LEASED HOUSING PROGRAM*

In 1967, HABC began using the new HUD program Section 23 Leased Housing. The Leased Housing program permitted HABC to lease private units from owners under contracts that allowed HABC to sublease the units to low-income families. Ex. 238, Van Story Branch, *Progress Report for Leased Housing* (Oct. 25, 1968) (PL 030810–18).

HUD approved funding for 250 leased housing units in Baltimore. Ex. 238A, Memorandum from Marie McGuire to Vincent Marino (March 15, 1967).

In 1967, HUD temporarily withheld approval of funding for HABC's participation in the Section 23 Leased Housing program in response to the City Council's geographic restriction of the program's area of operation. Ex. 240, Memorandum from Marie C. McGuire, Acting Deputy Assistant Secretary to Don Hummel, Assistant Secretary (Jan. 23, 1967) (PL 029258).

On February 15, 1967, Secretary Robert Weaver approved the application for 250 units. Ex. 241, Memorandum from Robert Weaver to Don Hummel (Feb. 15, 1967) (PL 029259).

In its letter to Local Defendants approving the application for 250 units, HUD's Assistant Secretary Don Hummel stated that he was accepting the Baltimore Urban Renewal and Housing Agency's (BURHA's) statements as "complete assurance" that the restriction to urban renewal areas would not "result in violations of the site selection criteria under Title VI." He also warned local housing officials: "You are expected to be constantly alert to prevent leasing only in areas which will perpetuate Negro concentration." Ex. 242, Letter from Don Hummel to Richard L. Steiner (Mar. 10, 1967) (PL 029260–62).

A city housing official subsequently remarked that "Baltimore City is the only locality in the United States having a Leased Housing Program where the area of operation is restricted to certain confines of the locality." Ex. 243, Van Story Branch, *Experience to Date with Leased and Used Housing Programs, Draft and Comments* (June 18, 1970) at 2 (PL 030828–36).

HABC itself recognized that "the program was considerably hampered by the restriction of the area of operation to the designated renewal areas of the city. Generally, housing that was offered was located in blighted areas or was in a dilapidated condition which would require extensive rehabilitation." HABC also recognized the need for housing to be offered in "areas in which Negro concentrations are not predominant." Ex. 238, Van Story Branch, *Progress Report for Leased Housing* (Oct. 25, 1968) at 2, 7 (PL 030810–27 at PL 030811, PL 030816); *see also* Ex. 243, Van Story Branch, *Experience to Date with Leased and Used Housing Programs, Draft and Comments* (June 18, 1970) (PL 030828–36).

On June 27, 1968, HUD found Local Defendants in violation of Title VI of the Civil Rights Act of 1964 based on evidence that all of the 75 units under lease after one year were located in areas ranging from 80 per cent to 99 per cent Black. Ex.

244, Letter from Marino to Moyer (June 27, 1968) (PL 030788–95).

Subsequently, HABC's allocation of Leased Housing was reduced from 250 to 150 units. HUD, however, allowed HABC to continue to operate the segregated units already under lease without requiring any desegregative actions by HABC. Ex. 238, Van Story Branch, *Progress Report for Leased Housing* (Oct. 25, 1968) at 1 (PL 030810–27).

HABC phased out the Leased Housing program in 1976. At that time, HABC admitted that the program was "mediocre" and that "the basic problem was the inability to obtain units in better areas of the city." Ex. 243A, Memorandum from Van Story Branch to R.C. Embry, *Phase–Out of the Leased Housing Program, MD 2–30* (April 12, 1976) (PL 030864–70).

### H. *SCATTERED SITE DEVELOPMENTS*

From 1964 (when HABC submitted its application for MD 2–24) to the early 1990s (when Defendants closed out Project Uplift), Defendants developed approximately 2800 units of "scattered site" public housing as part of 18 separate developments. Ex. 1, Maps, map 9e; Ex. 2, Taeuber at 47–49, 74–77; Ex. 5, Pendall Scattered Sites at 1.

The City Council Ordinance authorizing the scattered site developments specifically limited the development to vacant structures. Ex. 222A, Ordinance No. 459 (May 21, 1969) (PL 033579); Ex. 222, Ordinance No. 293 (Mar. 16, 1977) (PL 033614). These units were all developed by rehabilitating existing structures instead of using new construction.

HUD waived site and neighborhood standards for some of the projects. *See, e.g.,* Ex. 223, Memorandum from Lawrence Simons to Thomas Hobbs (Nov. 22, 1978) (1356–1359) (providing waiver for scattered site project MD 2–63); Ex. 229, Memorandum from Lawrence B. Simons to Thomas Hobbs, Request for Waivers— Public Housing Program Acquisition with Rehabilitation Projects MD–2–64, MD–2–65, MD–2–66, MD–2–67, MD–2–68 (Aug. 30, 1979) (1356–1359) (providing waivers for scattered site projects MD 2–64, MD 2–65, MD 2–66, MD 2–67 and MD 2–68).

HABC's applications to HUD for the scattered site projects included identification of the location of potential properties to be acquired. *See, e.g.,* Ex. 230, Letter from M.J. Brodie to Thomas R. Hobbs, with attached documents (Mar. 3, 1980) (1360–1398) (includes list of possible sites for MD 2–69 at 1395–1397; also includes chart showing racial composition of census tracts in Baltimore City at 1391–94, as well as chart showing number of units in each census tract at 1398); Ex. 232, Letter from M.J. Brodie to Thomas R. Hobbs with attachments (Oct. 21, 1980) (HUDBAL 000123–163) (forwarding Preliminary Site Report for MD 2–72 including chart showing racial composition of census tracts (at HUDBAL 000140–143) and list of possible sites for MD 2–72 (at HUDBAL 000145–162)).

HABC supplied HUD with monthly status reports listing addresses of units completed and under construction. *See, e.g.,* Ex. 232A, Letter from M.J. Brodie to Thomas Hobbs with attachment (Jan. 16, 1980) (HUDBAL 001227–001231) [part of D5154] (monthly status report for scattered site projects MD 2–63 and 2–65 showing address and census tract of units started and completed); Ex. 232B, Scattered Site Monthly Status Reports (HUD-BAL 003554–003669) (monthly status reports for various dates for scattered site developments MD 2–62, 2–64, 2–66, 2–67, 2–68, 2–69, 2–73 and 2–74 showing address

and census tract of units started and completed).

HABC provided certificates of completion, also listing the units in the project. *See, e.g.,* Ex. 232C, Letter from M.J. Brodie, Executive Director to Thomas R. Hobbs, HUD (July 2, 1982) (HUD 1303–1307) (enclosing Certificate of completion for MD 2–62 and a list of all properties included in the development); Ex. 232D, Letter from M.J. Brodie, Executive Director to Thomas R. Hobbs, HUD (April 15, 1983) (HA9091–9099) (enclosing Certificate of Completion for MD 2–67 and a list of all properties included in the development).

### 1. *MD 2–24*

The Development Program for MD 2–24, HABC's first scattered site public housing project, was submitted to HUD in October 1965. It planned 100 units of public housing in the Harlem Park urban renewal area. Ex. 224, Development Program, Project No. MD 2–24, Harlem Park (Oct. 5, 1965) (HA 12626–47 at HA 12629).

All of the existing families that were relocated to make way for the project were African–American. All of the units were developed in census tracts that were over 90 per cent Black in 1970. Ex. 5, Pendall Scattered Sites at 11, Table 11; Ex. 224, Development Program, Project No. MD 2–24, Harlem Park (Oct. 5, 1965) (HA 12626–47 at HA 12636).

### 2. *MD 2–76*

The development program for MD 2–76, the "Baltimore Demonstration Project," was submitted in 1976. Ex. 225, Letter from R.C. Embry to Everett Rothschild (Aug. 9, 1976) (HUD 01897–930).

According to the Memorandum of Understanding between HUD and HABC for this project, vacant City-owned properties, in most cases properties the City had acquired through tax sale, were to be used for this development. Ex. 228, Letter from M.J. Brodie to Thomas Hobbs with attached Report (July 13, 1979) (HUDBAL 001674–726 at HUDBAL 001720–21).

The development program included maps showing the location of vacant houses available for the project; these units are concentrated in neighborhoods identified as West Baltimore and East Baltimore, the existing Black ghettos. Ex. 225, Letter from R.C. Embry to Everett Rothschild (Aug. 9, 1976) (HUD 01897–930 at HUD 01911–12).

HUD's Fair Housing and Equal Opportunity Division approved the project saying it "meets all applicable Civil Rights and equal opportunity requirements." Ex. 226, Memorandum from Jackson Cronk to Maxine Cunningham (Sept. 10, 1976) (HUDBAL 3481).

Two years later, HABC wrote to HUD, stating that the Baltimore Demonstration Project, MD 2–76, and other projects developed under its Memorandum of Understanding had resulted in "the successful rehabilitation of more than 1400 scattered site units throughout Baltimore." Based on this "success," HABC asked for additional waivers of HUD requirements for additional projects. Ex. 227, Letter from M.J. Brodie to Everette H. Rothschild (Aug. 1, 1978) (HUD 03511–14).

HUD replied, granting a waiver of the Minority Housing Opportunities siting requirements for one project, but stating that further waivers would not be granted until HUD reviewed the Final Evaluation Report of the Demonstration Project. Ex. 227A, Letter from Thomas R. Hobbs to M.J. Brodie (Dec. 5, 1978) (1282–1284).

In 1979, HABC submitted its Final Report for the Demonstration Project. Some 95 per cent of the units of this "Demon-

stration Project," according to HABC's own report to HUD, were in census tracts at least 88 per cent minority as of the 1970 census.

### 3. *Additional Scattered Site Developments*

In August 1979, HUD's Assistant Secretary granted site and neighborhood waiver requests for projects MD 2–64, MD 2–65, MD 2–66, MD 2–67 and MD 2–68 based on the purported "success" of the Demonstration Project. HUD's waiver for these five scattered site developments again included a specific requirement "that at least 21 percent of the units to be selected will be located outside areas of minority concentration." Ex. 229, Memorandum from Lawrence B. Simons to Thomas Hobbs, Request for Waivers—Public Housing Program Acquisition with Rehabilitation Projects MD–2–64, MD–2–65, MD–2–66, MD–2–67, MD–2–68 (Aug. 30, 1979) (1354–59).

In March 1980, HABC submitted the Development Program for MD 2–69. Ex. 230, Letter from M.J. Brodie to Thomas R. Hobbs, with attached documents (Mar. 3, 1980) (1360–1398). The attached Memorandum of Understanding from HABC again characterized it as "a continuation of the very successful Vacant House Program under which over 2000 units have already been completed or are being developed." HABC again on paper assured HUD that "[a] minimum of 21 per cent of the selected units will be outside minority impacted areas." *Id.* at 1370. The submission included lists of potential properties and census tract information, showing the properties are concentrated in minority concentrated areas. *Id.* at 1391–1398.

HUD's Office of Fair Housing and Equal Opportunity recommended approval of this project, noting: "The City of Baltimore has stated in this submission that it will select a *minimum* of 21 per cent of the selected units outside minority impacted areas unless the Public Housing Authority demonstrates that less than 21 per cent of housing suitable for use in the program is located outside minority areas." Ex. 231, Memorandum from Rheba Milberry to Thomas Hobbs, Fair Housing and Equal Opportunity Division Review—MD 2–69 (May 21, 1980) (HUDBAL 03075).

However, when MD 2–69 was completed in 1988, 97 per cent of the units were in census tracts that were over 80 per cent Black. Ex. 5, Pendall Scattered Sites at 11, Table 11.

Once again, HUD funded these units, and took no action at all to sanction HABC or require HABC to take any desegregative compensatory measures.

### 4. *MD 2–72*

In October 1980, HABC submitted the Preliminary Site Report for MD 2–72, including lists of possible properties and information regarding the racial demographics of census tracts where the properties were located.

In December 1980, HUD's Office of Fair Housing and Equal Opportunity again recommended approval of the project "with the stipulation that 21 per cent of all proposed units be located outside areas of minority concentration." Ex. 232, Letter from M.J. Brodie to Thomas R. Hobbs with attachments (Oct. 21, 1980) (HUDBAL 123–63); Ex. 233, Memorandum from Rheba Milberry to Thomas Hobbs, Preliminary Site Report Review (Dec. 15, 1980) (HUDBAL 000165).

In September 1981, HUD's Office of Fair Housing and Equal Opportunity conditionally approved the MD 2–72 project with the caveat that "it appears that the Authority's tenant selection criteria may have been a contributing factor to this situation."

HUD approved MD 2–72 "conditioned upon receipt of an adequate tenant selection policy that would result in public housing tenant populations more reflective of the City's total racial composition."

When MD 2–72 was completed, over 98 per cent of the units were located in census tracts that were over 80 per cent Black. Ex. 5, Pendall Scattered Sites at 11, Table 11; Ex. 234, Memorandum from Rheba Gwaltney to Thomas Hobbs, Review of Development Program, Baltimore City, MD 2–72 (Sept. 15, 1981) (HUDBAL 000108–20); Ex. 235, Letter from Thomas R. Hobbs to M.J. Brodie (Sept. 30, 1981) (HUDBAL 000105–07).

### 5. *Project Uplift*

Project Uplift, or Baltimore Uplift, was the last scattered site project developed in Baltimore before the search for Fairfield replacement housing. It was still ongoing at the time that HABC applied for funding for Fairfield replacement housing and the time HUD approved funding for Fairfield replacement housing.

The sites acquired by HABC for Project Uplift were purchased by HABC from private individuals who were Washington investors. *See* Ex. 13, Hobbs Dep., at 168–170; Ex. 269, HABC Responses to Harris Request for Admissions No. 4.

On April 6, 1984, HUD sent HABC an Invitation for Low Rent Public Housing Application, specifically for acquisition of existing housing. Ex. 270, Letter from Thomas R. Hobbs to Marion Pines (April 6, 1984) (HA 13904–11). Within three weeks, HABC submitted two applications, Project MD 2–77 for 210 units and Project MD 2–78 for 80 units. Ex. 271, Letter from Marion Pines to Thomas R. Hobbs (April 24, 1984) (HA 13903); Ex. 272, Application MD 2–77 and MD 2–78 (April 24, 1984) (HA 13912–42).

On July 24, 1984, HUD notified HABC of a reservation of funds for MD 2–78. MD 2–78 was never developed. The fund reservation states: "Every effort should be made to locate buildings for acquisition with or without rehabilitation outside areas of minority concentration." The fund reservation also states "[t]he units must not be located in areas with large concentrations of subsidized housing and low income residents, but be utilized to deconcentrate low-income residents into neighborhoods with little or no subsidized housing."

On August 10, 1984, HUD requested a complete list of the Project Uplift properties. On August 24, 1984, HABC sent HUD a list of 215 properties. Ex. 274, Letter from Thomas R. Hobbs to Marion Pines (Aug. 10, 1984) (HA 13880–82); Ex. 275, Letter from Marion Pines to Thomas R. Hobbs (Aug. 24, 1984) (HA 13869–79).

Almost one year later, in June 1985, HUD informed HABC that 123 of the identified properties were acceptable because they are located "outside areas of minority concentration" or were in "revitalizing neighborhood areas." Ex. 276, Letter from Thomas R. Hobbs to Marion W. Pines (June 3, 1985) (HA 13891–902).

In June 1985, HUD advised HABC that it must have "a 3:1 ratio of minority versus non-minority locations" in order to satisfy the site and neighborhood standards for Project Uplift.

One-hundred and five of the 108 Project Uplift sites that were occupied prior to acquisition were occupied by African–American tenants. Ex. 278, Memorandum from Stan Campbell to Robert Ferguson, with attached Relocation Plan (Feb. 5, 1986) (HA 13686–707 at HA 13689).

In January 1989, HUD advised HABC that HUD was in the process of dividing Project Uplift into two projects to assist HABC in reaching the Date of Full Avail-

ability (DOFA) on the first 110 units, and allowing additional time for HABC to complete the remaining 66 units. Ex. 278A, Letter from St. George I.B. Crosse to Robert Hearn (Jan. 9, 1989) (HA14019–21).

By March 1989, HABC reported that 41 of the Project Uplift units had been completed, another 37 had been started, that 19 had not yet been started, and that three were on hold. In June 1990, HABC reported that it was working on or had completed 18 additional Project Uplift properties, none of which was on the March 1989 list. Ex. 278B, Weekly Rehabilitation— Progress Report, March 1989 (HA 13952–59); Ex. 278C, Weekly Rehabilitation— Progress Report, June 1990 (HA 13758–60).

HUD allowed HABC to use two million in Community Development Block Grant (CDBG) funds to develop Project Uplift units in minority areas during 1989, and an additional $500,000 in CDBG funds for Project Uplift units in minority areas during 1990. Ex. 278E, Baltimore City CDBG Program, 1989 Performance Report (MCC 000526–000731 at 000607); Ex. 278F, Baltimore City CDBG Program 1990 Performance Report (MCC 000732–000915 at 000774–000775).

In December, 1992, HUD approved HABC's Development Cost Budget/Cost Statement for Project Uplift MD 2–77. Ex. 278G, Development Cost Budget/Cost Statement, Project MD 2–77 (Dec. 31, 1992) (HA14027–29).

Project Uplift was completed and closed out by January 1993. Ex. 279, Letter from Maxine Saunders to Robert Hearn (Jan. 6, 1993); Ex. 269, HABC Responses to Harris Request for Admissions No. 10.

Five years later, HABC was proposing to demolish 26 units in MD 2–77 (out of a total of 110 units) and proposing to demolish 16 units of MD 2–89, out of a total of 66 units.

Four years later, in 2002, HABC reported that only 56 units of the 110 units in MD 2–77 were occupied. Ex. 280, Fax from Yves Djoko to Cassandra Loving, with attachment Units Proposed for Demolition (Dec. 10, 1998) (HUD 07012–13); Ex. 281, Disposition Application for Holy Nativity and St. John's Development Corporation at HA 44009 (April 2002) (HA 43992–44066).

### 6. *Fairfield Replacement*

HUD and HABC began to develop plans for the replacement of Fairfield Homes in 1987. Project Uplift was still under development at that time, and would not be closed out until 1993.

On April 6, 1987, HABC filed an application with HUD for public housing development funds to replace Fairfield's 300 housing units.

On September 30, 1987, HUD reserved funds for 100 units, Public Housing Project Number MD06–P002–081 ("MD 2–81"). In the fund reservation sent to HABC, HUD specifically provided that the funds could not be used for school conversions or scattered site public housing.

Additionally, the fund reservation explicitly provided that site approval for the project had to occur within 12 months of the reservation, or by September 30, 1988. *See* Ex. 283, Letter from St. George I.B. Crosse, Manager, HUD to Marion Pines, Commissioner, Neighborhood Progress Administration (Sept. 30, 1987) (HUD 20167–69).

The HUD fund reservation stated: "Every effort should be made to locate buildings for acquisition with or without rehabilitation outside areas of minority concentration." Ex. 283, Letter from St. George I.B. Crosse, Manager, HUD to

Marion Pines, Commissioner, Neighborhood Progress Administration (Sept. 30, 1987) (HUD 20167–69).

The fund reservations for Fairfield replacement units were conditioned on the Local Defendants' assurances of compliance with Title VI of the Civil Rights Act of 1964 and Title VIII of the Civil Rights Act of 1968.

The first seven potential sites identified by HABC by March 1988 were all in impacted areas, three of which were adjacent to existing HABC public housing developments; the remaining four were all in minority concentrated neighborhoods. By May 1988, all seven sites had been disapproved by HUD under the site and neighborhood standards either because they were in an area of minority concentration or because of an undue concentration of assisted housing. Ex. 284, Memorandum from James S. Kelly to St. George I.B. Crosse (Mar. 3, 1988) (PL 032753–54); Ex. 285, Chart: Fairfield Replacement Housing Sites (Mar. 31, 1993) (PL 033158–67).

HABC then proposed scattered site properties for MD 2–81. HUD reviewed these sites. Ex. 286, Memorandum from Rheba G. Gwaltney, Director Fair Housing and Equal Opportunity Division, to St. George I.B. Crosse, Manager (Sept. 8, 1988) (HUD 4154); Ex. 287, Memorandum from Rheba G. Gwaltney, Director Fair Housing and Equal Opportunity, to St. George I.B. Crosse, Manager (Feb. 27, 1989) (HUD 20217–18).

HUD determined in September 1988 that of the 92 sites currently proposed by HABC for MD 2–81, 80 per cent were located in areas of minority concentration. In February 1989, HUD's Fair Housing and Equal Opportunity Division recommended approval of 80 sites proposed by HABC for MD 2–81. Ex. 286, Memorandum from Rheba G. Gwaltney, Director Fair Housing and Equal Opportunity Division, to St. George I.B. Crosse, Manager (Sept. 8, 1988) (HUD 4154); Ex. 287, Memorandum from Rheba G. Gwaltney, Director Fair Housing and Equal Opportunity, to St. George I.B. Crosse, Manager (Feb. 27, 1989) (HUD 20217–18).

### 7. *HUD Reservation of Additional Funding*

As of September 1989, HABC had failed to identify the necessary sites in non-impacted areas and site approval for MD 2–81 had not occurred. On September 26, 1989, HUD reserved funding for another 20 units of Fairfield replacement housing, reservation MD 2–84. As with the reservation for MD 2–81, this reservation again required that sites for all the units be approved within 12 months of the reservation, *i.e.,* by September 1990. The reservation also required that every effort be made to locate sites outside areas of minority concentration, and that the units not be located in areas with large concentrations of subsidized housing and low-income families. Ex. 288, Letter from Robert W. Hearn, Executive Director HABC to St. George I.B. Crosse, Manager HUD (April 14, 1989) (HUDBAL 014286–90); Ex. 289, Letter from St. George I.B. Crosse, Manager, Baltimore HUD to Robert W. Hearn, Executive Director HABC (September 26, 1989) (PL 032943–46).

Throughout this period, HABC represented in submissions to HUD that all replacement units would be in non-impacted areas. Ex. 290, Letter from Robert W. Hearn, Executive Director HABC to St. George I.B. Crosse, HUD (July 31, 1989) (PL 032934–36) ("We will locate Fairfield replacement housing in census tracts and neighborhoods that are not areas of minority concentration or areas with a concentration of assisted families."); Ex. 291, Memorandum from Harry W. Staller, Acting Regional Administrator, HUD to Kirk

Gray, Director, Office of Public Housing, HUD (Sept. 25, 1989) ("The HABC will undertake to put all replacement units on unimpacted sites meeting the Site and Neighborhood Standards.") (HUD 19999–20001); *see also* Ex. 292, City of Baltimore, Resolution No. 24 (Jan. 18, 1990) (HUDBAL 13540–46) (Baltimore City Council Resolution approving attached Fairfield Homes Replacement Housing Plan: "It is also our intent to provide replacement housing in census tracts which do not have a concentration of low-income or minority families *or concentrations of assisted housing* in order to assure that full choices and real opportunities exist for families to find housing in and outside areas of minority *and assisted housing* concentration.").

HUD allowed HABC to place 200 of the 300 Fairfield replacement units in minority impacted neighborhoods and required that 100 of the units be in non-minority areas. Ex. 286, Memorandum from Rheba G. Gwaltney, Director Fair Housing and Equal Opportunity Division to St. George I.B. Crosse, Manager (Sept. 8, 1988) (HUD 4154).

HUD advised HABC that, for purposes of identifying those 100 units placed in "non-minority" areas, units placed in minority concentrated areas that were urban renewal or "Neighborhood Strategy Areas" would count as sites in non-impacted areas. Ex. 287, Memorandum from Rheba G. Gwaltney, Director Fair Housing and Equal Opportunity to St. George I.B. Crosse, Manager (Feb. 27, 1989) (HUD 20217–18); Ex. 293, HABC Response to Harris Request for Admission No. 16.

In November 1989, HUD advised HABC that the "current procedure in use for determining the acceptability of scattered-site units is satisfactory." Ex. 294, Letter from St. George I.B. Crosse, Manager to Robert W. Hearn, Executive Director, HABC (Nov. 30, 1989) (PL 032950–51).

In May 1993, Michael Janus, HUD General Deputy Assistant Secretary, suggested that HUD and HABC develop together "a map by census tract or, preferably, by neighborhood indicating areas within the City" which satisfied HUD's "non-impaction" requirements. Ex. 295, Memorandum from William Tamburrino to Maxine Saunders (May 7, 1993) (HUDBAL 013721–22).

### 8. *HABC and HUD's Collaborative Efforts on Site Proposals*

The proposal was made in an effort to eliminate "guesswork" by HABC when proposing sites. Ex. 296, Memorandum from William Tamburrino to Maxine Saunders (May 17, 1993) (HUDBAL 013723–24) ("It was suggested that such a map could eliminate any 'guesswork' on the part of HABC in identifying non-impacted sites and might increase the number of smaller, non-impacted areas in which to develop replacement housing.").

Census tract, block group (a subdivision of a census tract), block (a subdivision of block group) and neighborhood were all considered.

HABC proposed using "block" as that would provide HABC with the most potential sites.

HUD's Office of Fair Housing and Equal Opportunity proposed using "neighborhood" because that "would best satisfy the site and neighborhood standards, and that block groups and, especially, blocks could allow selective additions of public housing units in neighborhoods which are already minority-impacted."

The decision was made to develop a map using block group. Ex. 296, Memorandum from William Tamburrino to Maxine Saun-

ders (May 17, 1993) (HUDBAL 013723–24).

The Baltimore City Planning Department ended up mapping both by census tract and by block group, and additional maps comparing the two. This way, Local Defendants could analyze the areas that were considered "non-impacted" by using block groups, and analyze the areas considered "non-impacted" by using census tracts.

At a meeting regarding this issue on June 16, 1993, it was concluded that "HABC benefits to keep census tract but under certain circumstances, they'd like to use non-impacted block groups." Ex. 298, Handwritten Meeting notes (June 16, 1993) (PL 033210–12).

Based on this analysis, HABC proposed to use census tract, supplemented with "non-impacted block groups on a case by case basis." Ex. 299, Letter from Daniel Henson to Maxine Saunders, with attachments (June 16, 1993) (HUD 4194–98).

HUD approved HABC's request to use census tract, supplemented with "non-impacted" block groups located within otherwise minority impacted census tracts. HUD told HABC "[w]e believe that expanding the opportunities to find additional sites will facilitate the development process." Ex. 301, Memorandum from Harold Jackson to Melissa Peters (June 28, 1993) (PL 033219); Ex. 302, Letter from Maxine Saunders to Daniel Henson, with attachment (July 7, 1993) (PL 033220–29).

HUD admitted that, for purposes of Fairfield replacement housing, it considered an area to be racially impacted only if it was more than 60 per cent Black. Therefore, HABC could have placed all the Fairfield "non-impacted" units in areas that were majority Black, but less than 60 per cent Black, and satisfy HUD's criteria.

Ex. 303, Fed. Defs' Motion to Dismiss, or, in the Alternative, for Summary Judgment at 21–22.

By August 1990, HABC had not proposed approvable sites for the first 100 units of replacement housing awarded almost three years earlier, or the 40 units awarded subsequently. HUD approved the Fairfield demolition application (based on HABC's statement that it "intended" to locate the units in non-minority areas), and at the same time agreeing to fund the remaining 160 units of replacement housing. Ex. 304, Memorandum from Michael B. Janis, General Deputy Assistant Secretary PIH to Marry W. Staller, Deputy Regional Administrator (Aug. 20, 1990) (HUD 19965–68).

On October 10, 1990, HUD informed HABC that the Fairfield demolition application had been approved. Ex. 306, Letter from Maxine Saunders, Manager HUD to Robert W. Hearn, Executive Director, HABC (Oct. 10, 1990) (HUD 19940).

9. *School 47*

As of January 1992, four and a half years after the reservation of the first 100 units of Fairfield replacement housing, HUD and HABC had still not agreed on any sites for any Fairfield replacement units.

At that time, HABC finally submitted the School 47 site in Canton. This site was in a non-minority neighborhood and in a census tract that was 97.5 per cent White at the time of the 1990 census.

On January 16, 1992, the Fair Housing and Equal Opportunity Division recommended that the site be approved.

On April 1, 1992, HUD notified HABC that this site was approved. Ex. 307, Memorandum from Harold S. Jackson, Director Fair Housing and Equal Opportunity Division to Maxine Saunders, Manager

(Jan. 16, 1992) (PL 33062); Ex. 308, Letter from Maxine S. Saunders, Manager to Robert W. Hearn, Executive Director, HABC (April 1, 1992) (HA 18661–63).

In September 1992, Local Defendants decided not to use School 47 for Fairfield replacement housing. Ex. 309, Letter from Robert W. Hearn, Executive Director, HABC to John Cain, Nicholas D'Adamo and Perry Sficas, Baltimore City Council (Sept. 10, 1992) (HA 06026).

On September 10, 1992, HABC requested a waiver of HUD's site and neighborhood standards to allow all of the Fairfield replacement units to be developed in minority areas. The waiver request contended that sites acceptable to HUD have been, and will continue to be, opposed by neighborhoods, and that placement of public housing in those neighborhoods would cause "middle class flight." Ex. 310, Letter from Robert W. Hearn, Executive Director, HABC to Joseph G. Schiff, Assistant Secretary, HUD (Sept. 8, 1992) (PL 33095–98).

At a meeting on October 16, 1992, HUD advised HABC that it was denying the waiver request. However, HUD gave final approval to proceed with development of MD 2–84, the 20 units on the East Preston Street sites. Ex. 311, Memorandum from Michael A. Smerconish, Regional Administrator to Joseph G. Schiff, Assistant Secretary (Oct. 27, 1992) (PL 33102–04).

At a follow-up meeting in December involving HUD Regional Fair Housing and Equal Opportunity and HABC personnel, HUD advised HABC that "HUD understood the [housing] authority's dilemma." HUD's Office of Fair Housing and Equal Opportunity advised HABC to "utilize the enforcement authority of the Fair Housing Act to eliminate community opposition to sites that are available in nonminority neighborhoods." Ex. 312, Minutes of Meeting, HUD Manager's Conference Room (Dec. 18, 1992) (PL 033121–22).

10. *West Preston Street*

In a 1990 review of proposed sites on East Preston Street, HUD's Office of Fair Housing and Equal Opportunity had recommended disapproval of the sites based on the sites' location "in a 100 percent minority concentrated area." Ex. 313, Memorandum from LaVerne L. Brooks, Acting Director, Fair Housing and Equal Opportunity Division to Dean K. Reger, Acting Manager (May 16, 1990) (HUDBAL 019853).

In 1993, HUD's Public Housing Division also recommended rejection of the Preston Street sites because it was found to be a "very undesirable area" with a lot of suspected drug activity. Ex. 314, HUD internal memorandum from Candace Simms to Mary Ann Henderson and Melissa Peters (Feb. 12, 1993) (PL 033147).

Nevertheless, construction was started on the 20 East Preston Street units in December 1993. However, only 10 of the 20 proposed units were ever completed.

In 1998, HABC Executive Director Daniel P. Henson III, stated: "Just so we are all clear on how I stand on this. If we were looking at starting Preston Street today, I would demo the entire block rather than to start this project. This is a textbook example of everything that is wrong about how we used to do business. The only good thing about it is that we can learn what not to do in the future. Design plans that were outdated before we started; immediate change orders due to shifting site conditions vs. the plans; poor and delayed decisions all along the way; poor documentation of problems; the absolute wrong neighborhood, selected primarily because of the lack of resistance (easy since there was no one living there at the time), etc." Ex. 317, Memorandum from

Carnelious Harrison to Steve Broach with attachments (July 13, 2001) (PL 082039–46).

### 11. *Acceptable Replacement Sites*

On April 2, 1993, HUD informed HABC that a package of sites—15 of the 17 sites for MD 2–85—was acceptable. The acceptable sites included 1706 and 1802 Ashland Avenue, 504 Baker Street, 1812 W. Baltimore Street, 108 S. Calverton Street, 1825, 2205 and 2355 Druid Hill Avenue, 1709 E. Eager Street, 1058 W. Fayette Street, 107 N. Gilmore Street and 2039 W. Lanvale Street, all of which were identified by HUD as being in minority concentrated census tracts. Only two of the approved sites, 1925 and 1929 W. Baltimore Street were identified by HUD as being in non-minority census tracts.

By July 1993, HABC had added additional sites in tract 2003 to the MD 2–85 package—1931 W. Baltimore Street, 436 S. Payson and 31 South Pulaski. HUD's Fair Housing and Equal Opportunity Office approved the sites while admitting that "the street where the site is located may be distressed and impacted." Ex. 319, Internal HUD Memorandum from Harold S. Jackson to Candace Simms (Aug. 16, 1993) (PL 033236); Ex. 405, Map.

In April 1994, HUD granted another extension of the construction start deadline until July 31, 1994, stating that HUD "does not wish to delay this project any further."

By June 1994, HUD had reviewed plans and specifications for these sites—one of the last steps before they went out to bid. Ex. 321, Letter from Candace Simms to Daniel Henson (April 4, 1994) (HUDBAL 014042); Ex. 322, Letter from Bill Tamburrino, Director Public Housing Division, HUD to Daniel P. Henson, Executive Director, HABC (June 13, 1994) (HUDBAL 014342–46); Ex. 405, Map.

In July 1994, HUD granted HABC an extension until September 30, 1994 for construction start, stating: "This should provide sufficient time to finalize the construction bid documents, bid the project and award the contract." Ex. 323, Letter from Bill Tamburrino to Daniel P. Henson (July 1994) (HUDBAL 014626).

As of August 1994, according to HUD's Production Control Chart, all the units for MD 2–85 had been selected and all the design documents had been approved by HUD.

Also, that month, HUD forwarded the executed Annual Contribution Contract for MD 2–85 to HABC. Ex. 324, Production Control Chart (Aug. 5, 1994) (HUDBAL 021986–998); Ex. 325, Letter from Candace Simms, Director, Housing Development Division to Daniel P. Henson (Aug. 31, 1994) (HUDBAL 013352–55).

By November 1994, HABC had received bids for the work to develop MD 2–85, had forwarded information on those bids to HUD, and had received permission from HUD to negotiate with a single bidder. Ex. 326, Letter from Daniel Henson to William Tamburrino (Sept. 30, 1994) (HUDBAL 022002–03); Ex. 327, Letter from William Tamburrino to Daniel Henson (Nov. 17, 1994) (HUDBAL 022081–82).

On February 9, 1994, HUD wrote HABC approving 23 properties in the 800 and 900 blocks of Jack and Stoll Streets in Brooklyn. These sites were immediately adjacent to the 500 unit Brooklyn Homes public housing development.

By August 1994, having approved the sites, HUD was reviewing appraisals for these sites. Ex. 328, Letter from David K. Elam, HABC to Candace Simms, HUD (December 10, 1993), with attached map (PL 033253–54); Ex. 329, Letter from Candace Simms, HUD to David Elam

(Feb. 9, 1994) (PL 033275); Ex. 330, Memorandum from Candi Simms to Bill Tamburrino (Aug. 24, 1994) (HUDBAL 014428).

In April 1994, HUD notified HABC that six sites in the 1700 block of Lemmon Street and the 100 block of S. Mount Street had been approved as non-minority sites. Those sites are all in the northern portion of census tract 1903. That census tract was 36 per cent White and was considered non-minority by HUD. Ex. 331, Memorandum from Harold Jackson, Director, Fair Housing and Equal Opportunity Division to Candace S. Simms, Director, HUD (April 8, 1994) (HUDBAL 013407); Ex. 332, Letter from Candace S. Simms, Director HDD to David Elam, HABC (April 21, 1994) (HUDBAL 013410); Ex. 405, Map.

By July 1994, HUD was reviewing appraisals for the sites. Ex. 333, Draft letter from William Tamburrino, Director to David Elam, HABC, with attached appraisals and transmittal memo from HABC (July 25, 1994) (HUDBAL 014437–53).

HUD also gave HABC preliminary approval on the Holabird Park Apartments site, which is a non-impacted site by HUD standards. HUD's notes of a May 2, 1994 meeting indicate that the "City will hire an architect after our review of appraisal is completed—then they can negotiate w/owner and begin discussions on relocation. 30 days needed w/owner." Ex. 282, Fairfield Replacement proposed Locations (Feb. 4, 1994) (HUDBAL 016242–66); Ex. 334, Fairfield handwritten meeting notes (May 2, 1994) (HUDBAL 013386); Ex. 335, Rapid Reply letter from Candace Simms to Jim Kintz (April 8, 1984) (HUDBAL 013390–94); Ex. 405, Map.

On February 24, 1995, HUD sold to HABC the Montpelier Apartments for the sum of $1.00 (one dollar). The purpose of the acquisition was for HABC to develop public housing with funds from the Maryland State Partnership Rental Housing Program. These apartments had been disapproved by HUD's Fair Housing and Equal Opportunity Division for replacement housing on May 27, 1988. Ex. 285, Chart: Fairfield Replacement Housing Sites (Mar. 31, 1993) (PL 033158–67); Ex. 336, Memorandum from Daniel P. Henson, Executive Director, HABC to Eric C. Brown, Deputy Executive Director, HABC (Feb. 10, 1995) (HA 5334–35); Ex. 337, Settlement Statement (HA 5331–32); Ex. 338, Letter from Donna Poggi Keck, HABC to Yvonne Johnson, Maryland (PL 49101); Ex. 405, Map.

### 12. Hamilton

In April 2000, HABC and Baltimore City identified sites for 15 scattered site public housing units in the primarily White Hamilton neighborhood. Ex. 408, Memorandum from Patricia Payne, Commissioner HCD to Laurie Schwartz, Deputy Mayor, *HABC 15 Property Board Letter Submittal Summary* (Oct. 10, 2000) (BW 00021–22); Ex. 409, Letter from Mayor Martin O'Malley to Patricia Payne, HABC (July 27, 2000) (BW 00029) (approving of the units as they will "restore vacant houses to desirable placed to live ... I heartily support and approve the Housing Authority's plan.").

These units were to be developed using HUD owned homes, and HABC and HUD signed contracts for the sale to HABC of the majority of the units. Ex. 410, Executed sales contracts for various properties (BW 00356–366).

In August 2000, approval of the funding of these units was placed on the agenda of the Baltimore City Board of Estimates. Ex. 411, Memorandum from Patricia Payne, Commissioner to President and

Members of the Board of Estimates, *HABC 40 Replacement Housing Units in Non–Impacted Areas* (Aug. 14, 2000) (BW 00026–00027.01).

There was community opposition to the placement of these units. Ex. 25, Kramer Deposition (3/19/03, vol. 2 at 310:5—314:10); Ex. 412, Videotape of newscasts relating to the 40 Hamilton units; Ex. 413, *Public Housing Strategy Riles Baltimore Neighbors,* Washington Post (Nov. 9, 2000) (PL 075128–075129) (quoting counsel for Local Defendants: "The people that spoke tried to deemphasize race, but there were a lot of buzzwords... Those meetings were horrible.").

In January 2001, HABC notified HUD that it had decided not to proceed with these sites. Ex. 414, Letter from Paul Graziano, HABC to Harold Young, HUD (Jan. 2, 2001) (BW 00353); Ex. 25, Kramer Deposition (3/19/03, vol. 2 at 310:5—314:10).

HUD agreed to cancel the contracts for purchase of the proposed units. Ex. 415, Letter from Harold Young, HUD, to Denise Duval, HABC (Jan. 11, 2001) (BW 00350).

### 13. *Other Non–Impacted Areas*

In the early 1960s, HABC was looking at two vacant land sites in White areas. One site was referred to as the "Brooklyn Extension" or "Brooklyn" site, near the all-White Brooklyn Homes. Brooklyn Homes was at that time 100 per cent White occupied, and the entire Brooklyn neighborhood was over 98 per cent White. The second site was identified as the City Hospital site. In 1960, the residential neighborhoods surrounding City Hospital were over 95 per cent White. Ex. 245, Memorandum from Harry Weiss to Ellick Maslan (April 28, 1961) (HA 09217); Ex. 246, Potential Public Housing Sites, Baltimore, Maryland (Aug. 19, 1960) (HA

09227); Ex. 247, MCC Responses to Neal's Request for Admission Nos. 7 and 8; Ex. 406, Map of Sites Available in Non–Minority Concentrated Areas.

Both sites were evaluated by Local Defendants as "favorable." Ex. 246, Potential Public Housing Sites, Baltimore, Maryland (Aug. 19, 1960) (HA 09227). In May 1961, both sites were submitted to HUD along with two sites in segregated areas (identified as "Somerset" and "McCulloh") as part of an "unofficial" Development Program. Ex. 246A, R.C. Orser, *Chronology—Development Program—741 DUs* (March 9, 1965) (HA 22549). Neither site was ever developed for public housing.

In 1968, several turnkey sites in White neighborhoods were also under consideration. These included the Belle Vista site in northeast Baltimore and the Colmar Gardens site in Medfield which HUD originally tied to site approval for Oswego Mall. Both sites were characterized by Local Defendants as being in "predominantly White" neighborhoods.

Other sites under consideration at the same time that were characterized by Local Defendants as being in "predominantly White" neighborhoods were a site at 6000 Bowleys Lane in northeast Baltimore, a site at Athol and Davis Avenues in Irvington, and a site on DeSoto Road off Georgetown Road in the White neighborhood of Morrell Park. Ex. 185, Memorandum from Edgar Ewing, *Map Showing Turn–Key Locations* (Dec. 13, 1967) (HA 22723–44 at HA 22733–34, HA 22739–42); Exhibit 406, Map of Available Sites.

As of December 1967, City Council Ordinances for the DeSoto Road site, the Colmar Gardens site, and the Athol and Davis Avenue sites had been prepared. Ex. 185, Memorandum from Edgar Ewing, *Map Showing Turn–Key Locations* (Dec. 13, 1967) (HA 22723–44 at HA 22743).

In June 1969, HABC advised HUD that it wished to withdraw the "previously approved" DeSoto Road site. This request was granted. Ex. 403, Letter from R.C. Embry to Vincent Marino, HUD (June 26, 1969) (PL 053004–05). None of these five sites was approved by the City Council.

Additional turnkey sites that were identified by Local Defendants as being in "predominantly White" neighborhoods under consideration at around the same time were 2400 Patapsco Avenue, in the southwest Baltimore White neighborhood of Lakeland; the 4900 block of Wetheredsville Road in the Dickeyville neighborhood; Buena Vista Avenue near 41st Street in the White neighborhood of Hamden; and Forest Park Avenue and Pickwick Road, in the Dickeyville neighborhood. Ex. 406, Map of Available Sites. As of May 1968, the Buena Vista site was listed by Local Defendants as "recommended." However, none of these sites was developed for public housing. Ex. 248, Vacant Turnkey Public housing Sites for Review, with attachments (date unreadable) (HA 14766–79); Ex. 249, Memorandum from R.S. Moyer, *Recommended Vacant Sites for Turnkey Public Housing* (May 17, 1968) (HA 14780–82).

In 1969, HABC requested site approval from HUD for the "Upland Site" MD 2–48 at Old Frederick and Swann. The site was characterized by HABC as "located in a predominantly White area." In 1970, HABC expressed concern about getting City Council approval because the City Council President was opposed to public housing on the site. This site was never developed for public housing. Ex. 250, HABC Summary of Commission–Staff Discussion (Feb. 17, 1979) (HA 16938–43); Ex. 251, Letter from R.C. Embry to Vincent Marino (Nov. 10, 1969) (HA 13344–52); Ex. 406, Map of Available Sites.

In 1970, HABC was considering a site which it characterized as "predominantly White" at Frederick and Millington Avenues in the Steuart Hill Conservation District. This project was planned for 120 low rise family units. Ex. 250, HABC Summary of Commission–Staff Discussion (Feb. 17, 1979) (at HA 16941); Ex. 406, Map of Available Sites. This site was never developed for public housing.

In 1968, HABC was considering a site in Anne Arundel County within the HABC's 10 mile area of operation. This proposal was dropped. Ex. 252, Letter from Henry R. Lord to Joseph Burstein (August 12, 1968) (HA 16976–78); Ex. 406, Map of Available Sites.

14. *HABC and Non-impacted Areas*

From 1964 to the present, Baltimore City has owned property appropriate for residential development in non-minority neighborhoods and/or predominantly White census tracts but has not developed public housing on any of these properties. *See* Ex. 6, Nathanson Report at 4–5 of Overview; Ex. 247, MCC Responses to Neal's Requests for Admission No. 21.

During the period 1979 to 1990, HABC was developing hundreds of scattered site public housing sites in Baltimore's most distressed neighborhoods and was disposing of large numbers of vacant residential units in the Montgomery Urban Renewal Area in Federal Hill/South Baltimore located in Census Tract 2201. Ex 416, Excerpts from Baltimore City Land Disposition Records for Montgomery Urban Renewal Area. Those vacant units were all sold for private residential use. *See, e.g.,* Ex. 417, Memorandum from M.J. Brodie to Honorable President and Members of the Board of Estimates, Recommendation to Approve Disposition Agreement, 708 S. Sharp Street, Montgomery Urban Renewal Area, and at-

tached Agreement (Nov. 3, 1982) (BC 001457–001487 at BC 001461) (agreement requiring the purchaser to occupy the property for at least three years); Ex. 406, Map of Available Sites.

None was used for public housing development. HABC has never developed any public housing in Census Tract 2201.

During the 1970s, Baltimore City also disposed of property in the same census tract for senior apartments. Ex. 6, Nathanson Dep., at 1.6. In the early 1980s, Local Defendants disposed of another property in the same census tract for private condominiums. Ex. 6, Nathanson Dep., at 1.7. Census Tract 2201, which had been approximately 50 per cent African–American in 1970, was less than 20 per cent African–American as of the 2000 census. *Id.*

In the mid–1980s, Baltimore City disposed of nine blocks of properties in the Canton Waterfront Urban Renewal Area, which was developed as 133 private, high-end market townhouses. Ex. 6, Nathanson Dep., at 1.3; Ex. 418, Ordinance No. 80, Urban Renewal—Canton Waterfront—Renewal Area (June 5, 1984) (PL 076768–74) (establishing the Canton Waterfront Urban Renewal Area and authorizing the City to acquire multiple properties); Ex. 419, Land Disposition Agreement between the Mayor and City council of Baltimore and A & R/Waterford Joint Venture (Nov. 26, 1986) (PL 076777–825) (sale of property to private developer). These units are in a census tract that has negligible African–American population (2.5 per cent). Ex. 6, Nathanson Dep., at 1.3.

In 1988, Baltimore City sold property in northwest Baltimore for the sum of one dollar ($1.00) to a private entity to develop a senior center. This property was a portion of a parcel of land Baltimore City had acquired in 1959 and never developed. Ex. 421, Deed between Mayor and City

Council of Baltimore, and Northwest Senior Center, Grantee (May 2, 1988) (PL077218–077223).

In 1989, Baltimore City sold another piece of the same property to a private entity for the sum of $40,000. Ex. 422, Deed between Mayor and City Council, Grantor, and Mikva of Baltimore, Grantee (April 26, 1989) (PL 077224–077227). In 1998 Baltimore City sold the last portion of this parcel for $25,000 for development of senior housing. Ex. 6, Nathanson Dep., at 1.2; Ex. 423, Deed between Mayor and City Council of Baltimore, Grantor, and Harry and Jeanette Weinberg Woods, Inc., and Plat (Aug. 7, 1998) (PL 077228–077234, PL 077214).

These properties are located in Census Tract 2720.02 in the Cheswold neighborhood of Baltimore. HABC has never developed any public housing in this neighborhood. Ex. 420, HABC Scattered Sites Assessments, Executive Summary (Jan. 31, 2002) (HA 74791–74797 at HA 74794); Ex. 406, Map of Available Sites.

Brightleaf is a 30 townhouse private development in Mount Washington. It was developed on property owned by the City of Baltimore. Ex. 6, Nathanson Dep., at 1.1; Ex. 424, Baltimore City Land Disposition Records for Rogene Drive and Ivymount Road (BC 002200–002285); Ex. 406, Map of Available Sites.

Baltimore City began looking for a purchaser for this 5.550 acre parcel in around 1979. *See* Ex. 424, Baltimore City Land Disposition Records for Rogene Drive and Ivymount Road (BC 002200–002285 at BC 002260).

In 1984, after getting input from the Local City councilpersons and the neighborhood association, *id.* at BC 002233–002237, the property was sold for $42,000 to a private developer. *Id.* at BC 002203.

The conveyance included provisions that the community association would have input in the development. *Id.* at BC 002207–002208. HABC has never developed any public housing in the Mount Washington neighborhood.

In March 1986 the Urban Renewal Plan for the Key Highway Area was approved. Ex. 425, Ordinance No. 622, The Approval of an Urban Renewal Plan for the Key Highway Area (March 12, 1986) (PL 076915–76918).

Baltimore City never developed any property in this urban renewal area for scattered site public housing. In 1998, Baltimore City sold City-owned property in the Key Highway Urban Renewal Area to a private developer for development of market rate townhouses. Ex. 6, Nathanson Dep., at 1.4; Ex. 426, Land Disposition Agreement between Department of Housing and Community Development and 840 Key Highway Limited Liability Company (Oct. 7, 1998) (PL 076952–077019); Ex. 406, Map of Available Sites.

In the mid to late 1990's Baltimore City disposed of a vacant parcel of City-owned land at 1351 S. Clinton Street for development of AHEPA (American Hellenic Educational Progressive Association) Senior Apartments in Canton. Baltimore's Greek community was involved in this development.

HUD allowed Baltimore City to subsidize this development with $1,066,000 in HOME funds for this senior housing project. Baltimore City did not offer this property to HABC for development of family public housing. Ex. 6, Nathanson Dep., at 3.6; Ex. 9, Deposition of Stephen Janes (7/18/03) at 81:18—85:16; Ex. 406, Map of Available Sites. HABC has no family or scattered site public housing in the Canton neighborhood.

Baltimore City has not developed public housing on numerous City-owned smaller tracts of land in areas considered non-impacted by HABC and HUD (African–American population less than 60 per cent), including: 700 block of Singer Ave. in Hamden sold in 1983 (Census Tract 1306) (BC 002338–80); 531 S. Lakewood in Canton sold in 1986 (Census Tract 103) (BC 003374); 4517–21 Schenley in Roland Park sold in 1986 (Census Tract 2714) (BC 002306–36); 1229 S. Charles St. in Federal Hill sold in 1990 (LD 014438); 400 Millington Ave in 1990 (CT 2005) (LD 014436); 1426 E. Fort Ave. in Locust Point in 1991 (CT 2401) (LD 005231–32, LD 014944–46); 1317 S. Hanover Street in Federal Hill in 1992 (CT 2301) (BC 003357); 2947–49 Hudson St. in Canton in 1993 (CT 101) (BC 003368); 3320 Southern Ave. in Watherson sold in 1996 (Census Tract 2703.02) (BC 002381–89); 1414–1416 Lyman Ave in the Guilford/Homeland area (Census Tract 2712) (LD 005242–58); 2913 Echodale Ave. in Lauraville (Census Tract 2703.01) (LD 010886); 2639 Fait Ave in Canton in 2001 (CT 104) (BC 001975); 606 Ann St. in Fells Point in 2001 (CT 203) (find doc reference); 1300 Bayliss St. in Canton in 2001 (CT 2606.05) (BC 001975); 1312–40 Towson St. in Locust Point (CT 2401) (BC 6415–17). Ex. 427, Selections from Baltimore City Land Disposition Records; Ex. 406, Map of Available Sites.

Privately owned vacant land was also available in non-impacted areas for residential development. Thus there is no doubt that had the City decided to do so, it could have chosen to forego other uses and developed low income public housing chosen on a plethora of sites that would have been in non-impacted areas by any reasonable standard.

As noted by Plaintiffs' expert witness, the City decided not to develop public housing place on the sites of the Heather

Ridge Development at Red Cedar Place and Baneberry Court in Cheswold, The Towers in Cheswold, Roland Springs in Roland Park, Cross Keys, the Foster Avenue Townhouses in Canton, the S. Luzerne Avenue Townhouses in Canton, Washingtonville Addition in Lake Falls, Cambridge Walk in Canton, Canton Gables in Canton, Greenberry Woods in Mount Washington, Mount Washington Court in Mount Washington, Deer Ridge in Roland Park, Fireside Circle in Homeland and Villages of Homeland East in Homeland Southway.

Public Housing Authorities are limited in the amount of public housing development dollars they can spend to develop public housing by HUD's Total Development Cost (TDC). The TDC is set by HUD by regulation. *See, e.g.,* Ex. 428, Amendment to Calculation of Total Development Cost, Interim Rule, 58 FR 62522 (Nov. 29, 1993) (HUDBAL 002866–69); Ex. 429, Public Housing Total Development Cost, Final Rule, 67 FR 76096 (Dec. 10, 2002) (PL 058433–40).

While the TDC limits the amount of public housing dollars than can be spent to develop each unit of public housing, there is no limit on the use of other funds to supplement this, such as CDBG, HOME, low-income tax credits, private donations and private financing. HABC has requested, and HUD has granted, waivers of the TDC limits for public housing development in impacted areas. Ex. 431, Letter from Christopher Hornig, HUD, to Daniel Henson, HABC (Sept. 4, 1996) (HUD 17419–21) (waiving TDC for Lafayette redevelopment by 58 per cent); Ex. 432, Letter from Kevin Marchman, HUD, to Estella Alexander, HABC (Dec. 15, 1997) (HUD 13901–13903) (waiving TDC for Lexington development).

In its current Consolidated Plan July 2000—June 2005 (the HUD-required planning document for use of HUD funds),

Baltimore City identifies the "Inner Core of the city" as that area of the city with large numbers of abandoned houses, unoccupied houses, vacant lots, poor condition of the occupied housing, generally very low household incomes, and very high level of social problems. Ex. 433, Baltimore City Department of Housing and Community Development, Consolidated Plan, July 2000—June 2005 (HA 62209–393 at HA 62222). One of the objectives for the distressed "Inner Core of the city" under this plan is to "provide affordable rental opportunities for low-income households" *Id.* at HA 62292. The Plan also defines the "Middle Ring" of the city (area with increasing problems but without the degree of problems found in the "Inner Core") and the "Outer Ring" (area with a tight housing market and rising property values). *Id.* at HA 62223–62224.

It is Baltimore City's policy to require community support prior to development of assisted housing for low income persons. Ex. 434, Baltimore Department of Housing and Community Development, Developer's Funding Guide (BW 00436–00448 at BW 00441) (requirement that developers wishing to develop low-income housing "include letters of community support" as part of the development proposal); Ex. 9, Janes Deposition (7/18/03) at 17–20 (application goes no further if developer fails to provide evidence of community support).

## I. *HUD POLICIES*

By the mid–1960s, Federal Defendants were aware that "much of the public housing available to minorities was being constructed in areas of minority concentration." Ex. 32, Knapp Congressional Testimony at HUD 31242.

### 1. *Project Selection Criteria*

In 1972, HUD modified its site selection standards with the issuance of its Project

Selection Criteria. *See* Ex. 121, 37 Fed. Reg. 203 (Jan. 7, 1972).

During the post–1972 period, HABC developed, with HUD site approval and funding, the 122 unit Charles K. Anderson Village in the Cherry Hill neighborhood, and thousands of scattered site units that were concentrated in a few, minority-impacted, neighborhoods.

### 2. *Site and Neighborhood Standards*

Subsequently in 1980, HUD adopted the site and neighborhood standards which contained a strict provision limiting new construction development of public housing in minority neighborhoods where:

"(i) sufficient, comparable opportunities exist for housing for minority families in the income range to be served by the proposed project, outside areas of minority concentration; or

(ii) the project is necessary to meet overriding housing needs which cannot otherwise feasibly be met in that housing market area." Ex. 175, 45 Fed.Reg. No. 179 at HUD 03072 (Sept. 12, 1980) (HUD 03068–78).

This provision did not apply to public housing developments using existing structures. Instead, for all public housing developments, the regulation generally required, at 24 CFR 841.202(b), that "[t]he site and neighborhood must be suitable from the standpoint of facilitating and furthering full compliance with the applicable provisions of Title VI of the Civil Rights Act of 1964, Title VII of the Civil Rights Act of 1968, Executive Order 11063, and HUD regulations issued pursuant thereto," as well as the requirement, at 24 CFR 841.202(d), that "[t]he site must promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons." *Id.*

### J. HUD CONCENTRATION OF EFFORTS IN BALTIMORE CITY

HUD defines the "housing market area" as the Metropolitan Statistical Area ("MSA"). *See, e.g.,* Ex. 435, HOPE VI Programs Application, 2001 (PE6 6524–6625). Baltimore is part of the Metropolitan Statistical Area including Anne Arundel, Baltimore, Carroll, Harford, Howard and Queen Anne's county. Ex. 436, City of Baltimore, Comprehensive Housing Affordability Strategy, 1994–1998 (Dec. 30, 1993) (HA 71784–71906 at HA 71790).

While Baltimore City is currently 64 per cent African–American, the metropolitan area is only 28 per cent African–American. Ex. 436A, Expert Report of Federal Defendants' Expert Shelby Lapkoff, at 5.

Only 32 per cent of the metropolitan area's households live in Baltimore City. Ex. 436, City of Baltimore, Comprehensive Housing Affordability Strategy, 1994–1998 (Dec. 30, 1993) (HA 71784–71906 at HA 71793).

However, HUD has concentrated 89 per cent of the area's public housing in Baltimore City, and has concentrated 50 per cent of the housing area's Section 8 housing in Baltimore City. *Id.* at HA 71794.

In total, almost 72 per cent of the subsidized rental units in the metropolitan area are in Baltimore City. *Id.; see also* Ex. 437, Memorandum from Earl W. Cole to Thomas R. Hobbs, with attachments (Nov. 6, 1980) (HUD 4444–4461).

In addition, although up until 1990 HABC was authorized to operate public housing outside the limits of Baltimore City itself, HUD never required that HABC do so, and never assisted HABC to do so. Ex. 438, Letter from Thomas P. Perkins to Stanley Campbell (May 6, 1992) (LD 004935–37 at LD 004936) (explaining that HABC's area of operation had includ-

ed the 10 mile radius around the City up until 1990); Ex. 439, HABC Application for a Low–Rent Housing Program (Sept. 1966) (HA09274–09292 at HA 09287) (defines legal "area of operation" as including 10 mile radius around the City); Ex. 12, Deposition of William Tamburrino (11/21/02) at 162–163.

Since 1990, HABC has had authority to administer rent subsidies and housing assistance programs without regard to its territorial boundaries and beyond the ten-mile radius. *See* Md. Ann.Code, Article 44A, Section 1–103(b).

As a result, Baltimore City has become a "regional magnet" for families unable to afford housing on the private market. Ex. 436, City of Baltimore, Comprehensive Housing Affordability Strategy, 1994–1998 (Dec. 30, 1993) (HA 71784–71906 at HA 71795).

According to Baltimore City, "[l]iving in the City does not cause people to be poor. But being low income does cause people to concentrate in the City because virtually no where else in the metropolitan [area] is there housing they can afford!" Ex. 440, Census News 1990, Baltimore City Department of Planning (July 1992) (PL 079453–079462 at PL 079462) (*see also* at PL 079453, "A word from the Mayor"— "What I find particularly interesting, however, is what the data suggests about why the City's population is on average poorer than in the suburbs. It is not that living in the City makes one poorer. Rather, the majority of 'affordable' housing in the metropolitan area is in Baltimore City. The costs of housing in the suburban counties assures that most lower income households in the metropolitan area will be found in the City.").

HABC's inventory of public housing units are concentrated in distressed neighborhoods. Ex. 5, Pendall Family Projects, at 1; Pendall Scattered Site at 1.

In 1970, more than four-fifths of Baltimore's public housing units were located in extreme poverty census tracts, and 95 per cent were located in high-poverty tracts. Ex. 5, Pendall Family Projects, at 7, Table 1.

Of the nine projects opened after 1970, five projects, with 1,048 units, were located in extreme poverty tracts. *Id.*

Four projects (with 1,257 units) were located in areas with poverty rates below 20 percent. *Id.*

However, the vast majority of these units originally located outside high poverty areas (1000 units at Hollander Ridge and 121 units at Charles K. Anderson) have subsequently been demolished by HABC and HUD.

As of 1990, HABC's public housing was concentrated in extreme poverty Census tracts. Eighty-eight percent (or 11,065) of HABC's family public housing units (other than scattered site) were in extreme-poverty census tracts. An additional 926 units were in high poverty census tracts. The remaining two projects, Brooklyn (500 units) and Rosemont (106 units) were in tracts with between ten and twenty percent poverty. Ex. 5, Pendall Family Projects, at 9, Table 2.

In addition, all of HABC's public housing developments (other than scattered site) were located in distressed census tracts in 1990. Sixteen of the public housing developments in 1990 were in severely distressed tracts (Albert Spencer Gardens, Charles K. Anderson, Cherry Hill/Cherry Hill Ext./Cherry Hill Ext. II, Fairfield, Flag House, Latrobe, Lexington Terrace, McCulloh Homes, McCulloh Extension, Mt. Winans, O'Donnell Heights, Perkins, Poe Homes, Somerset Courts Extension, The Broadway and Westport/Westport Ex-

tension). Ex. 5, Pendall Family Projects, at 11, Table 3.

The remaining developments (Brooklyn, Claremont, Douglass, Dukeland, Emerson Julian Gardens, Murphy Homes, Gilmore, Hollander Ridge, Lafayette Courts, Oswego Mall, Rosemont, and Somerset) were located in moderately distressed census tracts. *Id.*

According to HABC, twenty of HABC's twenty-six family public housing developments are in neighborhoods which Local Defendants characterize as distressed. Ex. 441, Baltimore Department of Housing and Community Development, Consolidated Plan, July 2000–June 2005 (HA 62209–62393 at 62280); *see also* Ex. 8, Schuman Deposition (3/24/03), at 76:4–76:17, 143:21–147:22 (listing developments where HABC has difficulty attracting tenants because of neighborhood conditions and crime); Ex. 19A, Graziano Dep. at 235:18–239:9.

Of the other six developments, five are in neighborhoods characterized as "neutral" by HABC (O'Donnell, Brooklyn, Rosemont/Dukeland, Oswego Mall and Hollander Ridge). HABC characterizes only one, Claremont, as being in a "stable" neighborhood. Ex. 441, Baltimore Department of Housing and Community Development, Consolidated Plan, July 2000–June 2005 (HA 62209–62393 at 62280). Hollander Ridge, has subsequently been completely demolished by HABC.

Baltimore City has developed a "Neighborhood Housing Market Typology" which classifies Baltimore's neighborhoods into four types.

1. "Preservation" neighborhoods are defined as "[h]ealthy, attractive areas with high property values and high owner occupancy rates."

2. "Stabilization" neighborhoods are defined as "[s]olid homeownership areas showing initial signs of stress."

3. "Reinvestment" neighborhoods are defined as neighborhoods with "[v]isible signs of decline, but not highly concentrated."

4. The most distressed neighborhoods, identified as "Redevelopment" neighborhoods, have "[s]ignificant deterioration of housing stock with dense concentrations of abandoned buildings and vacant lots." Ex. 444, Baltimore's Neighborhood Housing Market Typology, City of Baltimore, Department of Planning (May 2002) (Exhibit 4 to Ex. 7, Conrad Deposition); Ex. 7, Conrad Dep., at 140:5–149:2.

The redevelopment neighborhoods are primarily located in East and West Baltimore (the old Black East Ghetto and West Ghetto), and the Park Heights corridor. Ex. 444, Baltimore's Neighborhood Housing Market Typology, City of Baltimore, Department of Planning (May 2002) (Exhibit 4 to Conrad Deposition); Ex. 7, Conrad Dep., at 167:10—168:4.

Most of Baltimore's residential neighborhoods fall into the two middle categories. Out of 237 neighborhoods total, 105 are "Stabilization" and 71 are "Reinvestment." Another 40 are in the highest category, "Preservation." Only 21 neighborhoods fall into the most distressed, "Redevelopment," category. Ex. 444, Neighborhood Typology Chart (BC 000380–388 at BC 000391).

Baltimore's scattered site inventory is concentrated in these twenty-one "Redevelopment" neighborhoods. Of the 2,872 scattered site units developed by HABC, over 72 per cent (2076 units), are located in "Redevelopment" neighborhoods. Sixty percent of the total units (1729 units) are further concentrated in nine neighborhoods, Barclay (118 units), Broadway East (133 units), Franklin Square (173 units), Harlem Park (227 units), Johnston Square (268 units), Middle East (255 units), Oliver

(137 units), Sandtown–Winchester (302 units) and Upton (116 units). Ex. 420, HABC Scattered Sites Assessments, Executive Summary (Jan. 31, 2002) (HA 74791–74797) (Executive Summary lists all scattered site units developed by neighborhood); Ex. 444, Neighborhood Typology Chart (BC 000380–388) (lists residential neighborhoods and identifies by typology); Ex. 7, Conrad Deposition, 149:5–157:3.

Another 25 per cent (727 units) of the units are located in the second most distressed type of neighborhood, "Reinvestment" neighborhoods. Only a handful (fewer than 40 units) are in "Stabilization" neighborhoods. No scattered site units at all were ever developed in any of Baltimore's 40 most stable neighborhoods, the "Preservation" neighborhoods. *Id.*

Of the total 2,872 scattered site units, HABC has determined that 923 are no longer viable. These non-viable units are more concentrated in "Redevelopment" neighborhoods than the scattered site units as a whole. Over 90 per cent (833 units) of the non-viable units are in "Redevelopment" neighborhoods. *Id.*

### K. *HUD MANDATING COMPLIANCE*

Compliance with Federal law, including Federal Civil Rights laws, is a condition of receiving federal funds to operate HABC's programs. HUD has a wide range of sanctions it can impose on HABC to carry out this task, ranging from requiring that HABC receive approval from HUD before taking any action in any area HUD considered to be a problem, to declaring HABC ineligible to receive certain new funds, to rescinding existing funds, to imposing a receivership. Ex. 445, GAO Report, Information on Receiverships at Public Housing Authorities (Feb.2003) (PL 91877–91931); Ex. 11A, Kaplan Dep., at 51

HUD has had a "constant presence at HABC," and has "continually scrutinized" HABC's activities. Ex. 12A, Tamburrino Declaration submitted in support of Federal Defendants' Motion to Dismiss, or, in the alternative, for Summary Judgment, at 2.

HUD repeatedly has found that the vast majority of HABC's public housing is racially identifiable. Ex. 256, Letter from Thomas Hobbs to M.J. Brodie (Mar. 19, 1982) (HUD3341–3342) (1981 finding that the majority of HABC's public housing projects were racially identifiable); Ex. 39, Letter from St. George I. Crosse to Robert Hearn, with attached Fair Housing and Equal Opportunity Monitoring Report (Sept. 30, 1988) (632–37 at 634) (1988 HUD finding that 44 of HABC's 48 public housing developments were racially identifiable); Ex. 257, Letter from Harold Jackson to Robert Hearn with attached Fair Housing and Equal Opportunity Monitoring Review (Sept. 30, 1991) (HUD27553–27561) (1991 HUD finding that HABC continued to operate racially identifiable projects, and that 45 of HABC's 48 public housing developments were racially identifiable).

HUD's Rule 30(b)(6) designees also have testified that a housing authority is "not in compliance with Title VI" when the authority operates racially identifiable projects. *See* Ex. 16, Deposition of Rheba Gwaltney (Jan. 29, 2003) at 81–82; *see also* Ex. 14, Deposition of Laverne Brooks (Feb. 6, 2003) ("Brooks Dep.") at 267; Ex. 33, John Goering *et al., The Location and Racial Composition of Public Housing in the United States* at 64 (Dec.1994) (HUD 00038–147) (finding that Baltimore's public housing is among the most highly segregated in the nation).

#### 1. *HUD's Monitoring Reviews in the 1980s*

HUD conducted monitoring reviews of Baltimore CDBG activities through the

1980s and found several violations. *See* Ex. 263, Memorandum of Laverne Brooks to Dudley Gregory (Apr. 13, 1990) (0773); Ex. 264, Memorandum of Harold Jackson to Laverne Brooks (Apr. 30, 1990) (0774). These reviews resulted in findings that "the City has failed to carry out the fair housing requirements of the CDBG program." *Id.*

In September 1989, HUD conducted a review of Baltimore City's CDBG activities for the prospective fiscal year. Pursuant to that review, HUD found that Baltimore City lacked available public housing units in non-minority concentrated neighborhoods. Ex. 265, Letter from Robert Hearn to St. George I.B. Crosse, with attachments (Oct. 16, 1989) (0661–88 at 0666). *See also* Ex. 446, Letter from St. George Crosse to Robert Hearn with attached Monitoring Report (Sept. 11, 1989) (HUD 277795–27800 at HUD 27797) (monitoring report acknowledges report documenting impediments to fair housing including the impediment of "lack of available public housing units in nonminority concentrated neighborhoods").

In response, Baltimore City stated that it would "target areas identified in the census tracts of communities with little or no minority representation for public and all other types of housing activities to provide a choice of housing opportunities throughout Baltimore City." Ex. 265, Letter from Robert Hearn to St. George I.B. Crosse, with attachments (Oct. 16, 1989) (0661–88 at 0666).

In addition, HABC provided documentation to HUD of the efforts it would take to achieve this goal, which included assurances that HABC would "locate Fairfield replacement housing in census tracts and neighborhoods that are not areas of minority concentration or areas with a concentration of assisted families." *Id.* at 0666, 0678.

2. *HUD's Written Act Plan Requirements*

In February 1990 HUD's Fair Housing and Equal Opportunity Division advised HUD internally that Baltimore City again be requested to develop a written action plan documenting actions to be taken to affirmatively further fair housing, including actions to address "Site Selection Policies." Ex. 447, Memorandum from LaVerne Brooks to Harold Young (Mar. 15, 1990) (HUD27645–27647 at HUD 27646).

In April 1990, HUD required HABC to provide a written action plan with goals and milestones, describing each action the City would take to remove the six impediments to fair housing choice identified earlier by the City. Ex. 266, Letter from Dean Reger to Robert Hearn (Apr. 13, 1990) (0764–72 at 0770–71).

In May 1990, the City repeated that it would target communities with little or no minority representation. Ex. 267, Letter from Robert Hearn to Dean Reger with attached Response to HUD's Annual In-House Audit Review (May 18, 1990) (0775–0814 at 0784).

In November 1990, HUD issued CDBG monitoring findings that Baltimore City's CDBG program was in "substantial non-compliance with applicable laws and regulations." Ex. 448, Letter from Maxine Saunders, HUD to Robert Hearn, HABC, with attached Monitoring Report (Nov. 13, 1990) (HUD 27709–27787 at HUD 27710).

The Monitoring Report found that HABC was out of compliance with fair housing requirements in that HABC had failed to provide goals and milestone for each action that will be taken to remove the identified impediments to fair housing choice, including site selection issues. *Id.* at HUD 277777–78.

Two years later, HUD "reminded" Baltimore City about "the open CDBG monitoring finding" regarding the "important requirement" of the obligation to affirmatively further fair housing. Ex. 449, Letter from Maxine Saunders to Robert Hearn (July 15, 1992) (LD 005745–005747 at LD 005745).

In the same letter, HUD advised the City that HUD was "pleased to inform" the City that HUD's review of the HOME program "has been completed and that the program description has been approved." *Id.*

### 3. *Analysis of Impediments to Fair Housing*

In the spring of 1995, HUD notified Baltimore City of the requirement that Baltimore City develop an Analysis of Impediments to fair housing, identify actions to eliminate any identified impediments, and maintain of records regarding Affirmatively Furthering Fair Housing, by February 6, 1996.

Baltimore eventually completed an Analysis of Impediments later that year. Its 1996 Analysis of Impediments to Fair Housing identifies racial segregation in public housing as an impediment to fair housing in the Baltimore area. Ex. 268, *Analysis of Impediments to Fair Housing in the Baltimore Metropolitan Area* (Nov. 1996) (HA 61919–90).

HABC has never prepared its own Analysis of Impediments to Fair Housing. Ex. 19B, Deposition of Amy Wilkinson (2/25/03) at 146:19–147:3.

### 4. *HUD's Ongoing Monitoring Activities*

In 1996, HUD conducted an on-site fair housing and equal opportunity monitoring review of Baltimore City's CDBG program. The review found that Baltimore City had not "developed and documented actions to remove the identified impediments to fair housing choice" identified in the Analysis of Impediments.

In 1998, HUD reminded Baltimore City that it has a statutory duty to affirmatively further fair housing. HUD advised Baltimore City that it had failed, in both its FY 1997 and FY 1998 Action Plans, to address the activities that City would take to affirmatively further fair housing. HUD further stated "[i]t appears that the City is not proceeding with a sense of urgency to develop and implement a strategy which would address the impediments described in the region-wide analysis of impediments." Ex. 452, Letter from Joseph J. O'Connor, HUD to Daniel P. Henson (Sept. 28, 1998) (HUD 29995–30004 at HUD 29999–30000).

In 2000 HUD reminded Baltimore City of its obligation to develop an Action Plan including "planned actions to overcome impediments which will be taken during the consolidated program year." Ex. 453, Letter from Joseph O'Conner, HUD to Patricia Payne (March 31, 2000) (HA 74085–74102 at HA 74088–89).

In September 2000 HUD undertook a monitoring review of Baltimore's CDBG program with primary focus on financial and economic development activities, and a "limited review" of fair housing and equal opportunity issues. Ex. 454, Letter from Joseph O'Connor, HUD to Patricia Payne (Sept. 27, 2000) (HUD 30111–30137).

In June of 2001 HUD reviewed HABC's performance with respect to use of HUD funds for the 1999 Program year. HUD advised Baltimore City that it was in compliance with HUD requirements and "congratulate[d] the City on its many accomplishments." Ex. 455, Joseph O'Connor, HUD to Paul Graziano (June 11, 2001) (HUD 29986–29994 at HUD 299992–94).

In August 2002 HUD performed an on-site monitoring of Baltimore City CDBG program, including a "limited civil rights review." HUD determined that it was unable to ascertain whether Baltimore City provided "sufficient housing choice to displaces in neighborhoods outside of areas of minority concentration" and recommended that the Fair Housing Program Center follow up in this area. Ex. 456, Memorandum from Charles Halm, HUD to LaVerne Brooks, HUD (Aug. 9, 2002) (HUD 30083–098).

Pursuant to its monitoring reviews, HUD repeatedly has found that HABC violated Fair Housing requirements and operates racially segregated public housing. In April 1981, HUD performed an "Occupancy Audit" of, among other things, HABC's "occupancy practices and policies," including the authority's tenant selection and assignment practices and policies. *See* Ex. 164, Letter from Thomas R. Hobbs to Michael Kelly, with attached Occupancy Audit (June 30, 1981) (HUDBAL 001131–52). That review found that, in Baltimore, applicants had been allowed to "specify their housing preference by geographic area and ... may decline an unlimited number of units within [the one preferred] geographic area without losing his/her application status." *Id.* at HUD-BAL 001137.

The letter memorializing the findings of the audit observed that this practice was inconsistent with the tenant selection and assignment plans that had been approved by HUD, and concluded that HABC's tenant selection and assignment practice "pose[d] a potential problem in *that it could tend to exacerbate existing racially segregated conditions within HABC's projects." Id.* at HUDBAL 001137–38 (emphasis added). The audit did not mention HABC's site selection practices.

A few months later, in a December 1981 Monitoring Finding, HUD found that the majority of the public housing projects owned and managed by HABC were racially identifiable. Ex. 256, Letter from Thomas Hobbs to M.J. Brodie (Mar. 19, 1982) (HUD3341–3342). However, HUD did not mandate that HABC desegregate projects by requiring that new public housing development be in non-impacted areas. *Id.*

In the spring of 1988, HUD performed a Title VI monitoring review of HABC in which it determined that, since "[f]orty-four of the forty-eight projects consists of more than 90 percent minority occupants," HABC "continue[d] to operate racially identifiable projects." Ex. 39, Letter from St. George I.B. Crosse to Robert Hearn, with attached Fair Housing and Equal Opportunity Monitoring Report (Sept. 30, 1988) (632–637 at 634); *see also* Ex. 14, Brooks Dep. (Feb. 6, 2002) at 202.

HUD suggested that, by way of "Corrective Action," HABC could seek the "recertification of the waiting list or changing from tenant selection assignment plan B (three-offer plan) to plan A (one-offer plan) to achieve racial balance in some of your projects." Ex. 39, Letter from St. George I.B. Crosse to Robert Hearn, with attached Fair Housing and Equal Opportunity Monitoring Report (Sept. 30, 1988) (632–637 at 634). The 1988 monitoring review did not address HABC's site selection practices.

At about the same time, in 1988, HUD's Regional Office conducted a Title VI compliance review of HABC. Those findings were not finalized or published to HABC. *See* Ex. 258, Memorandum from Maxine Saunders to Barry Anderson (Nov. 6, 1990) (HUDBAL 000291–93 at HUDBAL 000293).

Two years later, HUD notified HABC by letter that, pursuant to a request from

the Secretary, HUD had conducted a review of "tenant selection and assignment policies and practices" of various authorities, and had concluded that HABC's tenant selection and assignment policies and practices violated "the Department's Regulations and handbooks" because the authority allowed tenants to express locational preferences without agency approval. Ex. 259, Letter from Barry C. Anderson to Robert Hearn (Aug. 24, 1990) (199–200 at 199).

This tenant selection and assignment plan had been expressly approved by HUD in 1969. Ex. 163, Letter from Vincent A. Marino to Robert C. Embry (Jan. 17, 1969) (0197–98). Additionally, HUD was aware from its 1981 monitoring review that HABC allowed applicants to specify locational preferences. This 1990 letter was silent as to HABC's site selection practices.

In November 1990, the Manager of HUD's Baltimore Area Office recommended to the HUD Regional Office in Philadelphia that HUD perform a Title VI Compliance Review on HABC. *See* Ex. 258, Memorandum from Maxine Saunders to Barry Anderson, Recommendation for FY 1991 Title VI compliance Review (Nov. 6, 1990) (HUDBAL 000291–93 at HUDBAL 000291).

HUD conducted a monitoring review of, among other things, HABC's occupancy patterns pursuant to HUD's obligations under Title VI. *See* Ex. 257, Letter from Harold Jackson to Robert Hearn, Fair Housing and Equal Opportunity Monitoring Review (Sept. 30, 1991) (HUD 27553–27561).

HUD did not make any "negative findings" regarding HABC's tenant selection and assignment policies and practices, only observing that "[t]he Authority maintained records regarding the number of times units had been offered to applicants on the waiting list... A review of the Authorities [*sic*] records indicated that the Authority had updated its waiting list to establish the federal selection preferences as mandated by HUD." *Id.* at 0113.

HUD found again in 1991 that "[t]he Housing Authority of Baltimore City continues to operate racially identifiable projects." *See* Ex. 257, Letter from Harold Jackson to Robert Hearn (Sept. 30, 1991) (HUD27553–27561 at 27560).

HUD's first suggested "Corrective Action" was that "the Authority should consider" changing its tenant selection and assignment plan from the three-offer plan to the one-offer plan. *Id.* These findings were eventually cleared. The 1991 monitoring review did not address HABC's site selection practices.

In September 1992, HUD determined that HABC was not properly implementing its HUD-approved tenant selection and assignment. Ex. 165, Letter from Maxine Saunders to Reginald Thomas, with attached Limited Management Review, HABC, April 22—June 3, 1992 (Sept. 14, 1992) (PL03376–405 at PL03378, PL03381–85).

### 5. *HUD Title VI Compliance Review of HABC*

In 1997, HUD conducted its first formal Title VI compliance review of HABC. HUD concluded that HABC was failing to maintain data required for civil rights compliance purposes, and that without the required records and data, it could not determine whether HABC was otherwise in compliance with Title VI. *Id.* In 1998, HABC signed a Voluntary Compliance Agreement, promising again to correct the record-keeping violations. Ex. 261, Voluntary Compliance Agreement Between HUD and HABC (April 20, 1998) (HUD 04086–94).

In 2001 HUD continued to express concerns about HABC's compliance with Fair Housing laws. Ex. 457, Email from LaVerne Brooks to Nathaniel Smith (Feb. 13, 2001) (HUD 11229) ("I think that Fair Housing and Equal Opportunity Headquarters Enforcement staff as well as PIH and OGC staff [should] also attend any meetings to let the authority know that Fair Housing noncompliance findings have as much importance as PIH findings. In the past, this authority [HABC] has not made. fair housing a priority and consequently, no emphasis has been placed on resolving our issues."); Ex. 458, Email from William Tamburrino to Milan Ozdinec (March 5, 2001) (HUD 26151) ("Given concerns regarding HABC's compliance with Fair Housing laws, if the Plan were ready for review, we would not be able to approve it.").

In August 2003, HUD's Fair Housing and Equal Opportunity Division finally recommended that HUD close the Voluntary Compliance Agreement. Ex. 459, Memorandum from LaVerne Brooks for Wanda Nieves (Aug. 19, 2003) (HUD 36965–981).

The 1997/1998 Title VI compliance review was limited to tenant selection and assignment practices. Ex. 262, Letter from Walter Valentine, Director of Program Operations and Compliance, Office of Fair Housing and Equal Opportunity, to Daniel Henson, HABC Title VI Case Number 03–97–07–009(340) (July 11, 1997) (1014–17).

HUD has withheld monies from HABC temporarily because of deficiencies in its Public Housing Authority Plan. *See, e.g.,* Ex. 460, Letter from Unabyrd Ervin–Jones to Paul Graziano (Nov. 2, 2001) (HUDBAL 033375–77); Ex. 461, Letter from Unabyrd Ervin–Jones to Paul Graziano (Feb. 28, 2002) (HUD 29295–96) (releasing final one-third of previously withheld monies). HUD has also prevented HABC from applying for Section 8 Mobility funding because of "major program management findings or compliance problems." Ex. 400, Letter from Unabyrd Ervin–Jones, HUD to Paul Graziano, HABC (Sept. 18, 2001) (HUD 1274–75); Ex. 19A, Graziano Dep. at 71:15–78:7. However, HUD has never used or even threatened to use these sanctions against HABC for site selection violations or for failing to provide public housing outside areas of minority concentration.

David Enzel, HUD's Rule 30(b)(6) designee on HUD policies and practices regarding Title VI monitoring and compliance reviews, testified that "the only method that comes to mind" to address racially identifiable projects where both projects and waiting lists are 90 percent minority, "would be the creation of projects in areas that are not in areas of minority concentration." Ex. 15, Enzel Dep., at 150.

## L. *DEMOLITION WITHOUT REPLACEMENT*

### 1. *Demolition and Displacement Nationally*

As of June 2, 2002, HUD had approved, at the national level, demolition of 144,000 public housing units, 71,902 under the HOPE VI program. 82,000 units had actually been demolished. Ex. 368, HUD, *HOPE VI Best Practices and Lessons Learned 1992–2002,* Submitted to Committee on Appropriations, U.S. House of Representatives, Committee on Appropriations, U.S. Senate, Pursuant to House Report, Title II (June 14, 2002) at 107–272 (PL 081380–468).

Despite this high level of demolition and displacement, HUD's HOPE VI office did not have a relocation specialist. Ex. 21, Blom Dep. at 22.

HUD did not require housing authorities to track or report the number of families moving to non-minority areas or non-poor areas, the quality of the housing to which families are relocated, or the number of families making multiple moves, and does not assess their performance in this regard. Only 2 per cent of HOPE VI funds were budgeted for relocation. Ex. 368, "*HOPE VI Best Practices and Lessons Learned 1992–2002.*"

The HOPE VI grant administrators did not verify that staff were in place to provide the services described in HOPE VI relocation plans, and did not monitor the relocation activities of HOPE VI grantees.

HUD also did not require HOPE VI grantees to demonstrate the availability of other housing to absorb families being relocated from HOPE VI sites. Ex. 21 Blom Dep., at 22, 48–49, 199–200, 202.

Relocation was one topic that field offices could review in the course of HOPE VI monitoring. Ex. 21, Blom Dep., at 200. However, the HUD Baltimore office had not had a relocation specialist position since before 1995. Ex. 18, O'Connor Dep., at 158–160.

The Community Planning and Development Division of HUD was not involved in monitoring relocation for HOPE VI projects in Baltimore. *Id.* at 162–163.

### 2. *Situating the Baltimore housing market*

During the period 1995 to the present, HUD became aware of the housing shortfall faced by Baltimore's low-income African American residents. HABC's Public Housing Authority Plans consistently identified a need for additional affordable housing. Ex. 463, HABC Public Housing Authority Plans, Plan for Fiscal years 2003–2007, Annual Plan for Fiscal Year 2003 (April 8, 2003) (HUD 35137–35313 at HUD 35140, 35151, 35154); Ex. 390, HABC Public Housing Authority Plans, 5 year Plan for FY 2000–2004 (HA25251, 25262–67, 25419 at HA 25262–65, 25419); Ex. 464, City of Baltimore, Comprehensive Housing Affordability Strategy, 1994–1998 (Dec. 30, 1993) (HA 71784–71906 at HA 71795, 71824–33) ("[t]hose with middle and upper incomes have a range of housing choices while those lacking such resources are limited to an ever shrinking portion of the private market, depend on subsidized housing, live in substandard housing, or have no housing at all ... The consequence ... is that over one third of Baltimore's households are in need of affordable decent housing."); *see also* Ex. 359, Letter from Daniel P. Henson to Louis L. DePazzo (Oct. 20, 1997) (B4:01405–06 at B4:01405) (HABC admission that "the region's supply of affordable rental and ownership housing is decreasing at the same time that the need is increasing").

HABC reported that 69,866 Black households and 22,442 White households in the City with incomes at or below 80 per cent of the area median had housing needs. Of these households, 49,914 were considered extremely low income (*i.e.,* at or below 30 per cent of the area median). HABC also reported that its waiting list for public housing contained 12,305 households, of which 95.98 per cent were Black and 98.95 per cent were extremely low income. HABC's Section 8 waiting list contained 24,527 households, 94.69 per cent of which were Black and 97.48 per cent of which were extremely low income. Ex. 390, HABC Public Housing Authority Plans, 5 year Plan for FY 2000–2004 (Public Housing Authority Plan 2000) (HA 25251, 25262–67, 25419).

Baltimore's Analysis of Impediments to Fair Housing identified "the lack of sufficient affordable housing to meet the demands of the population ... as one of the

primary impediments to fair housing choice." Ex. 268, *Analysis of Impediments to Fair Housing in the Baltimore Metropolitan Area* (Nov.1996) (HA 61919–90 at HA 61992).

HUD considered the Baltimore metropolitan area to have a tight housing market that made it very difficult, even for families with vouchers, to secure housing. Ex. 476, Harold Young, HUD Baltimore Field Office, *The Electronic Dispatch,* August 2002 (PL 058428–058440 at PL 58428) (describing tight market); Ex. 25, Kramer Dep. at 282:14–283:6 (calling "extremely limited" number of viable multi-family housing units a barrier to utilization of Section 8 vouchers in the City); *id.* at 339:12–340:14 (recognizing that Baltimore City does not have enough "quality multifamily housing").

HUD recognized the severity of the shortage of affordable housing units. Ex. 27, Secretary Henry G. Cisneros, Testimony before the Housing and Community Opportunity Subcommittee of the Banking & Financial Services Committee, House of Representatives (Oct. 13, 1995) (HUD 01720–33 at 01721) ("For these people [public housing tenants], public housing provides a real, tangible response to the failure of the private market to provide sufficient housing at affordable rents. Nationally, the supply of affordable housing units falls well short of the demand—by about 4.7 million units. That gap would be far greater without public housing or other forms of federal housing assistance."); Ex. 29, Secretary Andrew Cuomo, Statement Before the Senate Committee on Banking, Housing and Urban Affairs Subcommittee on Housing Opportunity and Community Development (April 9, 1997) (HUD 01548–57 at 01550) ("In Baltimore, it [public housing] represents nearly one-quarter (23.4 per cent) of the rental housing affordable to these families.").

When public housing was being demolished, as under the HOPE VI program, HUD directed that PHAs "should ensure that the amount of public housing being rebuilt, either on or off-site, is adequate given local demand for this resource." Ex. 59, *Hope VI: Best Practices and Lessons Learned 1992–2002,* Submitted to the Committee on Appropriations, U.S. House of Representatives, and Committee on Appropriations U.S. Senate in House Report 107–272, Title II (June 14, 2002) (HUD 30170–256 at HUD 30202). One of the "lessons learned" from the HOPE VI program was that housing vouchers are "not viable replacement housing options" in tight housing markets like Baltimore's. *Id.* at HUD 30202–03.

The City's Constituted Plan recognized both the need for more affordable housing and the futility of the City's practice of addressing that need by developing subsidized housing primarily in the "inner core" areas: "Any development that takes place in these neighborhoods must be very carefully thought through if we are not to find ourselves in the same predicament that we have been in before—namely, with a lot of new 'vacants' in a neighborhood.... Lately, when development has taken place, many households that lived in relatively good blocks have moved to the new, subsidized development and because of lack of demand for the neighborhood, their former houses have become unoccupied and, later, abandoned. A relatively sound block thus becomes unsound." Ex. 433, Baltimore City Department of Housing and Community Development, Consolidated Plan, July 2000—June 2005 (HA 62209–393 at 62292).

### 3. *HUD and Development Areas*

HABC received, annually, significant formula funds from HUD. Ex. 465, HUD Funding Received by Local Defendants FY 1995–2003. In addition to the public

housing annual operating subsidy, HABC received Comprehensive Grant Funds (now Capital Funds) in the amount of approximately $30 million per year.

HABC had been eligible to receive Replacement Housing Factor Funds (RHFF) as the result of demolition of public housing units, for a total of approximately $20 million total since 1998.

HABC also planned to use a portion of its annual Capital Funds allocation to service $80 to $100 million in "revenue anticipation bonds." Ex. 463, HABC Public Housing Authority Plans, Plan for Fiscal years 2003–2007, Five Year and Annual Plan for Fiscal Year 2003 (April 8, 2003) (HUD 35137–35313 at HUD 35163).

The City received Community Development Block Grants funds of approximately $30 million per year, HOME funds in the amount of close to $10 million per year, and additional Housing Opportunity for Persons with Aids (HOPWA) and Emergency Shelter Grant (ESG) funds. Ex. 465, HUD Funding Received by Local Defendants FY 1995–2003.

In total, HABC and the City of Baltimore received over a billion dollars from HUD since 1995, not including the additional funding HABC received for Section 8.

In addition to the formula funds available to HABC from HUD, HOPE VI public housing development funds were available by competitive application.

In 1994, HUD adopted special site selection standards for the HOPE VI program. These standards allowed new public housing to be built on the site of existing projects, or in the same neighborhoods. Such production would not have been allowed under the 1980 site and neighborhood policies and regulations. Ex. 17, Deposition of Chris Hornig (Sept. 7, 1995) at 31–32.

Congress subsequently adopted legislation ratifying HUD's new site selection policy for all public housing developments that allowed new construction on former public housing sites in minority concentrated areas and in the same neighborhood, on condition that the number of units be substantially reduced. HUD expansively applied the "same site and neighborhood" exception, defining "same neighborhood" to extend three miles from an existing site. Ex. 339, FY 2001 HOPE VI Revitalization and Demolition Application Kit at 39.

HUD's HOPE VI site and neighborhood standards did not require any comparable units to exist in other neighborhoods outside areas of poverty and minority concentration. Out of a universe of 102 points used for Hope VI selection, HUD awarded only one point for developing "off-site housing that will lessen the concentration of low-income residents on-site and create opportunities for desegregated, mixed-income communities by locating such off-site housing in neighborhoods with low levels of poverty and/or low concentrations of minorities." To receive that one point, the Public Housing Authority had to show that "community acceptance is likely" as to the proposed desegregative housing. Ex. 339, FY 2001 HOPE VI Revitalization and Demolition Application Kit at 63; *see also* Ex. 466, HOPE VI Revitalization Grant Application, HUD (2002) (HUD 29016–29118); Ex. 21, Blom Dep., at 60–70.

### 4. HOPE VI and Hollander Ridge

By 1996, an assessment by HUD's Baltimore field office had found that the poor site conditions at Hollander Ridge had taken their toll. As a result of the steeply sloping topography of the site, "severe land erosion and difficulties with the sanitary lines have been historical problems." Ex. 341, Letter from Bill Tamburrino to Daniel P. Henson (June 26, 1996) (PL

048970–048992). Hollander Ridge was in a state of disrepair. *See Thompson v. HUD*, 220 F.3d 241, 245 (4th Cir.2000).

Hollander Ridge had also become the focus of anxieties about crime, class and race in the adjacent predominantly White Baltimore County community of Rosedale. HUD was, by 1996, aware of hostility on the east side of Baltimore County directed toward assisted housing generally and specifically toward HABC public housing families.

HUD acknowledged that race and class were underlying factors throughout a local debate some two years earlier over the Move to Opportunity program in Baltimore, "underlying assumptions about who lives in city public housing made it possible for local politicians and community leaders in Baltimore County to build on a fear of forced integration. Accelerated community decline through a mass influx of poor minorities would, it was argued, erode community standards and increase social ills." Ex. 66, HUD, Office of Policy Development and Research, *Assessing Property Value Impacts of Dispersed Housing Subsidy Programs: Final Report* (May 1999) at 3–24, 28 (PL 081326–46 at PL 081330, 081334).

HUD Inspector General Susan Gaffney, in a March 1996 memorandum to then-Secretary of HUD Henry Cisneros, blamed HABC's deficient maintenance, tenant screening, and security practices at Hollander Ridge for exacerbating these racial tensions: she wrote that, "with our funds, the Baltimore Housing Authority is sending a powerful message that having poor, minority people in your neighborhood means crime, drugs, and badly maintained housing; and the best thing to do about it is to put the existing problem people on reservations, and keep any additional such persons out." Ex. 342, Memorandum by Susan Gaffney to Henry G. Cisneros, Kevin E. Marchman, Elizabeth K. Julian (Mar. 19, 1996) (F2:02348–52 at F2:02349).

### 5. *The Hollander Ridge Fence*

Baltimore County pushed for construction of a perimeter fence to completely surround Hollander Ridge, with a single entrance at Pulaski Avenue. Ex. 343, Letter from C.A. Dutch Ruppersberger to Henry G. Cisneros (July 9, 1996) (offering to pay $350,000 toward construction of the fence) (Julian Dep. Ex. 34); Ex. 12, Tamburrino Dep. (Nov. 4, 1998) at 119.

The 1996 assessment by HUD's Baltimore Field Office found that there was a misperception among Rosedale residents that crime was increasing at Hollander Ridge, when, in fact, crime there had dropped significantly in the preceding three years, and the crime rate was half that of the City as a whole. Ex. 341, Letter from Bill Tamburrino to Daniel P. Henson (June 26, 1996) (PL 048970–048992). Noting the isolation of the site, and tensions between Hollander Ridge and Rosedale, the HUD report concluded that "the need for a perimeter fence surrounding the community should be reassessed as it may serve to further isolate the residents of this development." *Id.* at 20.

Baltimore County contributed $350,000 of its own federal Community Development Block Grant Funds to HABC for construction of the fence. HUD's community Planning and Development Division understood this as an activity benefiting Baltimore County, not a contribution to HABC. Ex. 18, Deposition of Joseph O'Connor (Jan. 22, 2003) ("O'Connor Dep.") at 145–49; Ex. 344, Notice of Intent to Request Release of Funds, Baltimore County, Maryland (Jan. 28, 1997) (PL 044989).

HUD awarded $300,000 to HABC for the Hollander Ridge fence, characterizing the funds as a HOPE VI "planning grant." Ex. 347, U.S. Department of Housing and Urban Development, HOPE VI Assistance Award–Amendment (Jan. 10, 1997) (F2:00513–20 at F2:00513, 00519); Ex. 21, Deposition of Dominique Blom (Jan. 30, 2003) ("Blom Dep.") at 99–100.

According to HUD General Deputy Secretary Milan Ozdinec, then-director of the office that runs the HOPE VI program, the order to award the $300,000 planning grant for a fence was so unusual that it generated questions within HUD as to why a planning grant was being used for that purpose. Ex. 20, Deposition of Milan Ozdinec (Mar. 20, 2002) ("Ozdinec Dep.") at 125–126. Ozdinec was unable to recall any other instance in which HUD had used planning grant monies for a fence or other physical improvements. *Id.* at 103–104.

Two years later, HUD staff and consultants continued to express reservations that the Hollander Ridge fence and gated entrance would "contribute to a continued sense of isolation from the mainstream." Ex. 21, Blom Dep., at 102–103; Ex. 348, E-mail from Dominique Blom to Marsha Cayford and Sharon Scharf with attached "Comments and Questions on Hollander Ridge RP," (Aug. 20, 1999) (HUD 26428–29).

After a tour of Hollander Ridge in the summer of 1996, HABC Executive Director Daniel Henson decided that HABC should submit an application to HUD for Hollander Ridge. Ex. 19, Henson Dep., at 51–52.

HABC's plan for Hollander Ridge, as submitted on September 10, 1996, was to modernize Hollander Ridge by, among other things, reducing the population density in the development through demolition and reconfiguration of existing units, and upgrading housing units and amenities.

*Thompson v. HUD,* 220 F.3d 241, 245 (4th Cir.2000); Ex. 349, Hollander Ridge HOPE VI Application (Sept. 10, 1996) (HA 40238–444).

HUD noted the conflict surrounding Hollander Ridge. A HUD memo stated: "Hollander Ridge lies on the border between a city increasingly populated by low-income minorities, and a county with a greater representation of working-class and middle-class Whites. Hollander Ridge has been the focus of county anxieties about crime, class and race, while public housing residents feel they have been unfairly stigmatized. The conflict has drawn the attention of politicians of national stature, and is emblematic of conflicts dividing many minority urban cores from their White suburbs. A successful solution will be a model nationally for a problem which must be solved if America's cities are to survive and prosper." Ex. 350, Memorandum For Henry Cisneros, Secretary from Kevin Emanuel Marchman, Acting Assistant Secretary, Office of Public and Indian Housing, Re: Recommendations for 1996 HOPE VI Grants (Oct. 21, 1996) (F2:00086–90 at F2:00088).

### 6. HOPE VI Application for Hollander Ridge

Shortly after HABC submitted its HOPE VI Application, HUD commissioned a viability assessment of Hollander Ridge conducted by Abt Associates, Inc. The September 1996 assessment report noted the poor physical condition of the site, its difficult topography, and its isolation: "Although the subject property is technically located in a non economically impacted neighborhood at the city's northeast border with Baltimore county, the property is extremely isolated and bounded on two sides by expressways. It is inconvenient for a range of services (such as, schools, shopping, and health care), and a fence

and barricades effectively cut it off from the only residential neighborhood that abuts it. As such, the property offers few of the social benefits that generally accrue to properties that are located within non-impacted residential areas." Ex. 216, Abt Associates, *Public Housing Stock Viability Assessment: Hollander Ridge, Baltimore, MD*, prepared for U.S. Department of Housing and Urban Development (September 24, 1996) (HUD 02148 at 2).

The report also questioned Hollander Ridge's viability even if rehabilitated with $20 million in HOPE VI funding awarded to HABC. *Id.* at 1–2. Indeed, HUD's expert recommended that the site not be redeveloped for public housing and instead that "the funds for HOPE VI be used to demolish the site and acquire/build replacement housing in other areas of the city (as is permitted under the HOPE VI program) that would offer greater leverage from a community development perspective or offer a more desirable location for 'non-impacted housing.'" *Id.* at 1.

HABC resisted this recommendation. Ex. 351, Letter from David P. Henson to Rod Solomon, Re: Viability Assessment, Hollander Ridge (Mar. 24, 1997) (HUD 18312–13); Ex. 352, Letter from Daniel P. Henson to Honorable Louis DePazzo (Oct. 20, 1997) (B4:01405–06 at B4:01405); Ex. 353, Letter from Daniel P. Henson to Kevin Emanual Marchman, Re: Hollander Ridge HOPE VI Grant Agreement (Nov. 12, 1997) (F2:00061–63).

Rosedale residents and their elected officials voiced their objections to the plan to both HUD and HABC. Ex. 354, Letter from Robert L. Ehrlich to Andrew Cuomo (Nov. 14, 1997) (F2:01471–01473 at F2:01471–72); Ex. 355, Letter from Nancy M. Leiter to Mayor Kurt Schmoke (Dec. 12, 1997) (HR 007134); Ex. 22, Deposition of Daniel Sowell (Nov. 9, 1998) ("Sowell Dep.") at 100; Ex. 23, Deposition of Steven Broache (Nov. 10, 1998) ("Broache Dep.") at 74–75.

HUD advised HABC that any revitalization plan for Hollander Ridge had to demolish all of the units because Hollander had failed HUD's viability test. Ex. 358, Letter from Deborah Vincent to Daniel Henson (Nov. 24, 1998) (HUDA 00041–43).

Baltimore City Mayor Schmoke proposed the senior village idea because "he had at that point been hearing so many opposing voices to spending HOPE VI money out at Hollander Ridge for family use that he thought the only way of silencing those voices was to make this kind of suggestion." *Id.*

HABC's plan did not call for any of the HOPE VI funds to be used to replace any of the 522 family public housing units that would be demolished at Hollander Ridge.

Mayor Schmoke met with the Hollander Ridge resident leaders on April 3, 1998 to hear their concerns about the HOPE VI planning process, including their belief that Rosedale wielded disproportionate influence, and that Rosedale's opposition to Hollander Ridge was racially motivated. The residents also requested that the money allocated for constructing the fence be used instead for other projects to help residents of the Hollander Ridge community. Ex. 361, Mayor's Meeting Agenda, Hollander Ridge Resident Council (April 3, 1998) (HR 007437–41 at 007437).

7. *Relocation of Hollander Ridge Residents*

HABC began moving residents out of Hollander Ridge in January 1998. Ex. 24, Deposition of Ruth Gamble ("Gamble Dep.") (Nov. 18, 1998) at 19–20.

In February 1999, HABC submitted an application to HUD seeking approval to demolish all 1000 units at Hollander and to relocate the 311 residents then remaining.

Ex. 363, Demolition/Disposition Application submitted by HABC to U.S. Department of Housing and Urban Development, Office of Public and Indian Housing (Feb. 5, 1999) (HUDA 00044–72 at HUDA 00048).

HABC's application included a cursory relocation plan in which HABC represented that it would emphasize relocation to housing outside areas of minority concentration. *Id.* at HUDA 00065.

Remaining Hollander residents were notified on May 25, 1999 that they would have to move within 120 days. Ex. 364, Daniel P. Henson to Helen Fair, Notice of Displacement (May 25, 1999) (PL 052771–75 at PL 052771).

The residents remaining as of October 15, 1999 were told that they would be moved on an emergency basis to a unit chosen for them by HABC. Ex. 340, Daniel P. Henson to Current Resident of Hollander Ridge, Re: Emergency Temporary Moves (Oct. 15, 1999) (PL 052776).

By the time that HUD approved the Hollander demolition application more than a year later, on March 28, 2000, Hollander was empty. Ex. 365, Memorandum from Harold Lucas to William Tamburrino (Mar. 28, 2000) (HUDA 00027–35 at HUDA 00032).

In July 1997, HABC staff reported on a meeting in which residents were "very upset about relocation, believing that they will have to move to the inner city where life is very dangerous." Ex. 366, E-mail from Donna Keck to various HABC staff (July 31, 1997) (PX 213).

A significant number of the Hollander families were relocated to properties owned by two landlords implicated in the federal investigation of real estate "flipping" in the Patterson Park neighborhood. Ex. 25, Kramer Dep., at 109–114. HABC removed these landlords from the Section 8 program, requiring the Hollander families living in their properties to move again. *Id.* at 113.

At the time that Hollander Ridge relocation was occurring, residents were also being relocated from two other HABC HOPE VI projects. In addition, HUD was relocating residents from an FHA foreclosure project, Freedom Apartments. HUD did not coordinate the Freedom relocation activities with Hollander Ridge residents searching for housing. As a result, Hollander residents were competing with other displaced households for a limited supply of housing. Ex. 26, Deposition of Mary Ann Henderson (Feb. 14, 2003) at 120–24.

### 8. *Demolition of Hollander Ridge*

HUD approved HABC's demolition application for Hollander Ridge on March 28, 2000. In July 2000, the entire complex was demolished. That same month, following the Fourth Circuit's ruling that the Partial Consent Decree could not be modified as the Defendants had wished, HUD advised HABC that the Hollander Ridge HOPE VI grant was in default. HUD further advised HABC that it was required to submit a default resolution plan and that failure to submit an acceptable plan could result in recapture of the HOPE VI funds. Ex. 373, Letter from Harold Lucas to Patricia Payne (July 31, 2000) (HUD 05999–06004).

HUD required that HABC obtain "written commitments from every party whose cooperation is needed for the implementation of the Revitalization Plan."

In February 2001, HABC submitted its default resolution plan for the Hollander HOPE VI grant. The plan provided for a limited number of public housing replacement units on the Hollander site, total rehabilitation of Claremont Homes, and

development of off-site replacement public housing units in non-impacted areas or "inclusionary areas," *i.e.,* areas experiencing "private investment or dynamic growth." Ex. 376, Letter from Paul Graziano to Milan Ozdinec with attached Plan for Hollander Ridge Funds (Feb. 28, 2001) (HUD 03028–38).

On April 18, 2001, HUD rejected HABC's default resolution plan and advised that it was recapturing the Hollander Ridge HOPE VI grant. The Hollander Ridge grant funds were subsequently restored by Congress.

## M. *FURTHER DEMOLITION OF BALTIMORE PUBLIC HOUSING UNITS*

### 1. *Cherry Hill*

HUD and HABC demolished units occupied by African-American families at Cherry Hill. In March 1997, HABC submitted an application to HUD for the demolition of 192 units of public housing at Cherry Hill 17. HABC's plan was to use public housing Comprehensive Grant Program (CGP) funds already set aside for the improvement of those units to, instead, demolish the units, and replace them with home ownership units and senior units solely on the Cherry Hill site. Ex. 379, Cherry Hill 17 Partial Demolition/Disposition Request (Mar. 24, 1997) (PL 045057–105). The plan included spending $7.4 million of the total $30,136,702 CGP funds available to HABC for FFY 1997 on development of the home ownership units. Ex. 380, Letter from Bill Tamburrino to Daniel P. Henson (Oct. 17, 1997) (HUD 04505–06).

In October 1997, citing an excessive density of public housing in Cherry Hill, HUD approved the demolition request. HUD also approved the partial demolition of Cherry Hill 17.

### 2. *Charles K. Anderson*

In 2000, HABC closed the 122–unit Charles K. Anderson project and included plans to demolish it in the agency's capital plan. HUD approved the demolition application in November 2002. Ex. 388, *Charles K. Anderson Demolition/Disposition,* submitted By HABC to Paul Graziano (June 2002) (HUD 30297–390); Ex. 389, Letter from Ainars Rodins, Director, to Paul Graziano (Nov. 8, 2002) (HUD 30281–82).

### 3. *Emerson Julian Gardens*

HUD approved the demolition of Emerson Julian Gardens in Upton. This 23–unit public housing development had been placed adjacent to Murphy Homes, and HUD approved its demolition at the same time the Murphy Homes demolition was approved. Ex. 205, Excerpts from Murphy Homes/ Emerson Julian Gardens HOPE VI Revitalization Grant Proposal, HABC (July 18, 1997) (HA 38657–39113); Ex. 396, Letter from Deborah Vincent, General Deputy Assistant Secretary to Daniel Henson (Sept. 3,1998) (HUDBAL 025453–55).

### 4. *Claremont*

Originally, Claremont was a *de jure* White development sited in a White neighborhood. Subsequently, Claremont became majority African–American. Claremont was located in one of the better neighborhoods available to HABC's tenant population. It was the only HABC development located in a neighborhood characterized by Baltimore City as "stable." Ex. 441, Baltimore Department of Housing and Community Development, Consolidated Plan, July 2000–June 2005 (HA 62209–62393 at 62280).

HABC allowed Claremont to deteriorate to the point that it is no longer habitable. Ex. 471, HABC, Scattered Sites and Con-

ventional Statistical Report, 1,630 Non–Viable Units (March 12, 2003) (HUD 34983–34990 at HUD at 34984) (description of the state of disrepair at Claremont); Ex. 472, Claremont Emergency Move Referrals (HA 82740–82920) (group of more than 80 emergency transfer requests because of uninhabitable conditions of units).

HABC has plans to demolish the entire development. Ex. 463, HABC Public Housing Authority Plans, Plan for Fiscal years 2003–2007, Annual Plan for Fiscal Year 2003 (April 8, 2003) (HUD 35137–35313 at HUD 35195).

### 5. *O'Donnell Heights*

The 900 unit O'Donnell Heights development was, originally, a *de jure* White development sited in a White residential neighborhood. It became majority African American in the mid–1990s. Ex. 2, Taeuber, at Table 5, 6. O'Donnell is one of the few developments in a neighborhood characterized by Baltimore City as "neutral." Ex. 441, Baltimore Department of Housing and Community Development, Consolidated Plan, July 2000–June 2005 (HA 62209–62393 at 62280).

HABC has plans to demolish 98 units at O'Donnell. Ex. 463, HABC Public Housing Authority Plans, Plan for Fiscal years 2003–2007, Annual Plan for Fiscal Year 2003 (April 8, 2003) (HUD 35137–35313 at HUD 35196). HABC has engaged in a Master Planning process for O'Donnell. Ex. 473, O'Donnell Heights Master Plan—Final Version (March 2003) (HA 81432–81522).

### N. *DEMOLITION OF SCATTERED SITES*

In 1998, HABC submitted an application to HUD for the demolition of 1000 units of scattered site public housing, or over one-third of its scattered site public housing inventory. HUD approved demolition of 297 of these units. Ex. 391, Application for Demolition of Scattered Site Units, HABC (Sept. 1, 1998) (HA 43397–488); Ex. 392, Memorandum from Harold Lucas to William D. Tamburrino (Oct. 7, 1999); Ex. 392, Letter from Harold Lucas to Daniel Henson (Oct. 7, 1999) (HUD 06939–67); Ex. 467, Letter from Unabyrd Ervin–Jones to Paul Graziano (April 1, 2003) (HUD 34140–34163).

HUD subsequently approved HABC's requests to dispose of an additional 65 scattered site public housing properties, and several smaller scattered site demolition/disposition applications. Ex. 393, Letter from M. Liu to Paul Graziano (Jan. 28, 2002) (HUDBAL 24465–70); Ex. 394, Letter from Michael Liu to Paul Graziano (Dec. 5, 2001) (HUD 10632–37) (approving disposal of 3 properties); Ex. 395, Letter from Joseph Shuldiner, Assistant Secretary, to Daniel Henson (Sept. 29, 1995) (HUD 06615–21) (approving disposal of an additional three properties).

HABC has plans to dispose of at least an additional 712 scattered site units. Ex. 464, HABC Public Housing Authority Plans, Plan for Fiscal years 2003–2007, Annual Plan for Fiscal Year 2003 (April 8, 2003) (HUD 35137–35313 at HUD 35191–92); Graziano Dep. at 243:6–247:13, 263:18–264:9.

### 1. *Demolition and Baltimore City Urban Renewal Plans*

Baltimore City currently has urban renewal plans for the development of a Bio–Tech Park adjacent to Johns Hopkins Hospital. This planned redevelopment will include new residential development, as well as 2 million square feet of biotech space. Ex. 468, Broadway East Amendment # 2, Draft (Apr. 25, 2002) (MCC 005275–82); Ex. 469, Draft HABC Disposition Application, BioTech—Phase II and Vacant Land

(undated) (MCC 00455–00523 at MCC 000494–95).

The buildings that will be demolished include HABC scattered site public housing units. HABC has already submitted an application to HUD to dispose of nine units of public housing in the Bio–Tech park area, and has plans to dispose of 133 additional Units. Ex. 470, HABC Disposition Application, East Baltimore Redevelopment Project (Oct.2002) (MCC 000258–454); Ex. 469, Draft HABC Disposition Application, BioTech—Phase II and Vacant Land (undated) (MCC 00455–00523 at MCC 00047).

HABC's planned demolition application for the Bio–Tech park also includes a planned request to dispose of an additional 200 public housing scattered sites. Ex. 469, Draft HABC Disposition Application, BioTech—Phase II and Vacant Land (undated) (MCC 00455–00523 at MCC 000467).

O. *SECTION 8 VOUCHER PROGRAM*

HABC is responsible for operating a Section 8 voucher program that has the potential to provide expanded housing opportunities for minorities. The tenant-based Section 8 housing certificate and voucher programs, 42 U.S.C. § 1437f, is intended to disperse federally-assisted housing and to allow low income minority families to obtain housing in neighborhoods of their choice throughout the metropolitan area and state. Ex. 397, John Goering, U.S. Department of Housing and Urban Development, Promoting Housing Choice in HUD's Rental Assistance Programs, A Report to Congress (April 1995) (PL 046930–7033).

Section 8 families are free "to choose where to live and to apply to that choice the same priorities that motivate other families, such as access to work, quality schools for their children, and safe neighborhoods." Ex. 69, Office of Policy Development and Research, U.S. Department of Housing and Urban Development, *State and Metropolitan Administration of Section 8, Current Models and Potential Resources: Final Report,* HUD, April 1997, at Foreword (PL 81199–81214).

In selecting families to receive Section 8 vouchers, Federal law prohibits HABC from excluding or penalizing a family solely because the family resided in a public housing project. 42 U.S.C. 1437f(s).

In 1990, Congress required housing authorities to allow families to apply for both public housing and Section 8, and if the families were offered a public housing unit first, to retain their place and preferences on the Section 8 waiting list. 42 U.S.C.A. § 1437f(s). Ex. 399, U.S. Department of Housing and Urban Development, Notice of Final Rule Governing Admission to the Section 8 Certificate and Voucher Programs (Aug. 31, 1994) (PL 046290–96) (requiring public housing tenants admitted to public housing on or after April 26, 1993 who were also on Section 8 waiting list to retain federal preference for Section 8).

In 1992, HUD found that HABC was using a special code to flag Section 8 applicants from public housing. HUD instructed HABC that federal law permits public housing residents to apply for Section 8 assistance and directed HABC to stop using the special code. Ex. 398, Letter from Maxine Saunders to Robert W. Hearn (May 5, 1992), with attached Management Review, Section 8 Certificate and Voucher Programs (Feb. 18–21, 1992) (HA 06083–112); Ex. 12, Tamburrino Dep.137:4–139:8.

Federal preferences have since been repealed. HABC's local preference policy does not give public housing tenants a preference to obtain a voucher, even if they are seeking the voucher to move to a

non-minority or low-poverty neighborhood or to move out of distressed or substandard public housing. Ex. 25, Kramer Dep. 447:16–448:7. HABC continued to assume, in the face of all evidence, that its housing meets HUD quality standards and that public housing residents are "generally ineligible" for a Section 8 preference. Ex. 25, Kramer Dep. 75:10–76:6; *id.* at 447–48. In fact, many of developments and scattered site units were and are so distressed that HABC either has already demolished them or is planning to do so.

Even residents who were required to move so that their units could be modernized were not offered Section 8 vouchers as a relocation option. Ex. 26A, Schumann Dep. 177:5–178:4.

HABC staff were not and are not required to inform residents seeking a transfer from their current unit of the alternative to apply for a Section 8 voucher. Ex. 26A, Schumann Dep. 206:3–206:9. If a family had not already applied for Section 8 assistance, it generally is no longer able to do so. HABC closed its waiting list for Section 8 effective February 14, 2003. Ex. 25, Kramer Dep. 71:4–6. New applications are being accepted only for emergencies and certain categories of persons (such as the disabled, veterans, crime victims and displaced persons). *Id.* at 73:3–76:6, 479:3–479:8.

More than 67 per cent of the City's Section 8 voucher holders live in census tracts that are 70–100 per cent Black, as compared to 53 per cent of the City's rental units, 56 per cent of units renting for $800 or less, and 53 per cent of City neighborhoods. Ex. 474 Clark Rep. at Table 10.

African–American voucher holders encounter barriers to choice not faced by Whites in competing for the affordable units that exist in the mainstream market. Ex. 479, HUD Office of Policy Development and Research, Issue Brief No. 5, May, 1995 *Federal Rental Assistance Should Promote Mobility and Choice* (PL 049807–PL 049812 at PL 049809) (reporting that 55 per cent of White recipients, compared to only 36 per cent, of Black recipients live in neighborhoods that are less than 10 percent poor). Consistent with national data, Dr. Pendall found that across all of the suburban counties in the Baltimore housing market, 47.7 per cent of voucher holders live in census tracts that are 25 per cent Black or less. However, most of the voucher holders in these tracts are White. Only 27.2 per cent of Black suburban voucher holders live in tracts 0–25 per cent Black, a significant improvement over Black voucher holders in Baltimore City, but still less than their White counterparts. Ex. 5, Pendall Section 8, Table 9.

Even when African American voucher holders find housing in majority White areas, it is often in neighborhoods transitioning from majority White to majority Black. Ex. 5, Pendall Section 8, at 3. This is true even in Baltimore County, where 56 per cent of Black voucher holders who lived in tracts that had a minority of Black residents lived in transitional tracts. *Id.* at p. 8 The Patterson Park neighborhood's character was changed by speculators from home ownership to primarily rental. "The speculators were buying properties and renting them exclusively to Section 8 households because the Public Housing Authority was not doing a good job of determining rent reasonableness. Thus, an owner could charge a higher rent to a Section 8 family than he might otherwise receive in the market." Ex. 367, HUD Report, Section 8 Tenant–Based housing Assistance: A Look Back after 30 Years (Mar.2000) (HUD 1215–73); *see also* Ex. 25, Kramer Dep. 105:17–106:19, 112:13–114:12 (describing speculators who "bought

properties, probably for very cheap in the Patterson Park area, made limited repairs and put them on the Section 8 program").

State law allows housing agencies to administer rent subsidies outside of their political boundaries. *See* MD Code Ann., Art. 44A § 1–103(b)(1)(i); Ex. 12, Tamburrino Dep. 162:13–163:7. However, HABC's primary interest is compliance with utilization and getting Section 8 vouchers utilized within the City." Kramer dep. 170:12–171:15

From time to time, HUD has provided funding for experimental programs that help voucher users move to low poverty or suburban areas. However, mobility programs in the HABC Public Housing Authority Plan have all been terminated or exhausted their funding. Ex. 25, Kramer Dep. 185:8–187:18; Ex. 12, Tamburrino Dep. 116 –119.

HABC's Section 8 director, Michael Kramer, described a program in complete disarray when he arrived in early 2001. Ex. 25, Kramer Dep 123:8—129:13; 133:9–138:3; 141:7–150:8. Mr. Kramer described a "decade of mismanagement" by HABC during which Section 8 was the treated as the agency's "stepchild." Ex. 484, "Kramer, Section 8 Concerns," undated (HA 69599). The agency was unable to account for the number of units it had under lease, was unable to pay owners in a timely manner, and was not utilizing approximately 4500 vouchers. *Id.*

HUD monitoring reviews conducted in 1992 and again in 1999 made clear that HUD was aware of the on-going problems with HABC's administration of the Section 8 program. Ex. 398, Letter from Maxine Saunders to Robert W. Hearn (May 5, 1992) (HA 06083); Ex. 485, Letter from Unabyrd Ervin–Jones to Patricia J. Payne, 1999 Management Review of Section 8 Programs, February 4, 2000 (HUD 09085).

The problems were allowed to fester until 2001, when HUD's Inspector General issued an audit of HABC's Section 8 program. The audit concluded that "[t]he HABC's Section 8 Program is barely functional, and the HABC continues to mismanage and waste scare resources intended to provide housing opportunities to its low-income residents." Ex. 401, OIG Audit Report, Housing Authority of Baltimore City, Section 8 Certificate and Voucher Programs (Mar. 28, 2001) (HUD 09265–326).

The Inspector General found that the HABC had failed to timely and accurately pay owners for units in its Section 8 Program. In March 2000 alone, HABC had failed to make payments for over 3,000 families, one third of its program participants. *Id.* at HUD 09282. HABC was overstating the number of units leased and failing to fully utilize its Section 8 funding.

This mismanagement led to HUD's recapturing of $74 million of unused Section 8 funds in 1997–98. *Id.* at HUD 09280. The recaptured funds were not returned to HABC and were lost to Baltimore. Ex. 25, Kramer Dep. at 141:21–146:14.

By 2001, another $50 million of unused resources had accrued in HABC's reserve accounts. Ex. 401, OIG Audit Report, Housing Authority of Baltimore City, Section 8 Certificate and Voucher Programs (Mar. 28, 2001) (HUD 09265–326 at 9300); Ex. 25, Kramer Dep. at 145:20–146:14.

In the Inspector General's view, these unspent funds resulted from unsound financial practices. The Inspector General concluded, "We believe the HABC does not fully utilize its Section 8 funding because it simply does not have the financial and operational capacity to effectively administer its Section 8 program...In our opinion, the HABC is not meeting its program mission of providing affordable housing to its low-income families in the City of

Baltimore." The program's lack of credibility with rental property owners is a barrier to its use in non-minority areas and throughout the market. Ex. 12, Tamburrino Dep. 136:15–137:6.

HABC also failed the Section 8 Management Assessment (SEMAP) for the fiscal years ending June 30, 2001, earning a performance rating of "troubled" with a score of fifteen (15) points out of a possible total of 120 points. Ex. 486, Unabyrd Ervin–Jones to Paul T. Graziano, Final Score Letter, November 29, 2001 (HUD 11553). HABC's Section 8 program did even worse the following year, earning only twelve points. Ex. 487, Unabyrd Ervin–Jones to Paul T. Graziano, April 30, 2003 (HUD 34666–HUD 34779). As a result of this failure, HABC was barred from applying for new Section 8 funds under a HUD Notice of Funding Availability. Ex. 12, Tamburrino Dep. at 102:13–102:18.

One of the indicators by which HABC's administration of the Section 8 program was evaluated specifically examined policies and practices that expand housing opportunities. HABC received a zero or failing score on this indicator for fiscal years 2001 and 2002. Contrary to claims in earlier SEMAP certifications, HABC admitted in its fiscal year 2001 certification that it did not have a written policy regarding actions it would take to encourage participation by owners of units outside areas of poverty or minority concentration; that it could not provide documentation that it had taken such actions; and that voucher holders were not given listings of owners who are willing to lease housing outside areas of minority concentration. Ex. 488, Paul Graziano to William Tamburrino, HABC SEMAP Certification, November 5, 2001, Indicator G (HABC 00553, 005573).

In September of 2001 HUD also barred HABC from applying for housing counseling funds to operate a Section 8 mobility program. Ex. 400, Letter from Unabyrd Ervin–Jones, HUD to Paul Graziano, HABC (Sept. 18, 2001) (HUD 1274–75); Ex. 12, Tamburrino Dep. 111:3–111:20.

Only 55 voucher holders leased in non-impacted areas of city during the latest twelve-month period for which data is available, compared to 1,173 in impacted areas. Ex. 481, CitiStat Report, Housing Authority of Baltimore City, May 16, 2003 at HABC 008308. While only 60 voucher families "ported out" of Baltimore City to other jurisdictions during this period, 209 voucher families moved into Baltimore City, all but seven to impacted areas. *Id.*

During the twelve-month period preceding May 2003, an average of 12,774 families were waiting for Section 8 assistance, while an average of 1,665 regular vouchers remained unused. Ex. 481, CitiStat Report, Housing Authority of Baltimore City, May 16, 2003 at HABC 008307.

## VI. CONCLUSION

For the foregoing reasons

1. The Court holds that, as discussed above, the Federal Defendants violated Section 3608(e)(5) of the Fair Housing Act by failing adequately to consider regional approaches to ameliorate racial segregation in public housing in the Baltimore Region.

2. The case shall proceed to the remedial trial phase pursuant to the decision herein.

3. Plaintiffs shall arrange a conference to be held no later than January 14, 2005 to schedule further proceedings herein.